**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

_____

| | |
|---|---|
| ACCESS LIVING OF METROPOLITAN CHICAGO, INC., an Illinois non-profit corporation, )<br><br>Plaintiff, )<br><br>v. )<br><br>CITY OF CHICAGO, an Illinois municipal corporation, )<br><br>Defendant. ) | JURY TRIAL DEMANDED<br><br>**COMPLAINT** |

_____

## NATURE OF THE ACTION

1.      Plaintiff Access Living of Metropolitan Chicago ("Access Living"), a non-profit disability advocacy organization and a Center for Independent Living ("CIL"), brings this action against the City of Chicago (the "City") because—over the last three decades—the City has funded and developed tens of thousands of affordable rental housing units without ensuring that a sufficient number are accessible to people with disabilities as required by the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504"), and the Fair Housing Act ("FHA"). As a consequence, low-income people with disabilities struggle to find suitable housing and are often forced to live on the street, in their cars, in nursing homes, in homeless shelters, or in other inadequate and dangerous housing.

2.      Since at least 1988, the City, through a number of different agencies, has developed and supported affordable housing initiatives throughout Chicago with U.S. Department of Housing and Urban Development ("HUD") and other funding. The City's efforts

to develop and support affordable housing using federal, state, and local funding—which have resulted in the construction or rehabilitation of over 650 developments with more than 50,000 rental units—are referred to as the "Affordable Rental Housing Program."

3.     Despite the City's acknowledgement that there is a particular need for housing for individuals with disabilities that is both accessible and affordable, Access Living has observed a severe shortage of such housing in Chicago. For years, Access Living has been inundated with thousands of requests to assist people with disabilities who are struggling to find accessible, affordable housing. Some representative examples include:

a.     a woman with a significant mobility disability who crawled up 25 stairs to the second floor of a single family house for years because it was the only place she could afford;

b.     a man who had both legs amputated and was forced to live in a nursing home because he was unable to find an affordable apartment without stairs or with doorways wide enough for his wheelchair;

c.     a woman with cerebral palsy who was in and out of homeless shelters for years until she was placed in a public housing unit after twenty years on the waitlist;

d.     a woman whose multiple sclerosis progressed while she lived in a walk-up apartment and who could not find another place to live, and was forced to call the fire department to have firefighters carry her down the stairs and back up every time she left her apartment;

      e.     a woman whose leg was amputated and was forced to live in a nursing home because she was unable to find an accessible apartment before her rental subsidy voucher expired;

      f.     a woman with a mobility disability as a result of several strokes who could not fit her walker into the bedroom and had to sleep in her dining room; and

      g.     a woman with lupus who was homeless for five months after her apartment caught fire and had to settle for an apartment with stairs despite struggles with mobility because she could not find anything else and was at risk of losing her rental subsidy voucher.

4.     Many of the individuals who contacted Access Living for help had already searched for housing for years and had become frustrated and depressed because of their inability to obtain accessible, affordable housing anywhere in Chicago.

5.     In 2016, after years trying to convince the City of the need for more accessible, affordable housing and assisting people with disabilities to find the relatively few such units available in Chicago, Access Living began an investigation to determine whether the City was complying with the accessibility requirements of the ADA, Section 504, and the FHA in its Affordable Rental Housing Program.

6.     Under all three of these federal laws, architectural accessibility is a cornerstone of equal opportunity for people with disabilities. With respect to units and buildings it funds or otherwise develops, the City is obligated to ensure compliance with the architectural accessibility standards mandated by these laws. In addition, the City must evaluate and ensure the meaningful accessibility of the Affordable Rental Housing Program as a whole. This includes implementing

policies and procedures to ensure that accessible units are actually prioritized for occupancy by people with disabilities who need the accessible features, and conducting a thorough self-evaluation to identify and address any ongoing barriers to accessibility in the Program.

7.     Access Living's investigation involved extensive review of publicly available documents and randomized testing of the architectural accessibility of the units and buildings in the City's Affordable Rental Housing Program. The investigation revealed that many developments in the City's Affordable Rental Housing Program were not constructed to allow individuals who use wheelchairs or walkers to enter, access, and/or use buildings, rooms, and amenities.

8.     Access Living's testing confirmed that the developments funded by the City were not and are not built to include units that are physically accessible and usable to people with disabilities.

   a.     At over one third of the properties tested, an individual who uses a wheelchair was unable to enter the building at all without assistance because of steps or other barriers.

   b.     In almost one quarter of the properties tested, the front door was too narrow for a tester who uses a wheelchair to enter a unit identified as "accessible."

   c.     In almost one third of the properties tested, doors in units identified as "accessible" were too narrow for a tester who uses a wheelchair to enter the bedroom and/or bathroom.

4

d.      In more than half of the properties tested, testers using wheelchairs were unable to approach the kitchen sink and/or the bathroom sink in units identified as "accessible."

e.      In two thirds of the properties tested, there was insufficient space in kitchens and bathrooms for testers using wheelchairs to turn around in units identified as "accessible."

f.      Over three fourths of the properties tested did not have roll-in showers in units identified as "accessible."

9.      Architectural barriers such as these make it difficult, if not impossible, for individuals with mobility disabilities to live in these units in the Affordable Rental Housing Program.

10.      In addition, although the City is obligated under federal law to ensure that units in its Affordable Rental Housing Program meet specific federal accessibility standards, the investigation revealed the City has not historically imposed—and does not currently impose—such standards on building owners and managers.

11.      Access Living's investigation also uncovered evidence that the City failed to implement and enforce policies necessary to make the Affordable Rental Housing Program as a whole meaningfully accessible to people with disabilities, including any policies to connect units with accessible features to individuals who need those features.

12.      The City's decades-long failure to provide architectural and program accessibility has adversely impacted people with physical and sensory disabilities and effectively excluded them from the City's Affordable Rental Housing Program. The City's failures continue to the present day.

13.     In order to counteract the negative effects of the City's violations of federal accessibility requirements, Access Living has been forced to spend thousands of hours each year to assist people seeking accessible, affordable apartments and to advocate for policy reforms to increase housing opportunities for the disability community. As a result, it had to divert staff time and resources away from providing Chicagoans with disabilities with the five core services required of a CIL:  independent living skills training; services that facilitate the transition of adults with disabilities from nursing homes and other institutions into the community and the transition of young adults with disabilities into adulthood; peer support; advocacy; and information and referral services.

14.     Furthermore, the City's failure to comply with federal accessibility requirements frustrates Access Living's mission by making it substantially harder to deliver core services to Chicagoans with disabilities who lack stable housing that is accessible and affordable. It also damages Access Living's reputation in the community by conveying to funders, clients, and the public at large that Access Living is powerless to address the shortage of accessible, affordable housing for Chicagoans with disabilities.

## **PARTIES**

15.     Founded in 1980, Access Living is a CIL with its principal place of business in Chicago. It is a non-profit, community-based corporation that provides a wide range of services to people with disabilities in the City of Chicago and adjoining areas. As a CIL, people with disabilities make up a majority of the members of Access Living's Board of Directors and staff.

