# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ACCESS LIVING OF METROPOLITAN CHICAGO, INC., | ) ) ) | Case No. 18-cv-3399 |
| Plaintiff, | ) ) | Judge Robert M. Dow, Jr. |
| v. | ) ) ) | |
| CITY OF CHICAGO, | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Access Living of Metropolitan Chicago, Inc. ("Plaintiff" or "Access Living"), brings this action against Defendant the City of Chicago ("Defendant" or "City"), for alleged violations of Title II of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, and the Fair Housing Act ("FHA") (collectively, the "Federal Accessibility Laws").  Currently before the Court is Defendant's motion to dismiss Plaintiff's complaint for lack of standing and failure to state a claim [24].  For the reasons explained below, Defendant's motion [24] is denied.

## I.     Background[1]

The complaint alleges that over the last thirty years, the City has distributed hundreds of millions of dollars to non-profit and private developers to build or rehabilitate more than 50,000 affordable rental units in more than 650 developments across the City.  [1] at 1, ¶ 1 & 14-15, ¶ 53.  The complaint refers to this as the City's "Affordable Rental Housing Program" or the "Program."  According to the complaint, the City—as a public entity, recipient of federal funds, and active

---

[1] For purposes of the City's motions to dismiss, the Court assumes as true all well-pled allegations set forth in Plaintiff's complaint.  See [1]; *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017).

participant in the development of affordable housing—has a duty under the Federal Accessibility Laws to ensure that owners of developments in the Program comply with federal accessibility requirements. [1] at 16, ¶ 60 & 19-20, ¶ 71. The City also must ensure that the Program as a whole is accessible to people with disabilities and does not discriminate against people with disabilities in its terms, conditions, or privileges, or in the provision of services or facilities. *Id.* at 16-17, ¶¶ 61-62.

The complaint alleges that although the City offers low-income residents more than 50,000 affordable units in the Program, it has failed to ensure that sufficient units are available to people with disabilities, resulting in Chicagoans with disabilities being forced to live on the street, in their cars or homeless shelters, in nursing homes, or in other inadequate and dangerous housing. [1] at 29, ¶¶ 110-112. The complaint details Plaintiff's extensive investigation into the Program's compliance with the Federal Accessibility Laws, including its randomized testing of approximately 300 developments in the Program. According to the complaint, Plaintiff determined that none of the properties it tested fully complied with the relevant federal standards. *Id*. at 22-27, ¶¶ 82-99. For example, the complaint alleges, many of the properties had stairs at the main entrances, lacked doorways wide enough to allow wheelchair passage, and/or had inaccessible bathrooms and kitchens.

The complaint alleges that the City's actions and omissions caused these accessibility problems. In particular, the complaint alleges that the City has no policies or procedures to ensure affordable housing units are accessible; does not ensure that accessible, affordable units that might be constructed are made available to and occupied by people who need their accessible features; and is unable to identify whether buildings in the Program have accessible units or where such units are located. See [1] at 27-29, ¶¶ 100-112.

According to the complaint, the City has the authority, but nonetheless largely fails, to require developments in the Program to comply with Federal Accessibility Laws. In particular, the City's contracts, loan and regulatory agreements, and covenants with developers and owners give the City authority to demand compliance with all applicable federal, state, and local requirements, and to enter, inspect, and declare a default for an owner's failure to comply. [1] at 13, ¶¶ 44-45.

The complaint alleges that the City's failure to enforce accessibility obligations has injured Plaintiff, which is an organization that promotes independent living for and offers a broad array of programs and services to Chicagoans with disabilities. Most of these individuals cannot afford to pay rent without some public assistance due to the many barriers to employment they face. The complaint alleges that the City's failure to make the Program accessible to people with disabilities undermines the effectiveness of Plaintiff's services and makes it more difficult and expensive for Plaintiff to attempt to connect clients to accessible, affordable housing. The complaint further alleges that the City's conduct has required Plaintiff to "divert its scarce resources away from its educational and other programs focused on expanding independent living options for its constituents and toward efforts focused on securing compliance with federal accessibility requirements in the City's Affordable Rental Housing Program." [1] at 33, ¶ 133. For instance, the complaint alleges, the City's actions have "forced Access Living to divert scarce resources to identify, investigate, and counteract the City's discriminatory practices" by conducting "site visits, investigations, surveys, and tests at properties throughout the Affordable Rental Housing Program in order to assess the extent of the City's discrimination, which resulted in the diversion of its resources in terms of staff time, travel, and incidental expenses that Access Living would not have had to expend were it not for the City's violations." *Id*. at 35, ¶ 137.

