**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ACCESS LIVING OF METROPOLITAN CHICAGO, INC., an Illinois non-profit corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:18-cv-03399 Honorable Robert M. Dow Jr. |
| CITY OF CHICAGO, an Illinois municipal corporation, | ) ) ) | Honorable Jeffrey Cole |
| Defendant. | ) ) ) ) | |

**PLAINTIFF'S MOTION FOR CLARIFICATION ON THE SCOPE OF DISCOVERY**
**AND/OR ENFORCEMENT OF THE COURT'S DECISION DENYING THE MOTION**
**TO DISMISS**

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ii

I.      Introduction..........................................................................................................1

II.     Procedural History ...............................................................................................2

        A.  This Court Recognized the Systemic Nature of Plaintiff's Claims When
            Denying Defendant's Motion to Dismiss .............................................................2

        B.  This Court Endorsed the Parties' Agreement to Prioritize Establishment
            of the Portfolio of Developments Covered by Plaintiff's Claims.......................4

        C.  Despite Its Representations to Plaintiff and This Court, the City Refused
            to Cooperate with Plaintiff to Establish the Portfolio...........................................6

        D.  Due to the City's Intransigence, Plaintiff Requested and this Court
            Assigned a Magistrate Judge to Oversee Discovery ..........................................9

        E.  Despite the Court's Instructions and the Parties' Prior Agreement to Focus
            on the Portfolio, Defendant Asked Judge Cole to Limit Discovery to
            Plaintiff's Pre-Litigation Investigation  ...............................................................10

III.    The Scope of Discovery Must Be Commensurate with Plaintiff's Allegations of
        Systemic Discrimination........................................................................................14

        A.  Discovery Necessarily Includes the Entire Portfolio of Developments in the
            Program..................................................................................................................15

        B.  There Is No Legal or Factual Justification to Limit Discovery to Plaintiff's
            Pre-Litigation Investigation ................................................................................17

IV.     Establishing the Portfolio Is a Threshold Task That Must be Prioritized.................18

V.      Conclusion ............................................................................................................20

TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Equal Rights Ctr. v. Equity Residential*, 798 F. Supp. 2d 707 (D. Md. 2011)...................17

*Goff v. Kroger Co.*, 121 F.R.D. 61 (S.D. Ohio 1988)...........................................17

*Hubbard v. Rubbermaid, Inc.*, 78 F.R.D. 631 (D. Md. 1978)............................................17

*Indep. Living Ctr. of S. California v. City of Los Angeles*,
296 F.R.D. 632 (C.D. Cal. 2013)...........................................................................15, 16, 17

*Janis v. Nelson*, No. CR. 09–5019–KES, 2009 WL 5216898 (D.S.D. 2009)....................17

*Miner v. Gov't Payment Serv., Inc.*, Case No. 14-cv-7474, 2017 WL 3909508
 (N.D. Ill. Sep. 5, 2017)..........................................................................................14, 15

*U.S. Equal Employment Opportunity Comm'n v. AutoZone, Inc.*, 141 F. Supp. 3d 912
 (N.D. Ill. 2015) as amended (Nov. 4, 2015) ....................................................17

**Other Authorities**                                                        **Page(s)**

Fed. R. Civ. P. 26...........................................................................................18

## I.    Introduction

Plaintiff Access Living of Metropolitan Chicago ("Plaintiff" or "Access Living") seeks the Court's clarification on the scope and sequence of discovery. As this Court recognized in its decision denying the City of Chicago's ("Defendant" or "the City") motion to dismiss, Plaintiff alleges systemic failures across the City's entire Affordable Rental Housing Program ("ARHP" or "the Program"). Establishing the bounds of this Program—and thus the scope of this case—is a threshold task of paramount importance. Determining which affordable rental housing developments are part of the Program is a predicate step—it must be accomplished *before* Plaintiff can engage in developing the facts necessary to prove the City is liable for violating federal accessibility laws. This is a case where the timing and sequence of discovery are critical to ensure full, fair, and efficient resolution of Plaintiff's claims.

During multiple status conferences since April, the City told the Court it agreed to prioritize the establishment of the Portfolio. Yet over the last eight months of formal and informal discovery, the City has refused to do so, first through delay and now by advancing a plainly false narrative that this case is about atomized incidents of discrimination, not systemic wrongs. Due to the City's mis-framing of the case, formal discovery has thus far been limited to the 135 developments involved in Plaintiff's pre-litigation investigation. This limitation reflects a fundamental misunderstanding of the Complaint itself and this Court's order denying the City's motion to dismiss (and subsequent charge to the parties concerning discovery).

There is no factual or legal basis for limiting discovery to Plaintiff's pre-litigation investigation. Doing so at the expense of defining the universe of developments encompassed in the ARHP—the "Portfolio" of developments[1]—will substantively impair Plaintiff's ability to

---

[1] Throughout this case, Plaintiff has defined the ARHP as every multifamily housing project consisting of 4 or more units, built or rehabilitated after July 11, 1988, that received financial

meet its burden of proof. Absent confirmation of the Portfolio, Plaintiff cannot schedule site

visits by its architectural expert to gather the measurements necessary to assess the architectural

accessibility of a statistically-drawn sample of the 700-plus apartment developments comprising

the Program, which visits are essential to proving liability. At the same time, establishing the

Portfolio will also streamline discovery (for the Parties and the Court) by confirming which

developments are in the case and not in the case, and by allowing Plaintiff to limit its discovery

requests to only those developments necessary to show liability.