16.     Access Living is mandated by federal law to promote independent living for people with disabilities. Among other activities, it transitions people with disabilities from nursing homes and other institutions into fully-integrated settings in the community and provides

6

assistance to those at risk of entering such institutions. It is the only federally-recognized CIL

serving people with disabilities in Chicago.

17.     Access Living's mission is to foster the dignity, pride, and self-esteem of people

with disabilities and enhance the options available to them so they may choose and maintain

individualized and satisfying lifestyles.

18.     Access Living is a "person aggrieved" within the meaning of Section 504. 29

U.S.C. § 794a(a)(2). Similarly, Access Living is a "person alleging discrimination on the basis of

disability" within the meaning of Title II of the ADA. 42 U.S.C. § 12133; *Innovative Health Sys.,*

*Inc. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997).

19.     Access Living is also an "aggrieved person" within the meaning of the Fair

Housing Act, and is authorized to commence litigation to obtain appropriate relief against the

City of Chicago. 42 U.S.C. §§ 3602, 3612-13. Access Living falls within the zone of interests

protected by the Fair Housing Act. Access Living has suffered concrete and particularized

injuries that are fairly traceable to the City of Chicago's conduct and that are likely to be

redressed by a favorable judicial decision.

20.     Defendant City of Chicago is a municipal corporation organized under the laws of

the State of Illinois.

21.      Since the ADA was enacted in 1990, the City has been a local government and

thus a "public entity" subject to the statutory and regulatory requirements of Title II of the ADA.

42 U.S.C. § 12131.

22.     At all times relevant, the City received federal financial assistance within the

meaning of Section 504.

23.     Each employee of a City agency who acted or failed to act, as alleged herein, was the actual or apparent agent, employee, manager, or representative of the City and, in doing the acts or omitting to act as alleged in this Complaint, was acting in the course and scope of his, her, or its actual or apparent authority pursuant to such agencies, or the alleged acts or omissions were subsequently ratified and adopted by the City as principal.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 12133, 29 U.S.C. § 794a, and 42 U.S.C. § 3613.

25.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) because the City operates and performs its official duties therein and thus resides there for purposes of venue, and because a substantial part of the events and omissions giving rise to the claims occurred in Chicago, which is in the Northern District of Illinois.

## STATUTORY AND REGULATORY FRAMEWORK

**I.      Title II of the Americans with Disabilities Act**

26.     The ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" with "clear, strong, consistent, enforceable standards . . . in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. § 12101(b).

27.     All public entities, including state and local governments and their departments, agencies, and instrumentalities, must comply with Title II of the ADA. This includes ensuring that the public entity's "services, programs, [and] activities" are provided in a non-discriminatory fashion to all qualified individuals regardless of disability. *See* 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.149.

8

28.     The U.S. Department of Justice ("DOJ"), the federal agency Congress charged with implementing Title II of the ADA, has interpreted the statute to mean that public entities that operate residential housing programs are subject to Title II and must provide accessible housing.

29.     DOJ regulations specify that a public entity may not "directly or through contractual, licensing or other arrangements . . . [a]id or perpetuate discrimination" on the basis of disability by others to whom it has delegated authority or control of any aspect of a public program. 28 C.F.R. § 35.130(b)(1). Similarly, the regulations specify that a public entity may not "utilize criteria or methods of administration" that discriminate on the basis of disability. 28 C.F.R. § 35.130(b)(3).

30.     A residential housing program subject to Title II must fulfill two obligations: (1) compliance with detailed architectural accessibility requirements; and (2) adoption and implementation of policies, practices, and other measures to ensure that this program—like every other City program, service, and activity—when viewed in its entirety is meaningfully accessible to people with disabilities. This requirement, called "program accessibility," applies to all of the City's programs, services, and activities, regardless of whether a particular program, service, or activity itself receives direct federal funding.

## II.     Section 504 of the Rehabilitation Act

31.     The purpose of the Rehabilitation Act of 1973 is to "maximize employment, economic self-sufficiency, independence, and inclusion and integration into society" of people with disabilities. 29 U.S.C. § 701(b)(1). The Rehabilitation Act is based on findings that "individuals with disabilities continually encounter various forms of discrimination in such critical areas as . . . housing" and that "the goals of the Nation properly include the goal of providing individuals with disabilities with the tools necessary to . . . achieve equality of

9

opportunity, full inclusion and integration in society, employment, independent living, and economic and social self-sufficiency." 29 U.S.C. §§ 701(a)(5), (6)(B).

32.     All entities receiving federal financial assistance must comply with the anti-discrimination provisions of Section 504 of the Rehabilitation Act, which provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794(a).

33.     A "program or activity" includes all of the operations of any state or local government department, agency, or other instrumentality, any state or local entity that distributes federal financial assistance, and any state or local department or agency that receives federal financial assistance. 29 U.S.C. § 794(b)(1). Once "any part" of a "department, agency, special purpose district, or other instrumentality of a State or of a local government" receives federal funds, Section 504's non-discrimination requirements apply to "all of the operations of" that entity, "regardless of which specific program receives federal funds." 29 U.S.C. § 794(b)(1), (4).

34.     Pursuant to Congressional authority, HUD promulgated regulations that specify that recipients of federal financial assistance "may not, directly or through contractual or other arrangements," discriminate on the basis of disability, or "utilize criteria or methods of administration the purpose or effect of which would" be to discriminate on the basis of disability. 24 C.F.R. §§ 8.4(b)(1), (4).

35.     Like Title II of the ADA, Section 504 requires a federally-financed residential housing program to fulfill two obligations:  (1) compliance with detailed architectural accessibility requirements; and (2) compliance with program accessibility requirements.

### III. The Fair Housing Act

36. Since 1988, the Fair Housing Act has prohibited discrimination on the basis of disability. Among other things, it prohibits the City from operating a housing program in which units are made unavailable or denied to a person because of disability. 42 U.S.C. § 3604(f)(1). The Fair Housing Act also prohibits discrimination in the "terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling," because of disability. 42 U.S.C. § 3604(f)(2).

37. In addition, Congress defined discrimination on the basis of disability to include the failure to design and construct new multifamily apartment buildings in a manner such that all ground floor units and units served by an elevator, and the common and public areas that serve those units, include certain accessible features. 42 U.S.C. § 3604(f)(3) ("FHA Accessibility Requirements"). Those who participate in the design and construction process must ensure that covered units include doors that are sufficiently wide to allow passage, accessible routes, accessibly located environmental controls, usable kitchens and bathrooms, and reinforced bathroom walls.

38. All participants in the design and construction process are jointly and severally liable for the failure to design and construct covered units in compliance with the FHA Accessibility Requirements.

## FACTUAL BACKGROUND

### I. The City of Chicago's Affordable Rental Housing Program

39. The City of Chicago was incorporated in 1837. The Mayor of Chicago is the chief executive of the City, and appoints the commissioners of the several City departments responsible for the financing, development, and permitting of affordable rental housing units.

11

40.     Since 1974, the City of Chicago has received billions of dollars of federal financial assistance for housing and community development activities, including funds from HUD's Home Investment Partnership Program ("HOME"), Community Development Block Grant, Emergency Solutions Grant, and Housing Opportunities for People with AIDS program (collectively, "HUD funds"). For each of the past ten years, the City has received in excess of $100,000,000 in HUD funds.