Plaintiff alleges that it filed this lawsuit to address the ongoing diversion of resources and frustration of mission caused by the City's conduct. According to the complaint, the City violated and continues to violate Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Fair Housing Act by failing to ensure (1) that individual buildings and units within the City's Affordable Housing Program are built in accordance with architectural standards set by federal law and (2) that individuals with disabilities receive the benefits of its Affordable Housing Program as a whole. The complaint seeks a declaration that the City actions violate Title II of the ADA, Section 504 of the Rehabilitation Act, and the FHA. It also seeks injunctive relief. In particular, the complaint requests that the City be enjoined from providing funds or assistance for housing units that fail to comply with the Federal Accessibility Laws, from failing to bring buildings and housing units in the Program into compliance with the Federal Accessibility Laws, and from failing to provide meaningful access to the Program for people with mobility, visual, and hearing disabilities. The complaint also requests injunctive relief requiring the City to survey all units in the Program and assess their compliance with the Federal Accessibility laws; to bring noncompliant units into compliance; to adopt policies and procedures to ensure that newly built or renovated housing complies with the Federal Accessibility Laws; and to adopt policies and procedures to ensure that owners of buildings in the Program comply with the Federal Accessibility Laws.

## II.    Legal Standard

The City has filed a motion to dismiss the complaint based on Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. The City's Rule 12(b)(1) motion challenges Plaintiff's standing to bring this lawsuit. Rule 12(b)(1) "provides for dismissal of a claim based on lack of subject matter jurisdiction, including lack of standing." *Stubenfield v. Chicago Housing Authority*,

6 F. Supp. 3d 779, 782 (N.D. Ill. 2013) (citing *Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856 (7th Cir. 1996)). Typically, "[i]n ruling on a motion to dismiss for want of standing, the district court must accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom in the plaintiff's favor." *Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003) (citing *Retired Chicago Police Ass'n,* 76 F.3d at 862); see also *Moore v. Wells Fargo Bank, N.A.*, 908 F.3d 1050, 1057 (7th Cir. 2018); *Browner v. American Eagle Bank*, 355 F. Supp. 3d 731, 732–33 (N.D. Ill. 2019). However, when "standing is challenged as a factual matter, the plaintiff must come forward with 'competent proof'—that is a showing by a preponderance of the evidence—that standing exists." *Lee*, 330 F.3d at 468; see also *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 445 (7th Cir. 2009) (once evidence calling the plaintiff's standing into question is proffered, the presumption of correctness accorded to a complaint's allegations falls away, and the plaintiff bears the burden of coming forward with competent proof that standing exists).

The City's 12(b)(6) motion challenges the sufficiency of Plaintiff's complaint. For purposes of a motion to dismiss under Rule 12(b)(6), the Court "'accept[s] as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff.'" *Calderon-Ramirez*, 877 F.3d at 275 (quoting *Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016)). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must allege facts which, when taken as true, "'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level.'" *Cochran v. Illinois State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007)). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011).

### III. Analysis

#### A. Standing

"To establish Article III standing, plaintiffs must show they have suffered '(1) a concrete and particularized injury in fact (2) that is fairly traceable to the challenged action of the defendant, and that is (3) likely to be redressed by a favorable judicial decision.'" *Gaylor v. Mnuchin*, -- F.3d --, 2019 WL 1217647, at *3 (7th Cir. Mar. 15, 2019) (quoting *Freedom from Religion Foundation, Inc. v. Lew*, 773 F.3d 815, 819 (7th Cir. 2014)). The City argues that Plaintiff's complaint should be dismissed for lack of standing because Plaintiff has not alleged facts sufficient to establish any of the three required elements of standing.