Accordingly, Plaintiff hereby seeks the Court's guidance on the scope and sequence of

discovery, including an affirmation of the Court's previous directive to the Parties to prioritize

the establishment of the Portfolio.

## II. Procedural History

Plaintiff provides a thorough recitation of the proceedings to date, including both formal

and informal discovery, to show how the City's conduct has forestalled Plaintiff's ability to

prosecute its claims.

### A. This Court Recognized the Systemic Nature of Plaintiff's Claims When Denying Defendant's Motion to Dismiss

Plaintiff filed this systemic challenge concerning the inaccessibility of the City's

Affordable Rental Housing Program in May 2018. Dkt. 1. Plaintiff alleges that, through the

Program, the City funded and developed affordable rental housing units without ensuring that a

sufficient number are accessible to people with disabilities as required by the Americans with

---

assistance from the City of Chicago. It includes senior housing, public housing, supportive
housing, and single room occupancy properties that otherwise meet the criteria listed in the
previous sentence. It does not include homeownership projects such as single-family structures,
condominium projects, and housing other than multifamily rental housing (such as shelters or
transitional housing). *See* Ex. 1, April 17, 2019 Email from L. Arandes.

Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504"), and the Fair

Housing Act ("FHA"). *Id.* at ¶ 1. The Complaint lays out in detail how the City failed to

"evaluate and ensure the meaningful accessibility of the Affordable Rental Housing Program *as*

*a whole*." *Id.* at ¶ 6 (emphasis added); *see also id.* at ¶¶ 11, 60, 70, 72. The allegations concern

the City's program-wide conduct, not individual incidents of exclusion or discrimination.

The City answered by way of a motion to dismiss, arguing Access Living lacked Article

III standing, the Complaint was not sufficiently specific, and the applicable statutes of limitations

barred violations occurring prior to May 2016. *See* Dkt. 25. This Court denied the motion to

dismiss in its entirety on March 29, 2019. Dkt. 35.

In doing so, the Court recognized the systemic nature and scope of the discrimination

claims at issue:

> The complaint alleges that over the last thirty years, the City has distributed
> hundreds of millions of dollars to non-profit and private developers to build or
> rehabilitate more than 50,000 affordable rental units *in more than 650 developments*
> *across the City*. The complaint refers to this as the City's "Affordable Rental
> Housing Program" or the "Program." According to the complaint, the City—as a
> public entity, recipient of federal funds, and active participant in the development
> of affordable housing—has a duty under the Federal Accessibility Laws to ensure
> that owners of developments in the Program comply with federal accessibility
> requirements. The City also must ensure that the Program *as a whole* is accessible
> to people with disabilities and does not discriminate against people with disabilities
> in its terms, conditions, or privileges, or in the provision of services or facilities.

Dkt. 35 at 1-2 (citations omitted) (emphasis added). The Court also homed in on how the City's

conduct across the ARHP, not its treatment of individual renters, had caused the injuries at issue

in this litigation:

> Further, the complaint alleges that the City has caused Plaintiff's injuries by failing
> to adopt or enforce any policies or procedures to ensure that housing units in the
> Program are accessible to persons with disabilities or comply with Federal
> Accessibility Laws. For instance, the complaint alleges that the City, prior to
> making funding commitments, does not review architectural plans to ensure
> compliance with the Federal Accessibility Laws; does not conduct field visits

during construction; and does not have a process for issuing construction and occupancy permits in a manner that ensures compliance with the Federal Accessibility Laws.

*Id.* at 10. Accordingly, as the Parties moved into discovery, there was zero indication this case could be construed or understood to involve individualized claims by housing consumers in Chicago.

B. <u>This Court Endorsed the Parties' Agreement to Prioritize Establishment of the Portfolio of Developments Covered by Plaintiff's Claims</u>

Shortly after the Court denied the motion to dismiss, on April 18, 2019, the Parties appeared for a status conference. The Court noted the complexity of the case and advised the Parties to conduct discovery in the spirit, if not in the letter, of the Mandatory Initial Discovery Pilot Project ("MIDP"). Ex. 2, April 18, 2019 Hr'g Tr., at 5:6-6:19 (suggesting an informal period of rolling discovery). The Court thus directed the City to "[g]ive them what they want most soonest, and focus on that." *Id.* at 5:8-5:9. As counsel for the City mentioned during the hearing, Plaintiff had already reached out to explain what it wanted "the most": The Portfolio, *i.e.*, the universe of developments in the ARHP. *Id.* at 4:16-4:21 (M. Khetarpal stating that Plaintiff sought the identification of "every mu[l]ti-family unit with more than four units that was built or rehabbed since July 1988. And for every project, they want the name, address, number of units, construction start date, and whether it was new or rehabbed and the type of financial assistance used"). This Court agreed that discovery should begin with the establishment of the Portfolio:

> MS. KLAR: Yes, your Honor. This is Jennifer Klar for the plaintiff. I just wanted to clarify that this housing portfolio information we wanted—you know, we've identified as the threshold issue, the first thing, and so we're trying to get that to get sort of to the start where we—before we start additional discovery. So my hope would be that in 60 to 75 days we can have that locked down before we move to the next step.