41.     The City designates the Office of Budget and Management ("OBM") as the agency that manages, monitors, and enforces the grants management process in conjunction with other City departments. OBM is also responsible for applying for and receiving HUD funds, and sub-allocates certain of those funds to other City agencies to provide financial support for the development of affordable housing.

42.     City agencies administering HUD funds include the Department of Planning and Development ("DPD"),[1] the Department of Family and Support Services, the Chicago Department of Public Health, and OBM itself. These agencies, and other City agencies that administer federal, state, and local funding to develop affordable housing, will be referred to as the "City Funding Agencies."

43.     The City Funding Agencies do not own the units in the Affordable Rental Housing Program, but they award money to third-party developers and owners to construct new rental housing units or to rehabilitate existing rental units for the benefit of low-income households.

---

[1] The agency currently known as DPD was previously known by other names, including the Department of Housing and Economic Development and the Department of Housing. For purposes of this Complaint, the term "DPD" denotes the current agency and the City's principal housing department as it was known under any previous name.

44.     Each agency has its own competitive mechanisms for evaluating and determining whether and what developments will receive City financial support. However, once a development has been selected, the City Funding Agencies must incorporate all requirements applicable to HUD funding programs into any contracts, loan agreements, or other documents evidencing the award of funding to third-party developers and owners, including requirements concerning accessibility and affordability.

45.     By virtue of such contracts, loan agreements, or other documents, the City Funding Agencies have the power to enforce federal and other requirements against third-party developers and owners, typically for as long as 30 years or more.

46.     Once a development receives a funding commitment from one of the City Funding Agencies, it becomes part of the City's Affordable Rental Housing Program. As of the filing of this lawsuit, the Affordable Rental Housing Program consisted of more than 650 developments, containing more than 50,000 total rental units.

47.     OBM sub-allocates virtually all of the HOME funding to DPD to support the development of income-restricted rental housing in Chicago. Since at least 1988, with HUD and other funding, DPD has "worked to develop and support affordable housing initiatives citywide" and its website provides a list of several hundred affordable rental housing developments "supported and developed through the City of Chicago."

48.     To comply with federal affordability requirements, DPD developed lease provisions, regulatory agreements, and a sophisticated annual on-site monitoring system to ensure that owners of developments in the Affordable Rental Housing Program lease rent-restricted units only to low-income tenants.

49. The City is subject to the accessibility requirements of the ADA and Section 504, but maintains no similar system that ensures that developments and units in the Affordable Rental Housing Program comply with those accessibility requirements.

50. Although the website for the Mayor's Office for People with Disabilities ("MOPD") says that MOPD "examines . . . plans for compliance with the accessibility provisions of the Chicago Building Code and Illinois Accessibility Code," and "is available to answer questions about [accessibility laws]," this agency is drastically underfunded and understaffed. In Fiscal Year 2018, MOPD has just four accessibility compliance employees—and a budget of only $367,000—to provide technical assistance, education and outreach, consultation, and plan review not just for all newly-constructed and rehabilitated residential housing, but also for all public buildings and retail and commercial businesses in the City of Chicago.

51. The City Funding Agencies do not have any obligation to consult with MOPD or submit any plans to MOPD for its approval prior to making funding commitments to developers for projects that become part of the Affordable Rental Housing Program.

52. For purposes of the FHA, the City's selection of funding applications, its entry into long-term funding and regulatory agreements with developers, and its provision of financing for the development of units in the Affordable Rental Housing Program make it a participant in the design and construction of the resulting newly-constructed multifamily housing.

53. Over the last three decades, the City has used hundreds of millions of dollars in federal funds, as well as state, local, and private resources, for the development, construction, and/or rehabilitation of thousands of rental units in the Affordable Rental Housing Program.

II.     **The Need for Accessible, Affordable Housing in the City of Chicago.**

54.     There are hundreds of thousands of individuals with ambulatory, vision, and/or hearing disabilities in Chicago, as the City itself recognizes.

55.     Many of these individuals with disabilities need accessible, affordable housing. Chicagoans with disabilities face many barriers to employment and, as a result, a disproportionate percentage are low income and require either housing-payment assistance or a subsidized unit. Only 28% of people with disabilities in Chicago are employed and more than one third live below the federal poverty line; in comparison, 70.5% of people without disabilities in Chicago are employed and less than one fifth live below the federal poverty line. This gap has existed for many years. In 2006, the median income for an individual with a disability was $20,114, and the median income for an individual without a disability was $28,476. In 2016, the median income for an individual in Chicago with a disability was $22,247, while the median income for an individual without a disability was $35,733.

56.     In addition, many individuals with disabilities rely on Supplemental Security Income ("SSI"). SSI is the federal assistance program for people with significant and long-term disabilities who have little or no other income, with a federal payment standard of just $750 for 2018. That paltry amount is not enough to cover the rent on a typical studio or one-bedroom apartment in Chicago and, even if it were enough, it would leave the recipient without funds to pay for food, clothing, utilities, transportation, and other necessities. Because many Chicagoans with disabilities are not able to find affordable housing on the open market, they are especially in need of assistance from the City's Affordable Rental Housing Program.

57.     The need for accessible, affordable housing is particularly acute for individuals under 62 who are not old enough to qualify for senior housing. Although only approximately

15

10% of individuals with disabilities in Chicago are over 65, approximately 22% of the units in the Affordable Rental Housing Program are in seniors-only housing.

58.     These demographics demonstrate that there is and has been a substantial need for accessible units within the Affordable Rental Housing Program for several decades. In its 2015 Consolidated Plan, the City itself recognized that "[t]he [dual] effect of a low income and decreasing affordable housing stock has proven extremely problematic to the elderly and those with disabilities," and acknowledged that the "gap between supply and demand for rental housing in Chicago continues to pose problems, particularly for . . . persons with disabilities."

### III.    The City is Required to Ensure Architectural and Programmatic Accessibility in the Affordable Rental Housing Program

59.     Under the ADA and Section 504, the City is obligated to ensure meaningful accessibility across the Affordable Rental Housing Program.

60.     The City is required to take affirmative steps to ensure compliance with the architectural accessibility standards mandated by federal law. This includes reviewing construction documents and completed projects for compliance, ensuring developers are on notice about accessibility requirements, and monitoring and enforcing compliance by developers and managers. In addition, program accessibility requires the City to evaluate the architectural accessibility of the Affordable Rental Housing Program as a whole.

61.     Program accessibility also mandates that the City take steps to ensure that accessible units that are part of the Affordable Rental Housing Program are meaningfully made available to individuals with disabilities who need them. Among other things, the City must: maintain lists of accessible units and their accessible features and make that information public; offer available accessible units to people who need the accessible features; adopt affirmative marketing to people with disabilities; provide accessible methods of application; and ensure

16

developers and managers of properties in the Program put the same mechanisms in place. It further requires the City to engage in a self-evaluation of the accessibility of the program, and to create a targeted plan to address any deficiencies identified in that evaluation.