As to the first requirement, a concrete and particularized injury in fact, the City argues that all of the expenditures Plaintiff has made as a result of the City's alleged failure to comply with the Federal Accessibility laws are "either part of its core mission or things it specifically receives government funding to do." [25] at 2. The City contends that because "Plaintiff already spends its time and money on investigating discrimination as part of its purpose, it cannot be said to have 'diverted' anything" to pursue this litigation. *Id.* at 9, n.4. For instance, the City points to evidence that from 2008 through 2016, Plaintiff received federal funding specifically for "the investigation of housing discrimination complaints and the administrative or judicial enforcement of federal, state, or local fair housing laws.'" *Id*. The City asserts that, under *Plotkin v. Ryan*, 239 F.3d 882 (7th Cir. 2001), Plaintiff's expenditures on investigating and litigating the City's alleged noncompliance with the Federal Accessibility Laws are insufficient to constitute a concrete and particularized injury in fact for purposes of standing.

*Plotkin* concerned the standing of the Better Government Association ("BGA")—an organization devoted to exposing government corruption—to bring a suit challenging alleged fraud

in the Illinois Secretary of State's Office in connection with the Secretary of State's gubernatorial campaign. The BGA alleged that it was injured "simply by reason of its expenditure of time and money in pursuing the alleged fraud." 239 F.3d at 886. The Seventh Circuit rejected this argument, reasoning that "ordinary expenditures as part of an organization's purpose do not constitute the necessary injury-in-fact required for standing." *Id*.

The Court is not convinced that *Plotkin* is applicable here, given the well-developed body of law (discussed below) specifically addressing the standing of fair housing organizations to bring suit to address alleged housing discrimination. The City does not cite, and the Court has not located, any cases in which *Plotkin*'s "ordinary expenditures" standard has been applied in the fair housing context. Assuming that *Plotkin* is applicable, Plaintiff has alleged more than "ordinary expenditures" of time and money to investigate the City's practices and pursue this litigation. According to the complaint, the City's actions also impede Plaintiff's day to day operations by making it much more difficult for Access Living to help place clients in accessible affordable housing and, in turn, provide services to clients in their homes. This reduces the total amount of services that Plaintiff is able to provide and the effectiveness of those services.

The City focuses little attention on the case law that applies the "injury in fact" requirement in the housing discrimination context, which sets a "relatively low bar for a housing organization to establish standing." *H.O.P.E., Inc. v. Eden Management LLC*, 128 F. Supp. 3d 1066, 1079 (N.D. Ill. 2015). In *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the Supreme Court addressed the standing of HOME—a non-profit corporation devoted to equal opportunity housing in the Richmond, Virginia, area—to bring suit challenging an apartment owner's racial steering practices. The Supreme Court held that HOME's complaint was sufficient to survive a challenge to standing where it alleged that "Plaintiff HOME has been frustrated by defendants' racial steering

practices in its efforts to assist equal access to housing through counseling and other referral services" and "has had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices." *Havens*, 455 U.S. at 379. The Court concluded that if the defendants' "steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact." *Id.* The Court reasoned that "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id*.

Applying *Havens*, the Seventh Circuit has made clear that "the only injury which need be shown to confer standing on a fair-housing agency" (including nonprofits that promote integrated housing) "is deflection of the agency's time and money from counseling to legal efforts directed against discrimination." *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990). As the court of appeals explained, "[t]hese are opportunity costs of discrimination." *Id.* Even where the organization's "counseling is not impaired directly," the court reasoned, "there would be more of it were it not for the defendant's discrimination." *Id.* (nonprofit corporation that promoted integrated housing had standing to bring action against real estate brokerage firm for alleged conduct of steering black home seekers to one village and white seekers to adjoining suburbs in violation of civil rights laws); see also *City of Chicago v. Matchmaker Real Estate Sales Center, Inc.*, 982 F.2d 1086, 1095 (7th Cir. 1992) ("The Leadership Council is a fair-housing agency. By conducting the investigation into Matchmaker's activities, the Leadership Council deflected its time and money from counseling to legal efforts directed against discrimination. The Leadership Council therefore has standing to sue."); *H.O.P.E., Inc. v. Alden Gardens of Bloomingdale, Inc.*,

2017 WL 4339823, at *5 (N.D. Ill. Sept. 29, 2017) (nonprofit organization's complaint contained sufficient allegations to establish standing to bring suit challenging apartments' rejection of applicants based on mental illness diagnoses, where it alleged that "it provides fair-housing counseling at no charge to housing providers and people seeking housing," that "individual complaints prompted its investigation of the Illinois Supportive Living Program," and that "conducting the investigation of other Supportive Living Facilities to determine whether the practices about which it received complaints were widespread impeded its educational outreach efforts and diverted its resources from its other programs"); *City of Evanston v. Baird & Warner, Inc.*, 1990 WL 186575, at *3 (N.D. Ill. Nov. 15, 1990) (nonprofit organization devoted to achieving economic and racial diversity and providing fair housing in the northern suburbs of Chicago had standing to bring FHA suit challenging real estate firm's alleged racial steering practices where it alleged that it "incurred costs as a result of investigating defendants' real estate practices").