THE COURT: Okay. *And that's exactly what I'm talking about*. You know, if the plaintiff identifies something that's the most important set of documents, focus on that because it will help everybody do their case evaluation, and that's really the purpose of the pilot.

*Id.* at 7:17-8:4 (emphasis added). The City did not express any objections or concerns about this task. Discovery therefore began with the Court and Parties in agreement that building the Portfolio was the foundational project of this first phase of informal discovery.

The Parties engaged in this undertaking in May and June of 2019.[2] In response to Plaintiff's request for a list of developments meeting the criteria for inclusion in the ARHP, the City identified 495 developments that had received funding through the City and/or are being monitored for compliance by the City. *See* Ex. 3, May 24, 2019 Letter from M. Khetarpal; Ex. 4, June 13, 2019 Letter from M. Khetarpal. When the Parties again appeared before the Court on June 18, 2019, Plaintiff and the City both stated they were collaborating on the Portfolio as a priority. The City specifically confirmed it was "on board" with this plan:

KLAR: When we talked yesterday, we felt that—we all agreed that the priority is working [the Portfolio] out. The plaintiffs are going to provide an overall list to the defendant at their request that has all of the properties, who put them in, et cetera, so that we can try to work on the discrepancies in the next, you know, 45 to 60 days together. . . And also working out this issue about which properties are in. There is an—the defendant has indicated about 492 properties they think are in. We think there are 702 on our additional list. And there's some sort of complex overlap and lots of overlap that we need to work out. So our view was to set a hearing later on in the summer and let us report back to you where we are in this preliminary but critical project, and also continuing to produce what we refer to as the low-hanging fruit.

---

[2] The Parties also exchanged certain documents during this period. Plaintiff produced declarations, FOIA documents with information on Chicago developments receiving federal funding, media documents on accessible housing in Chicago, Chicago Building Codes, Consolidated Annual Performance and Evaluation Reports, Consolidated Plans, Annual Action Plans, loan documents, and other City documents related to specific developments. Plaintiff also provided documents related to the testing that Access Living conducted prior to the complaint, including the forms filled out by testers and pictures taken during testing. The City produced records from the City's Office of Budget Management (OBM) and from the Mayor's Office for People with Disabilities (MOPD).

THE COURT: Sounds like a good plan. Everybody on board?

MS. KHETARPAL: Yes, your Honor.

Ex. 5, June 18, 2019 Hr'g Tr., at 4:20-5:20.

However, the City's last contribution to the Portfolio was its prehearing, June 13 disclosure of developments. Since that time (six months ago), despite assuring the Court it was "on board" with establishing the Portfolio, the City has persistently stonewalled and undermined this critical threshold task.

C. Despite Its Representations to Plaintiff and This Court, the City Refused to Cooperate with Plaintiff to Establish the Portfolio

The week after the status conference, Plaintiff sent the City a spreadsheet containing 881 developments, which included the 495 developments identified by the City and 386 additional developments identified by Plaintiff (referred to herein as the "Combined Portfolio"). The Combined Portfolio indicated whether one or both Parties had identified each development for inclusion. For 52 of these developments, the spreadsheet included an Integrated Disbursement and Information System ("IDIS") number—a unique identifier assigned by the Department of Housing and Urban Development ("HUD") to track projects/activities that receive federal funding.[3] Counsel for Access Living asked the City to review the developments not included on the City's list and confirm whether these developments met the criteria for inclusion or why they did not belong in the Portfolio. *See* Ex. 6, June 24, 2019 Email from J. Klar.

---

[3] When the City awards HUD funds to the owner of a multifamily housing development in Chicago, HUD requires that the development be assigned a unique identifier in HUD's Integrated Disbursement and Information System. The assignment of an IDIS number is near-presumptive evidence that the development meets the criteria for inclusion in the Portfolio.

During a meet-and-confer call on July 1, Counsel for Plaintiff asked the City to be ready to discuss the Combined Portfolio on July 11. The City indicated it was comparing the developments suggested by Plaintiff against those it had identified. Yet on July 11, the City had made no progress on the Combined Portfolio and offered only to "look at" the 52 developments with IDIS numbers. Plaintiff, meanwhile, answered all of the City's questions as to how it identified the additional 386 developments for inclusion in the Portfolio. More than a week later, Counsel for the City stated via email: "We are working on investigating the roughly 52 properties you claim were identified through FOIA requests or otherwise by an IDIS number. We are currently investigating those properties and expect to be in a position to discuss with you during our August 1st call." *See* Ex. 7, July 19, 2019 Email from M. Khetarpal.