62. In addition, the City is obligated under the FHA to ensure that it does not discriminate in the terms, conditions, or privileges, or in the provision of services or facilities, in connection with the Affordable Rental Housing Program. The City is also required to ensure that it does not deny or otherwise make unavailable to individuals with disabilities the units in the Affordable Rental Housing Program. The failure to ensure meaningful accessibility in the Affordable Rental Housing Program is relevant to whether or not the City discriminates against individuals with disabilities under the FHA.

**A.      Relevant Architectural Accessibility Requirements**

63. Architectural accessibility is a key component of a residential housing program's overall accessibility. If people cannot get into or reside in the affordable dwelling units the program creates, the program is not accessible to those individuals.

64. The three federal statutes relevant to this litigation—the ADA, Section 504, and the FHA—require the City to comply with overlapping obligations to ensure accessibility in the Affordable Rental Housing Program. The first two require a very high level of accessibility in a prescribed fraction of units in each building—including features such as roll-in showers, lowered countertops, extra wide doorways, large "clear floor space" areas in kitchens and bathrooms, the installation of multiple grab bars, and others—as well as accessible common areas and accessible paths of travel throughout the development. The FHA requires a more modest level of accessibility in all ground floor units and all units served by an elevator, together with accessibility in common areas and paths of travel that are similar to those under the ADA and Section 504.

65. Because of the significantly greater level of accessibility required under the ADA and Section 504, its standards will be referred to as the "heightened accessibility standards," and the FHA Accessibility Requirements will be referred to as "basic accessibility standards."

66. As a public entity, the City must comply with regulations under Title II of the ADA. Under Title II, for new construction commencing after January 26, 1992, the City must ensure apartment buildings are "designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.151(a)(1). From that commencement date until the ADA regulations were amended in 2012, the scoping and technical standards for such units were supplied by the Uniform Federal Accessibility Standards ("UFAS"), which requires that five percent (5%) of the total dwelling units in new multifamily housing projects receiving federal financial assistance meet heightened requirements for accessibility for people with mobility disabilities, and an additional two percent (2%) must be accessible per heightened requirements for people with hearing or vision disabilities. *See* 24 C.F.R. § 8.22. Alterations of existing buildings must conform to similar requirements "to the maximum extent feasible." 28 C.F.R. § 35.151(b)(1).

67. As of March 15, 2012, the Americans with Disabilities Act Accessibility Guidelines ("ADAAG") provide mandatory accessibility requirements—both scoping and technical—for residential buildings constructed or altered by, or with the assistance of, local government entities such as the City. ADAAG also requires five percent (5%) of the total dwelling units to provide heightened mobility features, and an additional two percent (2%) to provide heightened communication features for people with hearing or vision disabilities. *See* 2010 ADA Standards, ch. 233.

18

68.     In addition, by virtue of receiving federal financial assistance, the City is required to ensure that the scoping and technical requirements of the UFAS accessibility standards are applied to newly-constructed and substantially rehabilitated properties in the Affordable Rental Housing Program, including those receiving direct federal financial assistance. 24 C.F.R. §§ 8.20, 8.22, 8.23, 8.32.

69.     Because the City has acted and continues to act as a developer of residential multi-family developments with four or more units built for first occupancy after March 13, 1991, through its Affordable Rental Housing Program, those developments must also comply with the FHA Accessibility Requirements. It is jointly and severally liable for any failure to design and construct in accord with those requirements.

**B.      Ensuring and Evaluating Architectural Accessibility**

70.     The City is obligated to ensure compliance with the heightened and basic architectural accessibility requirements in the Affordable Rental Housing Program. In addition, it must evaluate architectural accessibility as a whole throughout the Program.

71.     In furtherance of its obligations, the City must adopt policies and procedures to ensure housing units and common areas in the Affordable Rental Housing Program are designed and constructed consistent with the relevant federal architectural accessibility standards. Among other things, the City must:

a.      review construction documents for developments in the Affordable Rental Housing Program to ensure they are designed to comply with architectural accessibility and other requirements;

b.      inspect projects during the construction process to ensure compliance with architectural accessibility requirements;

19

     c.     inspect completed projects to ensure compliance with architectural accessibility and other requirements at the time of their completion and at regular intervals over the time in which they are part of the Affordable Rental Housing Program;

     d.     ensure developers are on notice of specific requirements for developments in the Affordable Rental Housing Program, including accessibility requirements; and

     e.     monitor and enforce compliance by third party developers and managers with relevant architectural accessibility requirements.

72.     Furthermore, the City must consider the architectural accessibility of the portfolio as a whole.

73.     The City must also assess whether accessible units are distributed throughout housing projects and sites to the maximum extent feasible and are available in a range of sizes and amenities so that a person with a disability has a choice of living arrangements comparable to that of others.

### C. Ensuring Individuals Who Need Them Can Find and Are Placed in Units With Accessible Features

74.     As part of ensuring program accessibility, the City must take steps to ensure that accessible dwelling units in its Affordable Rental Housing Program are made available to and occupied by people who need the accessible features of those units. Among other things, it must:

     a.     maintain a list of accessible units and their accessible features;

     b.     respond to requests from members of the public concerning the location of accessible units;

     c.     offer available units first to people who need the accessible features;

> d.     adopt policies and procedures to ensure that accessible units are occupied by people who need the accessible features;
>
> e.     adopt affirmative marketing procedures that will actually attract eligible tenants without regard to, among other things, disability; and
>
> f.     provide accessible methods of applying for accessible units.

75.     Under federal law, the City must require participating private entities to take the same steps, including offering available accessible units to people who need the accessible features first and adopting affirmative marketing procedures. However, the City has failed to create such requirements.

**D.     Evaluation of the Affordable Rental Housing Program**

76.     Finally, in order to establish and maintain program accessibility, the City must regularly evaluate the Affordable Rental Housing Program's current services, policies, and practices.

77.     To maintain programmatic accessibility, the City must conduct a self-evaluation that identifies barriers to accessibility in the Program and develop a transition plan to correct any deficiencies identified.

78.     As part of the self-evaluation, the City must:  identify the scope of the overall need for accessible rental housing in the area served by the Affordable Rental Housing Program; assess and ensure that architectural accessibility standards are being met; and identify and assess how and whether policies and procedures are in place to make accessible units available to those who need them, as described in paragraph 74.

**IV.     The City Failed to Ensure Architectural and Programmatic Accessibility in the Affordable Rental Housing Program**

79.     Access Living conducted a months-long investigation into the City's Affordable Rental Housing Program that included testing, interviews, public records requests, and review of publicly available documents.

80.     The investigation revealed that, by any measure, the Affordable Rental Housing Program is inaccessible to people with disabilities. The City's failure to ensure the accessibility of the Program has a different and disparate impact on people with mobility and sensory disabilities who have a particular need for housing with accessible features, and effectively excludes them from the Affordable Rental Housing Program.

**A.     Developments in the Affordable Rental Housing Program Do Not Comply With Applicable Accessibility Standards**

81.     Access Living's investigation revealed that for thirty years and continuing into the present, the City failed to ensure that developments in the Affordable Rental Housing Program were designed and constructed in accord with applicable accessibility standards so as to be accessible to individuals with disabilities.