In each of these cases, combatting housing discrimination could be characterized as a core mission of the plaintiff organization, [25] at 2, yet the courts concluded that the plaintiff was injured because it was required to expend resources to combat the defendant's allegedly discriminatory housing practices. The City attempts to distinguish *Village of Bellwood* on the basis that Plaintiff here cannot be said to have "diverted" any resources from its educational programs or programs focused on expanding living options to the instant litigation, because Plaintiff "receives a variety of government funding for those precise activities." [25] at 9. The City has not demonstrated, however, that this level of specificity is required to satisfy the "diversion of resources" standard. Even if such specificity were required, the "evidence" relied on by the City suggests only that Plaintiff has certain dedicated funding streams, not that those funds are more than sufficient to cover all of Plaintiff's expenses in particular areas or that there

is no overlap in the use of funds, personnel, or other resources.[2]  Further, Plaintiff alleges not only that the City's actions have required it to divert resources to this litigation, but also that they have undermined the effectiveness and reach of Plaintiff's supportive programs and services by requiring Plaintiff to spend considerably more staff time and money to assist clients in locating and securing accessible housing.  In other words, there would be "more of" Plaintiff's counseling and support services "were it not for" the City's alleged violations of the Federal Accessibility Laws.  *Village of Bellwood*, 895 F.2d at 1526.

Turning to the second requirement for standing, the City argues that the complaint fails to specify how Plaintiff's injuries were caused by the City.  As the City emphasizes throughout its briefs, it does not own any of the housing units at issue.  However, the complaint recognizes this and is not premised on the City owning any of the units in the Program.  Instead, the complaint alleges that the City has the authority to enforce the Federal Accessibility Laws through its contracts, loan and regulatory agreements, and covenants with developers and owners.  See [1] at 13, ¶¶ 44-45.  The City presents no evidence that calls these allegations into question.  Further, the complaint alleges that the City has caused Plaintiff's injuries by failing to adopt or enforce any policies or procedures to ensure that housing units in the Program are accessible to persons with disabilities or comply with Federal Accessibility Laws.  For instance, the complaint alleges that the City, prior to making funding commitments, does not review architectural plans to ensure compliance with the Federal Accessibility Laws; does not conduct field visits during construction; and does not have a process for issuing construction and occupancy permits in a manner that ensures compliance with the Federal Accessibility Laws.  See *id*. at 27-28, ¶¶ 101-107.  The City

---

[2] Since the materials relied on by the City are insufficient to call into question the complaint's allegations of injury, the Court does not consider Defendant's motion to be a "factual" challenge to standing.  See *Apex Digital*, 572 F.3d at 445.

also allegedly fails to compile, track and publicize information regarding the location of accessible units in the Program, making it extremely difficult for individuals with mobility and sensory disabilities who need accessible features to find the few units where they might live comfortably. See *id.* at 29-30, ¶¶113-119. While the complaint does not identify specific properties or units that fail to comply with the Federal Accessibility Laws, the City does not cite any case law that would require such specificity and the complaint's detailed allegations are more than sufficient to put the City on notice of the basis of Plaintiff's claims.

The City also argues that the complaint does not sufficiently plead how Plaintiff's injury is likely to be addressed by a favorable decision. In particular, the City faults Plaintiff for not explaining how the City has the legal right or authority to provide what the City deems the "core relief" requested in the complaint: surveying all housing units for compliance with the Federal Accessibility Laws and bringing noncompliant units into compliance. According to the City, Plaintiff has not shown that the City has a legal right to even enter the units in question. In fact however, the complaint alleges that the City's contracts, loan and regulatory agreements, and covenants with developers and owners give the City a right to enter, inspect, and declare a default for an owner's failure to comply with the Federal Accessibility Laws. [1] at 13, ¶¶ 44-45. The City has not presented any evidence to the contrary. Further, even if the City is correct in its suggestion that it has no legal ability to enter or otherwise obtain data about occupied units, the complaint requests a broad array of other types of injunctive relief beyond surveying and bringing existing units into compliance. See [1] at 41-43, ¶¶ 162-163.