However, the City was not able to discuss the 52 developments with IDIS numbers on August 1. Instead, Counsel for the City said their research placed 26 of these developments in the Portfolio, though it would not disclose which 26 developments it could confirm. The City stated it would provide more information the following week. Plaintiff once again provided additional insight about the developments it identified, such as the documents on which it relied upon to identify relevant developments.[4]

---

[4] During this same July-August window, Plaintiff also sought to advance the Portfolio project by requesting seven highly relevant and readily accessible IDIS Reports concerning complexes in the ARHP. By way of explanation, pursuant to federal requirements, the City routinely reports IDIS data to HUD on each apartment complex in the ARHP that has received federal funding. If a development is included on these reports, it shows that HUD is tracking the development as a recipient of federal funding, which would be a presumptive indicator of inclusion in the Portfolio. Counsel for the City acknowledged they had generated and reviewed these reports but refused to turn them over. The City purported to withhold the reports on relevance grounds, even after Plaintiff sent the City a comprehensive explanation of the critical information contained in each of the seven IDIS reports, including why such reports would facilitate the establishment of the Portfolio. *See* Ex. 8, July 16, 2019 Email from J. Klar. The City continues to withhold these reports.

On August 14, Plaintiff sent the City a letter describing its pre-litigation investigation and identifying the developments it visited, contacted, or otherwise investigated. That same day, the City returned the Combined Portfolio with annotations—but no confirmations. Instead, the City included only identification of discrepancies (e.g., problems with names and addresses of developments) and potential duplicates. *See* Ex. 9, Aug. 14, 2019 Email from M. Khetarpal. This correspondence did not include an update on the 52 developments with IDIS numbers. *Id.* Hopeful that this step nevertheless represented meaningful progress, Plaintiff responded the next day to inquire whether the Parties were in agreement that any development without annotations fell within the Portfolio. *See* Ex. 10, Aug. 15, 2019 Email from J. Klar. When counsel received no response, Plaintiff repeated this question in an August 20 letter, which was accompanied by a fully sourced version of the Combined Portfolio (hereinafter referred to as the "Validated Portfolio"). *See* Ex. 11, Aug. 20, 2019 Letter from J. Klar.

The Validated Portfolio confirmed the inclusion of 704 developments in the Portfolio by identifying the source of the information that showed that the development met the criteria for the ARHP. *Id.* The overwhelming majority of the sourcing was drawn from the City's own publications and representations to the Federal Government. *Id.* at 1. Plaintiff also recommended solutions for the discrepancies that the City identified and resolved duplicate entries, hence the adjustment from 881developments in the Combined Portfolio down to 704 developments in the Validated Portfolio. *Id.* at 1, 3. The letter explained how to use and understand the Validated Portfolio, *id.* at 2-3, and included an offer from Plaintiff's Counsel to make themselves available "to resolve any uncertainties [the City] may have about the portfolio, or about our methodology for validating it," *id.* at 1.

The City never responded to the substance of the Validated Portfolio.

D. Due to the City's Intransigence, Plaintiff Requested and this Court Assigned a Magistrate Judge to Oversee Discovery

The Parties appeared for a status conference on August 21. Concerned by the paucity of progress on the Portfolio during the spring/summer informal discovery, Plaintiff requested a transition to formal discovery and supervision by a magistrate judge.[5] *See* Ex. 12, Aug. 21, 2019 Hr'g Tr., at 3:2-4:20 (explaining that "threshold project" had not been accomplished despite Plaintiff's efforts and asking for "help from a magistrate judge" as the case transitioned to formal discovery). The City resisted appointment of a magistrate but did not disclose any concerns whatsoever about the Court-approved plan of focusing on the Portfolio. *Id.* 6:14-6:16 ("[Ms. Khetarpal: "We are taking steps towards confirming a list of properties. We just think a referral to a magistrate is premature at this time."). Nor did the City suggest the Court revisit its directive that the Parties work together on the Portfolio. Days later, however, counsel for the City issued a one-sentence email stating it was "not in a position to agree to include any particular properties" in the Portfolio. *See* Ex. 13, Aug. 26, 2019 Email from M. Khetarpal. In other words, the City waited until after the Parties appeared before the Court to contradict its prior representations and refuse to cooperate on the Portfolio.

Given the paramount importance of the Portfolio, however, Plaintiff continued to seek a collaborative solution. Counsel for Plaintiff sent the City a letter on September 4 to note dismay at the City's recent conduct and to offer two paths toward establishing the Portfolio,

---

[5] During the August 21 hearing, Plaintiff also made a factual proffer to correct a discrepancy in Paragraph 83 of the Complaint. Specifically, Plaintiff advised the Court that it had contacted around 140 developments, not 300. *See* Ex. 12 at 4:21-5:16. The Court determined that no formal amendment was necessary, which makes sense given the fact that this number has no bearing on whether the City is liable for failing to make units in the Program accessible, as required by Federal Accessibility Laws. *Id.* at 5:17-6:3.

collaboration or formal discovery.[6] *See* Ex. 14, Sep. 4, 2019 Letter from J. Klar. The letter reminded the City that a disagreement on the merits was not a basis for avoiding the factual project of determining the Portfolio, especially in light of the Parties' representations to this Court. *Id.* The City responded on September 9 to state that, disclosure of 495 developments notwithstanding, it had never agreed to include any development in the Portfolio and declined to work together collaboratively. *See* Ex. 15, Sep. 11, 2019 Letter from M. Khetarpal. With this correspondence, the City all but nullified the efforts of the previous four months.