82.     Access Living's investigation included systematic, randomized testing of developments in the Affordable Rental Housing Program for compliance with ADAAG, UFAS, and FHA Accessibility Requirements. *None* of the properties tested by Access Living fully complied with any of those standards.

83.     Access Living contacted nearly 300 developments in the Affordable Rental Housing Program to inquire about available accessible, affordable units. These properties include multifamily housing, permanent supportive housing, and single room occupancy developments; range in size from five units to more than 700 units; are located around the City; and received financing from the City between July 1988 and 2016.

84.     Management agents for dozens of developments in the Affordable Rental Housing Program represented that their buildings did not have any accessible units at all. Some agents stated they only had walk-up units or that all units in the building were only reachable via stairs. This included buildings that received funding from the City over the last thirty years, including within the last two years.

85.     Many agents stated that no units in their buildings, including buildings developed by the City within the last two years, contained roll-in showers. Such showers are required in a subset of units within each building to comply with the heightened accessibility standards.

86.     Management agents also repeatedly told Access Living callers that they had long waiting lists, with hundreds of people on them, and predicted wait times of up to ten years. These developments did not maintain separate wait lists for units with accessible features. One leasing agent advised the Access Living caller to check retirement homes because they occasionally admit individuals who use wheelchairs but do not meet the age requirements.

87.     Access Living was able to observe conditions at 17 developments in the Affordable Rental Housing Program. At each of these developments, Access Living identified significant accessibility barriers that rendered the developments out of compliance with UFAS, ADAAG, and/or the FHA Accessibility Requirements.

88.     There were multiple developments tested whose front entrances could not be reached by individuals who use wheelchairs, as there were stairs or other barriers at the main entrance to the building or unit. If an individual in a wheelchair cannot even enter the building, it is not accessible under any accessibility standard.

89.     Multiple developments lacked doorways sufficiently wide to allow passage by a wheelchair user, including into bathrooms and bedrooms. These narrow doorways impede the

ability of potential residents to live there and prevent residents from having guests who use wheelchairs. These doorways violate both the heightened and basic accessibility standards.

90.     In multiple tested units, countertops were higher than 34 inches. Such countertops do not satisfy the heightened accessibility standards, which require lowered counter space usable by an individual who uses a wheelchair.

91.     Multiple tested units did not provide the space or features necessary for wheelchair users to use key kitchen appliances comfortably and safely, which significantly impedes the unit's overall accessibility and does not comply with federal accessibility standards.

        a.     In several tested units, a wheelchair user could not access the kitchen sink by a forward approach because there were cabinets blocking access. In those units, under-sink cabinets were not constructed to be easily removable. This violates both the heightened and basic accessibility standards.

        b.     In several tested units, the kitchen sink lacked lever hardware, which is necessary for individuals who have difficulty gripping or maneuvering with their hands. This violates the heightened accessibility standards.

        c.     In certain tested units, the controls for the range were located on the back of the stove, rather than at the front. This is dangerous for wheelchair-users as they have to extend their arm directly over the flame to control the range. This violates the heightened accessibility standards.

92.     Similarly, several tested units did not provide the space or features necessary for wheelchair users to use bathroom features comfortably and safely. The inability to access and

use a bathroom creates obvious obstacles for residents, potential residents, or guests with disabilities.

    a.    Several tested bathrooms did not have a 60-inch turning radius in the bathroom, such that an individual who uses a wheelchair could comfortably maneuver from feature to feature. This violates the heightened accessibility standards.

    b.    In multiple tested bathrooms, an individual using a wheelchair could not access the bathroom sink by a forward approach because there were cabinets blocking access. In those bathrooms, the under-sink cabinets were not constructed to be easily removable. This violates both the heightened and basic accessibility standards.

    c.    Sinks, showers, and tubs in bathrooms lacked lever hardware, which is necessary for individuals who have difficulty gripping or maneuvering with their hands. This violates the heightened accessibility standards.

    d.    Fourteen of the seventeen tested developments did not have a roll-in shower in their designated "accessible" unit. Roll-in showers allow an individual who uses a wheelchair to shower independently in his or her wheelchair without having to transfer to a separate seat. This violates the heightened accessibility standards.

93.    In multiple tested units, light switches and thermostats were located higher than 48 inches off the ground. Individuals with limited reach range cannot live in those units without sacrificing the ability to control the light and the temperature. This violates both the heightened and basic accessibility standards.

94.     Several tested developments provided parking for residents, but lacked designated accessible parking spaces. This failure diminishes accessibility for people with disabilities who drive, whether they are residents, potential residents, or guests, and violates both the heightened and basic accessibility standards.

95.      Several tested developments did not have a van-accessible parking space, which has a wider access aisle than a standard accessible parking space in order to accommodate a wheelchair lift. This violates the heightened accessibility standards.

96.     One of the tested developments was built in 2017. At this development, the units described by the management as "highly accessible" did not include the necessary shower seat or chair required by the heightened accessibility standards. In a unit not designated as "highly accessible," an individual using a wheelchair could not access the bathroom sink or the kitchen sink by a forward approach because there were cabinets blocking access. In those bathrooms, the under-sink cabinets were not constructed to be easily removable. The tested units at this development did not comply with either the heightened or basic accessibility standards.

97.     In addition to its failure to comply with accessibility requirements for the Affordable Rental Housing Program as a whole, Access Living's investigation also establishes that the City failed to ensure compliance with accessibility requirements when the City provided federal funding directly to the developer and/or owner of the project. At least eight of the investigated developments had direct federal funding but did not satisfy either the heightened or basic accessibility standards.

98.     The City's unlawful development practices have been in place for decades, and continue into the present.

99.     Access Living's testing and investigation demonstrate a uniform failure of the Affordable Rental Housing Program over several decades to comply with federal accessibility standards in its developments.

### B.     The City Has No Policies and Procedures to Ensure Architectural Accessibility in the Affordable Rental Housing Program

100.     In addition, Access Living's investigation revealed that from 1988 to the present, the City failed, and continues to fail, to have policies and procedures to ensure that housing units and common areas of developments within the Affordable Rental Housing Program are designed and constructed consistent with federal architectural accessibility standards, including UFAS, ADAAG, and the FHA Accessibility Requirements.

101.     Although the City's Consolidated Plan identifies several programs that provide support services for people with disabilities, and acknowledges the large gap between supply and demand for accessible, affordable housing, it does not identify any specific program or policy that ensures affordable housing units are designed, constructed, and maintained to meet UFAS and other applicable federal accessibility standards.

102.     Prior to making funding commitments, the City Funding Agencies do not review architectural plans to ensure compliance with the accessibility requirements of the ADA, Section 504, or the FHA.

103.     The City Funding Agencies do not conduct field visits during construction to ensure that developments in the Affordable Rental Housing Program are actually built or renovated in compliance with the heightened accessibility requirements of the ADA and Section 504 or the basic accessibility requirements of the FHA.

104.     The City Funding Agencies do not have their own process for issuing construction permits, conducting building inspections, or issuing occupancy permits for developments in the

Affordable Rental Housing Program. Rather, the City funding agencies rely on the permitting and inspection process administered by the City's Department of Buildings.