For these reasons, Plaintiff has satisfied its burden of demonstrating that it has standing to bring this lawsuit. The City's motion to dismiss under Rule 12(b)(1) is, therefore, denied.

## B.    Failure to State a Claim

In its motion under Rule 12(b)(6), the City argues that the complaint should also be dismissed because Plaintiff has not "identified with any particularity when, where, or by whom alleged disability discrimination occurred, instead relying on impossibly vague, conclusory allegations that do not meet Rule 8 pleading requirements." [24] at 2.  While acknowledging that the complaint alleges that Plaintiff contacted nearly 300 developments in the City ranging in size from 5 to over 700 units who received federal funding between 1988 and 2016, the City contends that this is insufficient because Plaintiff does not identify the developments by name or allege when they were contacted or where they are located.  The City also acknowledges that the complaint alleges that Plaintiff observed conditions at 17 developments that posed significant accessibility barriers, but faults Plaintiff for failing to allege "when they were visited, how many units in each development were visited, or how those developments were selected," how those units were "representative of the overall group," or which City employees were responsible for any of the alleged instances of discrimination.  [25] at 13.

The Court is not convinced that any of these details are necessary to satisfy Rule 8.  To survive a motion to dismiss, a complaint needs to contain only enough "'factual content [to] allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Lewis v. City of Chicago*, 914 F.3d 472, 475 (7th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Plaintiff's detailed, well-organized 44-page complaint easily satisfies that standard.  The complaint outlines the applicable legal requirements of the Federal Accessibility Laws, describes Plaintiff's extensive investigation into the City's compliance with those laws, and details the variety of ways in which the City has failed to ensure that its Affordable Rental Housing Program is compliant.  The City cites no case law indicating that Plaintiff was required to provide

development-by-development or unit-by-unit level detail on its investigation or the results thereof. And it is easy to see why Plaintiff did not, as that would result in an unwieldly complaint that was hundreds of pages long. As Plaintiff points out, all of the details that the City claims are lacking "go to the substantiation of Plaintiff's claims and methodology," which "the City is free to explore in discovery." [33] at 2-3.

Finally, the City argues that, to the extent that Plaintiff's claims are based on violations that occurred more than two years before the complaint was filed, they are barred by the applicable statutes of limitations. This issue cannot be resolved at the pleading stage. Dismissal of a complaint based on a statute of limitations is appropriate only where the plaintiff has "affirmatively plead himself out of court" by "plainly reveal[ing] that [the] action is untimely." *County of Cook v. Bank of America Corp.*, 181 F. Supp. 3d 513, 520 (N.D. Ill. 2015) (internal citation and quotation marks omitted). The City does not even argue that this is the case here. Further, the complaint expressly alleges that the City's practices constitute a *continuing* violation of the Federal Accessibility Laws. One of those laws, the FHA, provides that a civil enforcement action must be filed "not later than 2 years after the occurrence or the *termination* of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A) (emphasis added). "The italicized language was added to the FHA in 1988 to codify the continuing violation doctrine recognized in *Havens*: '[W]here a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within [two years] of the last asserted occurrence of that practice.'" *Bank of America*, 181 F. Supp. 3d at 520 (quoting *Havens*, 455 U.S. at 380-81). The continuing violation doctrine has also been applied to claims brought under Title II of the ADA and Section 504 of the Rehabilitation Act. See Deck v. City of Toledo, 56 F. Supp. 2d 886, 894

(N.D. Ohio 1999) (ADA); *D.G. v. Somerset Hills School Dist.*, 559 F. Supp. 2d 484, 495 (D.N.J. 2008) (Rehabilitation Act). Since the City's alleged violations of the Federal Accessibility Laws may constitute continuing violations, the Court cannot determine at this early stage of the case whether any parts of Plaintiff's claims are barred by an applicable statute of limitations.

## IV. Conclusion

For these reasons, Defendant's motion to dismiss [24] is denied. This case is set for status hearing on April 18, 2019 at 9:00 a.m.

Dated: March 29, 2019

_____
Robert M. Dow, Jr.
United States District Judge