E.    Despite the Court's Instructions and the Parties' Prior Agreement to Focus on the Portfolio, Defendant Asked Judge Cole to Limit Discovery to Plaintiff's Pre-Litigation Investigation

The City's conduct before Judge Cole has gone beyond the stonewalling that characterized informal discovery. Since September 2019, Defendant has insisted on a patently incorrect narrative of the case, one that is so at odds with the Complaint and with this Court's decision on the motion to dismiss that it can only be understood as a deliberate attempt to limit discovery and, in turn, Plaintiff's ability to prove the claims this Court ruled survived the City's motion to dismiss.

During the September 25 hearing before Judge Cole, counsel for the City repeatedly stated to Judge Cole that Plaintiff's claims concern individual incidents of discrimination. *See, e.g.*, Ex. 16, Sep. 25, 2019 Hr'g Tr. at 6:19-6:23 ("MS. KHETARPAL: So this is, again, a discrimination case, *and what we should focus on right now is whether anybody has been discriminated against*, whether there's been even a threshold showing that there's anything that

---

[6] The formal discovery Plaintiff contemplated was a set of Requests for Admission ("RFA"), which would have confirmed each criterion for inclusion in the Portfolio for each development. Plaintiff subsequently served RFAs as part of formal discovery, but ultimately withdrew them when the City moved for a protective order to yet again avoid establishment of the Portfolio. *See* Dkt. 62; Dkt. 66.

has happened that implicates the actual laws that are at issue here." (emphasis added)). The City
continued to make such statements even after Counsel for Access Living, the party responsible
for raising the claims at issue in this action, corrected this misrepresentation. *See id.* at 15:16-
15:18 ("MS. KHETARPAL: . . . First of all, I want to take us back to what the case is about. This
is a discrimination case, not an accessibility case."). The City coupled its mischaracterization of
Plaintiff's claims with an insistence that discovery focus not on the Portfolio, but instead on the
135 developments that Plaintiff investigated prior to filing the Complaint and disclosed on
August 14. *See, e.g.*, *id.* at 18:21-18:24. In other words, the City implied that Plaintiff's claims
turn on whether its pre-litigation investigation uncovered specific episodes of exclusion at a
subset of developments in the Portfolio.

  This position misunderstands Plaintiff's claims in significant ways. At its core, this case
concerns the City's systemic failure to make the ARHP accessible to people with disabilities.
Dkt. 35 at 1-2. Liability will turn on the City's program-wide conduct and actual accessibility;
whether individual incidents of exclusion are part of the factual record is neither here nor there.
Nor do the 135 developments Plaintiff investigated prior to filing merit some special solicitude.
They merely provide a representative illustration of inaccessibility. Plaintiff could have
investigated a completely different set of developments, or none at all, and still pursue precisely
the same claims against the City. Accordingly, the City's narrative at the September 25 hearing
mischaracterized and distracted from Plaintiff's claims.

  The City provided no explanation or justification for contravening the Court-approved
plan of prioritizing the Portfolio. Judge Cole limited discovery based on the City's
mischaracterization of the case. Dkt. 54, Minute Entry (limiting discovery to the developments
that Plaintiff investigated prior to litigation and disclosed to the City on August 14).

To promote alignment, build understanding of the Portfolio, and contextualize its relevance within this case, Plaintiff filed a Discovery Plan on November 6. *See* Dkt. 61, Plaintiff's Notice Regarding Discovery Plan. The Discovery Plan provides a roadmap for how Plaintiff intends to conduct discovery to prove both architectural and programmatic inaccessibility, and, importantly, the order in which the various steps must occur. *Id.* More specifically, Plaintiff outlined its plan for "(1) establishment of a complete list of all properties in the Program; (2) randomization and selection of samples of properties in the Program for plan and measurement review; (3) review of plans, as approved, for accessibility/inaccessibility; and (4) on site review of buildings and units, as built, for accessibility/inaccessibility." *Id.* at 3. This plan reflects Plaintiff's careful and experienced assessment of the fairest and most efficient way to resolve the claims at issue. Plaintiff hoped the Discovery Plan would enable the Parties to work together to move the case forward.

Despite Plaintiff's transparency regarding its plan for discovery, the City again requested that discovery be limited to Plaintiff's pre-litigation investigation during the November 12 hearing with Judge Cole. *See* Ex. 17, Nov. 12, 2019 Hr'g Tr., at 18-20 (discussing discovery for 135 properties in pre-litigating investigation only). The City maintained this position even though it is flatly inconsistent with the allegations in the Complaint, the decision denying the motion to dismiss, and Plaintiff's method of proof.

The City's pace of document production is an independent cause for concern, one which also arose on November 12. As of that hearing, over six weeks after insisting that discovery focus only on 135 developments, the City had produced documents for *just 25 developments*. Dkt. 69 at 3. The City also refused to engage in any other parallel discovery, even that which would include information about the 135 developments but could not be disaggregated from

other developments in the Portfolio, such as production of the IDIS reports. *See* Ex. 18,
Defendant's Objections to Instructions for Plaintiff's First Set of Requests for Production, at 5.3
(asserting that discovery that "exceeds the 135 Properties . . . exceeds the scope of permissible
discovery").