105. Access Living's investigation reveals that the Department of Building's process for issuing construction and occupancy permits does not ensure developments in the Affordable Rental Housing Program are built in accord with the heightened accessibility requirements of the ADA and Section 504 or the basic accessibility requirements of the FHA.

106. The City, through its Department of Buildings, reviews plans and buildings in construction to ensure that certain provisions of the Chicago Building Code applicable to new and rehabilitated residential buildings are enforced, including requirements related to structure, fire safety, light and ventilation, and electrical, mechanical, and plumbing systems. However, the City does not ensure that the accessibility provisions of the Chicago Building Code are enforced, including for properties in the Affordable Rental Housing Program.

107. The City and DPD know or should know that the Department of Buildings' standard process will not result in developments that comply either with the heightened accessibility requirements of the ADA and Section 504 or the basic accessibility requirements of the FHA. In part, they should know this because Access Living and other disability advocates have long complained to the City about the ongoing lack of accessible, affordable housing throughout the City. Access Living and other individuals and entities have also filed a number of cases over the last several decades alleging that new construction in the City of Chicago was not being built according to federal accessibility law.

108. The City's failures with regard to ensuring the accessibility of the Affordable Rental Housing Program stand in stark contrast to its efforts to enforce other requirements, such

as regulatory provisions concerning affordability requirements, deck and porch requirements, fencing requirements, and the City's weed control ordinance.

109.     The City has also failed to ensure that third-party developers and owners comply with the heightened accessibility requirements of the ADA and Section 504 or the basic accessibility requirements of the FHA.

110.     As a result of the City's failure to enforce compliance with the heightened accessibility requirements, the Affordable Rental Housing Program lacks thousands of units with accessible features that would have existed had the City taken adequate steps to ensure compliance with the heightened accessibility requirements of the ADA and Section 504.

111.     Similarly, the Affordable Rental Housing Program lacks thousands of units that comply with the basic accessibility requirements of the FHA, due to the City's failures.

112.     As a result of the City's failure to enforce such compliance, hundreds or perhaps thousands of Chicagoans with disabilities, including those described in paragraph 3, have been forced to live on the street, in their cars, in nursing homes, in homeless shelters, or in other inadequate and dangerous housing.

**C.     The City Has Failed to Ensure Individuals Who Need Accessible Features Have Access To, and Are Being Placed In, Accessible Units**

113.     The City also failed to take steps to ensure accessible units within the Affordable Rental Housing Program are made available to people with disabilities who need them.

114.     During its investigation, Access Living requested all documents from DPD reflecting the number, location, and availability of apartment units that received federal financial assistance and complied with the UFAS requirements. DPD confirmed it does not possess or maintain a list that summarizes and contains that information for more than a small subset of the Affordable Rental Housing Program. Thus, at all relevant times, the City could not or would not

identify for the public which buildings or units in the Affordable Rental Housing Program received federal financial assistance.

115.    At all relevant times, the City could not or would not identify for the public any wheelchair-accessible or sensory-accessible units in the Affordable Rental Housing Program.

116.    At all relevant times, the City could not or would not describe for the public any accessible features in so-called "wheelchair units," "handicapped units," or "sensory accessible units" within the Affordable Rental Housing Program.

117.    Because the City has not compiled and tracked information regarding the location of accessible units in its Affordable Rental Housing Program, it has failed and continues to fail to respond to requests from members of the public concerning the location of any accessible units that do exist.

118.    The City has also failed, and continues to fail, to notify people with disabilities of the existence and availability of any accessible units that do exist, or to provide a method for applying for those units.

119.    The City's failure to track and publicize the existence and availability of units with accessible features makes it extremely difficult for individuals with mobility and sensory disabilities who need accessible features to find the few units where they might live comfortably.

120.    The City has also failed, and continues to fail, to take steps to ensure that accessible units that do exist in the Affordable Rental Housing Program are indeed inhabited by people with disabilities who need those accessible features. When people who do not need accessible features reside in accessible units, it diminishes the housing opportunities of those who need a unit with such features.

121.    In addition, to the extent the City includes provisions in its loan and regulatory agreements with developers, owners, operators, and managers of Affordable Rental Housing Program developments that mandate compliance with accessibility requirements, the City does not enforce such requirements and does not seek to recover funds if those requirements are breached.

**D.    The City Has Not Completed a Comprehensive Self-Evaluation**

122.    Neither the City nor DPD has conducted a self-evaluation in accord with the requirements of the ADA, 28 C.F.R. § 35.105, and Section 504, 24 C.F.R. § 8.51, that assessed the accessibility of the Affordable Rental Housing Program.

123.    In its annual budget statement presented in October 2015, MOPD reported that "as part of the City's Title II Self-Evaluation Program, [MOPD] conducted self-evaluation surveys of all City facilities and programs," but provided no information on findings of inaccessibility in the Affordable Rental Housing Program. Nor did it reference any transition plan to overcome accessibility barriers within the Affordable Rental Housing Program.

124.    MOPD's October 2016 and October 2017 Budget Statements make no mention at all of a self-evaluation or a transition plan for the Affordable Rental Housing Program.

125.    While the City posts a Notice of Nondiscrimination on its website, identifying the Commissioner of MOPD as the City-wide ADA Coordinator, the City displays no ADA or Section 504 self-evaluation or transition plan for DPD or any other agency on any publicly-available website.

126.    To the extent the City is engaging in the kind of accessibility self-evaluation required by federal law, there is no evidence that it has identified or has decided to address the chronic shortage of accessible, affordable housing in its Affordable Rental Housing Program.

*    *    *

31

127.    The City failed, and continues to fail, to ensure that housing within the Affordable Rental Housing Program complies with applicable federal law and is accessible to people with disabilities. As a result, people with physical disabilities who require accessible units are denied meaningful access to the Affordable Rental Housing Program.

128.    The City has also failed, and continues to fail, to ensure the affordable housing units within the Affordable Rental Housing Program are made equally available to people with disabilities and that the Affordable Rental Housing Program's services and facilities are equally available to people with disabilities.

## INJURY TO PLAINTIFF ACCESS LIVING

129.    Access Living is a cross-disability organization governed and staffed primarily by people with disabilities. Access Living fosters the dignity, pride, and self-esteem of people with disabilities and enhances the options available to them so they may choose and maintain individualized and satisfying lifestyles. To this end, Access Living offers:  peer-oriented independent living services; public education, awareness, and development; individualized and systemic advocacy; and enforcement of civil rights on behalf of people with disabilities. Access Living recognizes the innate rights, abilities, needs, and diversity of people with disabilities, works toward their full integration into community life, and serves as an agent of social change.

130.    As a result of the actions described above, Access Living and its consumers, employees, and board of directors ("constituents") have been directly and substantially injured. These actions have frustrated Access Living's mission and undermined the effectiveness of the programs and services it provides, including its efforts to:  move people out of institutional settings and into housing in the community; encourage community integration of people with disabilities; provide assistance to individuals and families searching for housing or affected by discriminatory housing practices; and eliminate discriminatory housing practices.