Most recently, the Parties appeared before Judge Cole on December 2. In advance of that
hearing, Plaintiff suggested two categories of documents that would enable Plaintiff to
independently establish the Portfolio and proceed to the next phase of discovery. *See* Ex. 19,
Dec. 2, 2019 Hr'g Tr., at 6:10-7:8; Dkt. 69 at 4 (explaining that production of "(1) the City's
fully executed loan agreements with property owners, including exhibits and attachments; and
(2) the fully executed regulatory agreement with each owner" would "streamline discovery and
help keep the case more on schedule"). Based on the City's statements in its own status report
and supporting declarations, the sought-after documents are available in the City's Law/Finance
Department and Department of Housing, respectively. Dkt. 68 at 7, 11. Obtaining these two
documents for all developments would have permitted discovery to be dual tracked—Plaintiff
could have used the documents to confirm the Portfolio and proceed with randomization and
evaluation while the City continued to review and produce the rest of the documents. *See* Ex. 19
at 6:4-6:9.

The City refused even to provide such documents for any developments beyond the 135
involved in the pre-litigation investigation. *Id.* at 31:8-9 (purporting, among other things, that
Plaintiff's claims "are based on, the results of looking at those 135"). The City also disclosed that
it could not complete production of documents for even the 135 developments until May 2020, a
full eight months after Plaintiff served its discovery requests. *Id.* at 42:13-43:3. At the City's
projected rate, it would take ***more than three years just to confirm the Portfolio of***

***developments in the ARHP***, to say nothing of the work necessary thereafter to establish architectural and programmatic inaccessibility. Far from the dual track Plaintiff proposed, the City's timeline delays the rest of the critical steps of randomization and measurements by years, all but ensuring this case will languish for at least half a decade.

When Plaintiff expressed alarm at how far off course Defendant had pushed discovery, Judge Cole suggested seeking clarity from this Court. *Id.* at 50:4-50:5. Given that the City spent eight months thwarting Plaintiff's efforts to effectuate the agreed-upon task of establishing the Portfolio, Plaintiff agrees that Court intervention is necessary.

Accordingly, for the reasons set forth below, Plaintiff requests that the Court clarify that discovery necessarily includes the entire inventory of developments in the ARHP and that establishing the Portfolio is the first step.

## III. The Scope of Discovery Must Be Commensurate with Plaintiff's Allegations of Systemic Discrimination

Plaintiff is presumptively entitled to discovery that reflects the scope of the allegations in the Complaint. To limit discovery to the 135 developments involved in Plaintiff's pre-litigation investigation when Plaintiff alleges program-wide violations would essentially rewrite Plaintiff's Complaint to encompass fundamentally different claims. In other words, limiting discovery to Plaintiff's pre-litigation investigation not only contradicts the Federal Rules of Civil Procedure, but also reflects a material misunderstanding of the systemic nature of Plaintiff's discrimination claims.

The liberal discovery standard plainly precludes limiting discovery in this systemic case to Plaintiff's pre-litigation investigation. "It is well-established that the federal discovery rules permit liberal discovery in an effort to facilitate the trial or settlement of legal disputes. Pursuant to Federal Rule of Civil Procedure 26(b)(1), '[p]arties may obtain discovery regarding any

nonprivileged matter that is relevant to any party's claim or defense.'" *Miner v. Gov't Payment Serv., Inc.*, Case No. 14-cv-7474, 2017 WL 3909508, at *3 (N.D. Ill. Sep. 5, 2017) (Dow, J.) (citations omitted).

A. Discovery Necessarily Includes the Entire Portfolio of Developments in the Program

In this systemic action, Plaintiff is entitled to discovery into the entire ARHP. This scope of discovery issue arose in a materially similar action involving the City of Los Angeles, which sought to limit discovery in a similar systemic inaccessibility case to developments specifically named in the complaint. *See Indep. Living Ctr. of S. California v. City of Los Angeles*, 296 F.R.D. 632, 633 (C.D. Cal. 2013). There, the plaintiffs alleged violations of Section 504, the ADA, the FHA, and state laws because the City of Los Angeles and its agencies failed to take steps to ensure that housing developed, funded, and significantly assisted with public funds was accessible and meaningfully available to people with disabilities. *Id.* Three key holdings from that decision are instructive here. First, the court held that the plaintiffs' discovery requests that reached  beyond the named developments were "clearly relevant" to the plaintiffs' claims because "the main focus of this lawsuit is the legality of the overall housing program." *Id.* at 635. Here, too, as this Court recognized, Access Living challenges the accessibility of the ARHP "*as a whole*," Dkt. 1 at ¶ 6; Dkt. 35 at 4, not just the smaller subset of developments included in Plaintiff's pre-litigation investigation. Plaintiff is therefore entitled to discovery into the entire Portfolio.