131.     A substantial majority of Access Living's consumers are people with disabilities or family members of people with disabilities who have been harmed and continue to be harmed due to the City's failure to ensure that the Affordable Rental Housing Program is accessible to people with disabilities.

132.     Because the City has not complied with its obligations to ensure that its Affordable Rental Housing Program meets accessibility requirements, and because it has failed to inform the public of the existence of any accessible units, Access Living has been required to devote substantial staff time and money to assist people with disabilities to locate and secure such accessible housing.

133.     As a consequence of the violations by the City described herein, Access Living has had to divert its scarce resources away from its educational and other programs focused on expanding independent living options for its constituents and toward efforts focused on securing compliance with federal accessibility requirements in the City's Affordable Rental Housing Program.

134.     For example, Access Living attempts to facilitate and encourage independent living through its community reintegration work. Access Living's community reintegration services help people with disabilities transition from nursing homes into communities of their choice, because it is well-established that a person's quality of life improves when integrated into the community. The reintegration process is comprehensive and involves:  referral from a managed care organization; identifying the consumer's housing and independent living needs; the location and viewing of housing units; completing housing subsidy and lease paperwork; identifying and purchasing needed household and grocery items; moving into the unit; and connecting the client with wrap-around services and benefits. Access Living also offers

independent living skills training, including financial literacy classes, so individuals are successful in their new homes. One of the primary barriers to moving people with disabilities from institutions into the community is the lack of accessible, affordable housing. Due to the shortage of such housing in the Chicago area, people who could be moved into the community through Access Living's community reintegration services continue to languish in nursing facilities and require additional time and effort from Access Living staff who work on their behalf.

135.    Since 2004, Access Living has received over 50,000 telephone inquiries from consumers seeking affordable and/or accessible housing. As a result, Access Living has expended substantial resources attempting to counteract the City's discriminatory practices including, but not limited to, counseling people with disabilities affected by the City's discriminatory practices and conducting outreach to the City about federal accessibility requirements, resulting in the diversion of resources that it would not have had to expend were it not for the City's violations.

136.    In addition, Access Living has invested considerable time and effort to educate the City, the housing industry, and the general public about the importance of accessible housing for people with disabilities in an attempt to secure compliance. Over the last several years, Access Living staff has engaged in systemic advocacy efforts around accessible, affordable housing, including but not limited to: meeting with City officials, submitting comments to the City's Consolidated Plan and Five-Year Housing Plan, testifying at public hearings, and working with its constituents to convey individual accounts of their inability to find accessible, affordable housing directly to City officials, including the Mayor.

137.    The City's continuing discriminatory practices have also forced Access Living to divert scarce resources to identify, investigate, and counteract the City's discriminatory practices, and such practices have frustrated Access Living's other efforts against discrimination, causing Access Living to suffer concrete and demonstrable injuries. As detailed above, Access Living conducted site visits, investigations, surveys, and tests at properties throughout the Affordable Rental Housing Program in order to assess the extent of the City's discrimination, which resulted in the diversion of its resources in terms of staff time, travel, and incidental expenses that Access Living would not have had to expend were it not for the City's violations.

138.    Each time the City failed to ensure that housing in the Affordable Rental Housing Program was accessible, it frustrated the mission of Access Living inasmuch as it made it difficult or impossible for people with disabilities to live in that housing, and difficult or impossible for Access Living to deliver federally-mandated services to Chicagoans with disabilities.

139.    Going forward, to counteract this frustration of mission, Access Living will be required to carry out a comprehensive program of monitoring, training, public education and outreach, and counseling for people with disabilities seeking accessible housing.

140.    Until remedied, the City's unlawful, discriminatory actions will continue to injure Access Living by:

      a.    interfering with efforts and programs intended to bring about equality of opportunity in housing;

      b.    requiring the commitment of scarce resources, including substantial staff time and funding, to investigate and counteract the City's discriminatory

conduct, thus diverting those resources from Access Living's other

activities and services, such as education, outreach, and counseling;

c.       continuing to frustrate the mission and purposes of Access Living; and

d.       conveying to people with disabilities and to the public at large that Access

Living is ineffective in addressing the needs of the disability community

in Chicago and fulfilling its federal mandate.

141.    By the actions described above, the City has engaged and continues to engage in discrimination against individuals with disabilities in violation of the ADA, Section 504, and the Fair Housing Act. The City's discriminatory conduct over the last several decades constitutes a continuing violation.

142.    The City has acted or failed to act with deliberate indifference. The City has known that its acts and omissions create a substantial likelihood of harm to Access Living's federally protected rights, and the City failed to prevent that likelihood.

143.    There now exists an actual controversy between the parties regarding the City's duties under federal civil rights laws. Access Living accordingly is entitled to declaratory relief.

144.    Unless enjoined, the City will continue to engage in the unlawful acts and the pattern or practice of discrimination and unlawful conduct described above.

145.    Access Living has no adequate remedy at law. It is now suffering and will continue to suffer irreparable injury from the City's acts and unlawful conduct unless relief is provided by this Court. Access Living is thus entitled to preliminary and permanent injunctive relief.

## CAUSES OF ACTION

### Count I – Violation of the Americans With Disabilities Act,

### 42 U.S.C. § 12131 *et seq.*

146.    Access Living re-alleges and incorporates by reference each and every allegation contained in the foregoing paragraphs.

147.    The City, a public entity, discriminated and continues to discriminate on the basis of disability in violation of Title II of the ADA by acting or failing to act in a manner that, among other things:

      a.    denies meaningful access to the Affordable Rental Housing Program to people with mobility, visual, and hearing disabilities;

      b.    aids or perpetuates discrimination against people with disabilities, including the construction of new facilities used for public purposes that are not accessible, when such discriminatory conduct is engaged in by developers and others who have received financial or other significant assistance from the City as part of the Affordable Rental Housing Program;

      c.    uses methods of administration that discriminate against people with disabilities, defeating the purpose of the Affordable Rental Housing Program, and/or that perpetuate the discrimination of other agencies by failing to ensure that the Affordable Rental Housing Program provides accessible housing or otherwise provides meaningful access to people with mobility, visual, or hearing disabilities; and

      d.     otherwise limits people with disabilities from enjoying housing or the opportunity to obtain such housing by engaging in the policies, practices, acts, and omissions described above.

148.    As a result of the discrimination alleged in the previous paragraphs, Access Living has sustained the injuries described herein.

**Count II – Violation of Section 504 of the Rehabilitation Act,**

**29 U.S.C. § 794 *et seq.***

149.    Access Living re-alleges and incorporates by reference each and every allegation contained in the foregoing paragraphs.

150.    As a recipient of federal financial assistance, the City discriminated and continues to discriminate on the basis of disability in violation of Section 504 of the Rehabilitation Act by acting or failing to act in a manner that, among other things:

      a.     denies meaningful access to the Affordable Rental Housing Program to people with mobility, visual, and hearing disabilities;

      b.     aids or perpetuates discrimination against people with disabilities, including the construction of inaccessible facilities with federal housing funds and/or for other public purposes, when such discriminatory conduct is engaged in by developers and others who have received financial or other significant assistance from the City as part of the Affordable Rental Housing Program;

      c.     uses methods of administration that discriminate against people with disabilities, defeating the purpose of the Affordable Rental Housing Program, and/or that perpetuate the discrimination of other agencies by

38

failing to ensure that the redevelopment housing provides meaningful access to people with mobility, visual, or hearing disabilities; and

d.  otherwise limits people with disabilities from enjoying housing or the opportunity to obtain such housing by engaging in the policies, practices, acts, and omissions described above.