Second, *Independent Living* held plaintiffs were entitled to program-wide information regardless of the size of their pre-filing investigation and regardless of the specific developments named in their complaint. 296 F.R.D. at 635 ("What's more, even assuming there was only one—or even no owner defendants—named in the instant action, plaintiffs would still be entitled

to the subject discovery."). Discovery into other developments was independently "necessary to enable plaintiffs to obtain a full picture of the extent and nature of the interrelationship between the government defendants and the owners and developers of housing who received funds from the CRA/LA and/or the City." *Id.* Here, too, discovery into the developments in the Portfolio is necessary to understand the City's relationship to the developments in the ARHP. This relevance is entirely distinct from whether or not Access Living investigated any developments prior to litigation.[7]

Third, *Independent Living* held that the plaintiffs were entitled to "information concerning the government defendants' practices at properties other than the ones named in the SAC" because such information was "relevant to plaintiffs' allegations that the government defendants have engaged in a 'pattern or practice' of discrimination in failing to make multifamily housing units and common areas in the government defendants' entire housing portfolio meaningfully accessible to people with disabilities, in violation of Section 504 [and] the ADA." *Id.* at 636. Here, Access Living likewise alleges systemic conduct and specifically plead that the City engages in a pattern or practice of differential treatment. *See* Dkt. 1 at ¶144; *id.* at ¶ 159. Access Living is therefore entitled to discovery relevant to showing a pattern or practice of discrimination throughout the entire ARHP. 296 F.R.D. at 636.

---

[7] Even before it commenced its pre-suit investigation, Access Living suspected the City was out of compliance with federal accessibility requirements. For years, it had struggled to assist its individual clients locate and apply for accessible affordable housing in Chicago. When it learned, in 2016, that the City could not identify the locations of accessible units in the ARHP—let alone publicize those locations to people with disabilities needing the accessible features—Access Living determined that an investigation was necessary. It undertook that investigation by requesting certain information from the City and by contacting 135 individual developments to assess whether they met the architectural and program accessibility requirements of Section 504, the ADA and the FHA. The results of that investigation, as well as Access Living's own experience and its extensive review of public documents, suggested systemic inaccessibility across the ARHP. Access Living therefore sought remedies with respect to the entire Program.

The *Independent Living* court ordered that "[t]he scope of discovery in this action shall extend to the entire housing portfolio, including projects not yet completed, of . . . the City." *Id.* at 637. The scope of discovery in this action, which includes parallel allegations regarding the entire inventory of housing in the City's ARHP, must likewise extend to the entire Portfolio. *See Janis v. Nelson*, No. CR. 09–5019–KES, 2009 WL 5216898, *4 (D.S.D. 2009) (holding that discovery into the defendants' practices were relevant when the plaintiffs alleged that people were removed from voter list after felony conviction pursuant to the state's general practice); *Goff v. Kroger Co.*, 121 F.R.D. 61, 61–62 (S.D. Ohio 1988) (employment discrimination plaintiff entitled to discover information regarding employer's subsidiary and affiliated companies because information relevant to showing "pattern and practice of discrimination by defendant"); *Hubbard v. Rubbermaid, Inc.*, 78 F.R.D. 631, 639 (D. Md. 1978) (company-wide discovery appropriate in case alleging employment discrimination in one division: "non-departmental data may well lead to relevant evidence tending to show discrimination within the department in question").[8]

B. <u>There Is No Legal or Factual Justification to Limit Discovery to Plaintiff's Pre-Litigation Investigation</u>

Given that the scope of discovery necessarily includes the full ARHP, limiting that scope to the developments Plaintiff investigated prior to filing the Complaint would be improper. *See, e.g.*, *U.S. Equal Employment Opportunity Comm'n v. AutoZone, Inc.*, 141 F. Supp. 3d 912, 915 (N.D. Ill. 2015) as amended (Nov. 4, 2015) (holding that the scope of discovery in a pattern or practice employment case was not limited to the EEOC's pre-litigation investigation). To limit

---

[8] *See also Equal Rights Ctr. v. Equity Residential*, 798 F. Supp. 2d 707, 731–32 (D. Md. 2011) (denying summary judgment against a housing organization and explicitly rejecting the argument that the organization's standing was limited to the developments to which it sent testers).

discovery to pre-litigation investigations would create perverse incentives—plaintiffs bringing systemic challenges would be wary of detailing their pre-litigation investigations for risk of narrowing the scope of their claims. Plaintiffs would thus face a Hobson's choice between risking dismissal for insufficiently specific pleadings—something the City sought here, *see* Dkt. 25 at 12-14—or risking circumscription of their claims—as Access Living now faces. That Access Living specifically investigated certain developments prior to filing suit does not now limit the scope of discovery or Plaintiff's claims, especially considering the many other robust allegations of discrimination and harm in the Complaint.[9] Accordingly, this Court should confirm that Plaintiff is entitled to discovery on the entire ARHP Portfolio.

## IV. Establishing the Portfolio Is a Threshold Task That Must Be Prioritized

Beyond permitting broad discovery, district courts have discretion to determine the sequence of discovery. *See* Fed. R. Civ. P. 26(d)(3). Here, the sequence of discovery is of central importance because each phase of Plaintiff's discovery plan builds on the one before. *See* Dkt. 61, Plaintiff's Notice Regarding Discovery Plan. It is for this reason that Plaintiff has persisted in its efforts to accomplish the key threshold task of establishing the Portfolio ever since the Court denied the City's motion to dismiss in April 2019.