151. As a result of the discrimination alleged in the previous paragraphs, Access Living has sustained the injuries described herein.

**Count III – Violation of the Fair Housing Act,**

**42 U.S.C. § 3601 *et seq*.**

152. Access Living re-alleges and incorporates by reference each and every allegation contained in the foregoing paragraphs.

153. Access Living is an aggrieved person as defined in 42 U.S.C. § 3602(i).

154. The Affordable Rental Housing Program contains residential apartment units that are "dwelling[s]" within the meaning of 42 U.S.C. § 3602(b).

155. As described above, the City has committed discriminatory housing practices that made such dwellings unavailable to persons because of their disabilities in violation of 42 U.S.C. § 3604(f)(1).

156. The City has also discriminated against persons because of their disabilities in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection with the rental of a dwelling, in violation of 42 U.S.C. § 3604(f)(2).

157. The Affordable Rental Housing Program also contains residential multi-family developments with four or more units built for first occupancy after March 13, 1991 ("covered units"), subject to the design and construction requirements set forth in 42 U.S.C. § 3604(f)(3)(C) of the Fair Housing Act.

158. The City, as a developer of numerous properties subject to the Fair Housing Accessibility Requirements, has failed to design and construct those developments in compliance with the requirements mandated by 42 U.S.C. § 3604(f)(3)(C) and the applicable regulation, 24 C.F.R. § 100.205 (2008), including, *inter alia*, failing to design and construct those developments such that:

    a.    the public-use and common-use portions are readily accessible to and usable by people with disabilities;

    b.    doors designed to allow passage into and within covered units are sufficiently wide to allow passage by a person who uses a wheelchair;

    c.    covered units contain an accessible route into and through the dwelling;

    d.    light switches and thermostats in covered units are in accessible locations; and

    e.    covered units contain usable kitchens and bathrooms such that a person who uses a wheelchair can maneuver about the space.

159. The City's differential treatment of individuals with disabilities in the Affordable Rental Housing Program is consistent and continuous throughout the last several decades. Whether analyzed on a year-to-year basis or over the entire period of investigation, the same pattern of differential treatment is evident and constitutes a continuing violation of the Fair Housing Act.

160. As a result of the discrimination alleged in the previous paragraphs, Access Living has sustained the injuries described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Access Living respectfully prays that this Court enter an order against the City of Chicago, as follows:

40

161.     Declare pursuant to 28 U.S.C. § 2201, 42 U.S.C. § 12133, 29 U.S.C. § 794a, 42 U.S.C. § 3613, and Rule 57 of the Federal Rules of Civil Procedure that the City's policies, practices, acts, and omissions as set forth above violate Title II of the ADA, Section 504 of the Rehabilitation Act, and the Fair Housing Act.

162.     Enjoin the City, its officers, directors, employees, agents, managers, successors, assigns, and all other persons in active concert or participation with the City, both temporarily during the pendency of this action, and permanently, from:

    a.     providing funds or property or other significant assistance for land or for the development, construction, or rehabilitation of any housing and/or common areas in buildings containing housing units that, in any way, fail to comply with the accessibility requirements of Title II of the ADA, Section 504 of the Rehabilitation Act, and the Fair Housing Act;

    b.     failing or refusing to bring housing and the public use and common use areas in buildings containing housing units that are part of the Affordable Rental Housing Program into compliance with the requirements of Title II of the ADA, Section 504 of the Rehabilitation Act, and the Fair Housing Act; and

    c.     failing or refusing to otherwise provide meaningful access for people with mobility disabilities and visual and hearing disabilities to the Affordable Rental Housing Program.

163.     Pursuant to 28 U.S.C. § 2202, 42 U.S.C. § 12133, 29 U.S.C. § 794a, 42 U.S.C. § 3613, and Rule 65 of the Federal Rules of Civil Procedure, enjoin the City, its officers,

41

directors, employees, agents, managers, successors, assigns, and all other persons in active

concert or participation with the City from failing or refusing to:

a.  survey each and every housing unit in the Affordable Rental Housing

Program and appurtenant common and public use areas, and assess the

compliance of each with the accessibility requirements of Title II of the

ADA, Section 504 of the Rehabilitation Act, and the Fair Housing Act;

b.  report to the Court the extent of the noncompliance with the accessibility

requirements of Title II of the ADA, Section 504 of the Rehabilitation Act,

and the Fair Housing Act;

c.  bring each and every such housing unit in the City's Affordable Rental

Housing Program and appurtenant common and public use areas into

compliance with the requirements of Title II of the ADA, Section 504 of

the Rehabilitation Act, and the Fair Housing Act;

d.  otherwise provide meaningful access to the City's Affordable Rental

Housing Program to people with mobility, visual, or hearing disabilities;

e.  adopt policies and procedures to ensure that newly built or renovated

housing meets the accessibility requirements of Title II of the ADA,

Section 504 of the Rehabilitation Act, and the Fair Housing Act; and

f.  adopt policies and procedures to ensure that the owners of buildings in the

City's Affordable Rental Housing Program and any prospective owner or

manager of units in such buildings comply with the requirements of Title

II of the ADA, Section 504 of the Rehabilitation Act, and the Fair Housing

Act with respect to assignment of accessible units to residents who need

such units because of their disabilities and with respect to reasonable

accommodation and reasonable modifications in relation to those units.

164.    Award damages to Access Living pursuant to 42 U.S.C. § 12133, 29 U.S.C.

§ 794a, and 42 U.S.C. § 3613 in an amount to be determined by the jury that would fully

compensate it for injuries caused to it by the City's discriminatory practices and conduct alleged

herein;

165.    Award Access Living its reasonable attorneys' fees and costs pursuant to 42

U.S.C. §§ 12133, 12205, 29 U.S.C. § 794a, 42 U.S.C. § 3613, and as otherwise may be allowed

by law; and

166.    Order such other relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

167.    Plaintiff Access Living requests a trial by jury as to all issues so triable.

Date: May 13, 2018

/s/ Kenneth M. Walden
Kenneth M. Walden
Mary Rosenberg
Access Living of Metropolitan Chicago
115 West Chicago Avenue
Chicago, IL 60654
Tel: 312-640-2136
Fax: 312-640-2101
TTY: 312-640-2102
kwalden@accessliving.org
mrosenberg@accessliving.org

Michael G. Allen*
Jennifer I. Klar*
Laura Gaztambide-Arandes*
Orly May*
RELMAN, DANE & COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
Tel: 202-728-1888
Fax: 202-728-0848
mallen@relmanlaw.com

43

jklar@relmanlaw.com
larandes@relmanlaw.com
omay@relmanlaw.com

*Attorneys for Plaintiff*

*\*Pro Hac Vice Applications to Be Submitted*