Given the scope of this action, which touches more than 700 developments in the ARHP, it is impossible to evaluate architectural inaccessibility for all covered units in all covered developments. Rather, liability will be shown by testing a statistically randomized sample of

---

[9] Indeed, that neither Defendant nor the Court stated any concerns when Plaintiff corrected the discrepancy in the number of developments covered by Plaintiff's pre-litigation investigation during the August 21 hearing indicates that no one saw the investigation as relevant to the scope of discovery or Plaintiff's claims.

developments in the Portfolio, the results of which an expert will extrapolate to the Portfolio as a whole to opine on the inaccessibility of the ARHP. *Id.*

As Plaintiff explained in its Notice Regarding Discovery Plan, the Portfolio is the cornerstone of Plaintiff's step-by-step discovery plan in this action:

> The first major focus of discovery will be demonstrating that (1) the City routinely *approved* architectural drawings/blueprints for developments in the Program that did not comply with federal accessibility standards and (2) that developments in the Program were not *built* in compliance with federal accessibility standards. There are several essential steps, that must be completed in order, for Plaintiff to conduct this discovery. Those steps are: (1) establishment of a complete list of all properties in the Program; (2) randomization and selection of samples of properties in the Program for plan and measurement review; (3) review of plans, *as approved,* for accessibility/inaccessibility; and (4) on site review of buildings and units, *as built,* for accessibility/inaccessibility.

*Id.* at 3. Without the Portfolio, Plaintiff cannot randomize the developments to select a statistically sound set of developments for review.[10] *Id.* at 3-4. Without the randomized sample, Plaintiff's experts cannot begin plan and measurement review. *Id.* at 4. Without this expert analysis, Plaintiff cannot prove inaccessibility. *Id.* at 4-5. These consecutive steps form a direct line between the Portfolio and Plaintiff's ability to satisfy its burden of proof at trial. The Portfolio is the predicate task that must be completed for the remaining steps to occur. And of course, because Plaintiff's claims apply to the entire ARHP, there can be no doubt that the Portfolio must be established before this systemic case can be resolved.

Establishing the Portfolio early on has other benefits as well. It will minimize discovery disputes, prevent needless document review and production for developments that do not fit within the parameters of Plaintiff's claims,[11] and ensure that discovery in this case does not drag

---

[10] And, as Plaintiff explained at the Dec. 2 hearing and in its accompanying status report, establishment of the Portfolio does <u>not</u> require full document production. *See* Ex. 19 at 6:10-7:8; Dkt. 69 at 4.

[11] For example, with the benefit of discovery and Plaintiff's own validation work, it is now apparent that not all of the developments it investigated fall within the Portfolio. If the Portfolio

for half a decade. Once the Portfolio is settled, Plaintiff can undertake the subsequent steps in its Discovery Plan while Defendant continues to review and produce documents. By contrast, delaying establishment of the Portfolio will needlessly protract the litigation and risk limiting the scope of Plaintiff's claims themselves. The advantages of establishing the Portfolio will redound to the benefit of both Parties, and to the benefit of the Court.

This systemic action necessarily includes the entire ARHP. Limiting discovery to Plaintiff's pre-litigation investigation and the 135 developments encompassed therein, even temporarily, is improper. Rather, the first step must be establishing the Portfolio of developments covered by Plaintiff's claims. The request that Plaintiff made on December 2—immediate production of (1) the City's fully executed loan agreements with property owners, including exhibits and attachments; and (2) the fully executed regulatory agreement with each owner for all developments—is the best way to accomplish this essential predicate task.

## V.    Conclusion

For the foregoing reasons, Plaintiff moves the Court to issue an order that (a) clarifies the scope of discovery to include the entire Affordable Rental Housing Program and that there is no limitation (temporary or otherwise) to 135 properties, (b) affirms the Court's previous directive that discovery should begin with the establishment of the Portfolio, (c) compels the City to produce the two categories of documents described above, and (d) grants any other relief it deems appropriate to facilitate discovery .

---

is established, then the City need not spend time locating, reviewing, and producing documents for those that are not in the ARHP.

Date: December 16, 2019

/s/ Jennifer I. Klar
Michael G. Allen*
Jennifer I. Klar*
Lila Miller*
Kali Schellenberg*
RELMAN, DANE & COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
Tel: 202-728-1888
Fax: 202-728-0848
mallen@relmanlaw.com
jklar@relmanlaw.com
lmiller@relmanlaw.com
kschellenberg@relmanlaw.com

Kenneth M. Walden
Mary Rosenberg
Access Living of Metropolitan Chicago
115 West Chicago Avenue
Chicago, IL 60654
Tel: 312-640-2136
Fax: 312-640-2101
TTY: 312-640-2102
kwalden@accessliving.org
mrosenberg@accessliving.org

*Attorneys for Plaintiff*
*Admitted Pro Hac Vice*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 16, 2019, a true and correct copy of the foregoing

Plaintiff's Motion for Clarification on the Scope of Discovery and/or Enforcement of the Court's

Decision Denying the Motion to Dismiss was served via CM-ECF on all attorneys of record.


/s/ Jennifer I. Klar
Jennifer I. Klar