# EXHIBIT 53

Report of John L. Wodatch

In the matter of:

Access Living of Metropolitan Chicago, Inc.,
an Illinois non-profit corporation,
Plaintiff,

vs.

City of Chicago,
an Illinois municipal corporation,
Defendant.

Case No.: 1:18-cv-03399

United States District Court
Northern District of Illinois
Eastern Division

Report Date: January 3, 2023

Submitted under the signature of:

*John L. Wodatch*

---

John L. Wodatch
Disability Rights Attorney

645 A Street, N.E.
Washington, D.C. 20002
(202) 738-6565 cell
jlwodatch@gmail.com

1

## I.      INTRODUCTION

I was retained by Plaintiff's counsel to opine on:

(1)  The Federal requirements for public entities in meeting the new construction and alterations and the program accessibility obligations of Section 504 of the Rehabilitation Act, as amended, (Section 504) and the Americans with Disabilities Act (ADA) during the time period covered in this litigation; and

(2)  The extent to which the City of Chicago, the defendant in this litigation, has fulfilled its obligation to comply with the new construction and alteration and the program accessibility requirements of Section 504 and the ADA and with the current standard of practice.

## II.     GENERAL CONCLUSION

My review of documents that are referenced in this report lead me to the conclusion that the City and its Department of Housing[1] have operated the Affordable Rental Housing Program (composed of at least 517 multifamily developments listed in a stipulation of the Parties, Dkt. No. 185), in a manner that is in violation of the requirements of Section 504 and Title II of the ADA and the implementing regulations of the U.S. Department of Justice (DOJ) and the U.S. Department of Housing and Urban Development (HUD), and in a manner that denies persons with disabilities an equal opportunity to participate in the City's affordable housing program.

## III.    QUALIFICATIONS

For the past 50 years, my professional activities have focused almost entirely on increasing accessibility for, and promoting the community integration of, people with disabilities. Over five decades, through enforcement and education activities, I have become intimately familiar with the practical methods employed by public entities to comply with both the new construction and alterations requirements and the program accessibility requirements of Section 504 and the ADA.

Prior to retiring from the Civil Rights Division of the DOJ in 2011, I served a total of 31 years as the Deputy Assistant Attorney General for Civil Rights, Chief of DOJ's Disability Rights Section, Director of the Office on the Americans with Disabilities Act, and Deputy Chief of the Coordination and Review Section. From 1975 to 1980, I was Director of the Office of New Programs and Branch Chief of the Office for Civil Rights at the U.S. Department of Health, Education and Welfare (HEW). From 1969 to 1975, I was an attorney in the Office of General Counsel at HEW.

---

[1] I am informed that the City of Chicago entity responsible for administration of the Affordable Rental Housing Program has been housed in different City agencies from 1988 to the present, including the Department of Planning and Development, the Department of Economic Development, the Department of Community Economic Development, and the Department of Housing. For purposes of clarity, this report uses "Department of Housing" to refer to all of these.

While at the General Counsel's Office in 1973, I was assigned the responsibility to draft HEW's regulations for the newly enacted Section 504 of the Rehabilitation Act of 1973 (Section 504). I developed the concept of program accessibility for HEW and, under President Ford, oversaw government-wide coordination of 504 regulations at other Federal agencies. At the Office for Civil Rights, I headed an office charged with ensuring that each Federal agency incorporated the concept of program accessibility into its Section 504 rules.

The final coordination rule was promulgated in 1977—after over 20 public hearings around the country and two public rulemaking processes. Shortly thereafter, President Carter reassigned coordination responsibility for Section 504 to DOJ, and I moved to that agency as Deputy Chief for the Coordination and Review Section. In that capacity, I reviewed HUD's regulations to ensure that they required program accessibility in all programs operated by HUD and by its grantees. During the Reagan administration, I worked closely with the Presidential Task Force on Regulatory Relief to ensure that the program accessibility requirements were strengthened.

In early 1989, I was appointed as the White House's technical expert to help draft and secure passage of the ADA. After passage of that law, Attorney General Dick Thornburgh charged me with developing DOJ's ADA regulations and working with the Access Board to write the ADA Accessibility Guidelines. At the Office on the Americans with Disabilities Act ("Office")—which became the Disability Rights Section ("Section")—I was responsible for implementing the ADA's technical assistance program and with enforcement of the substantive provisions of the law. We saw these two components as complementary, with both being necessary to ensure widespread compliance with the ADA.

Under my supervision, the Office and the Section created and operated an extensive public outreach and technical assistance program, providing the public with practical information on how to comply with the ADA in a cost-effective manner, through the development of guides and pamphlets, a grant program, extensive public speaking and training, an ADA website, and a telephone information service. In other words, we sought to make available to state and local governments (and businesses)—including the City of Chicago and its related agencies—all the technical information they needed to voluntarily comply with their ADA (and Section 504) obligations.

I also established the Federal government's program for the certification of State accessibility codes as compliant with ADA requirements. During my tenure, five States (not including Illinois) achieved certification status.

During my tenure (1990 through July 2011), the Section commenced more than 3,000 investigations and negotiated many voluntary resolutions securing compliance with the ADA and Section 504. I was personally involved in hundreds of investigations and cases relating to the application of the program accessibility standard to state and local governments, through the program known as Project Civic Access.

Since my retirement from DOJ in July 2011, I have provided advice and information to a range of clients related to the Americans with Disabilities Act, the U.N. Convention on the Rights of Persons with Disabilities, Section 504 of the Rehabilitation Act, and other disability rights laws and regulations. For the past two years, I have been serving as a Senior Disability Policy Advisor to the Office for Civil Rights of the U.S. Department of Health and Human Services as a Federal contractor, providing advice and guidance on Section 504 of the Rehabilitation Act of 1973, Title II of the Americans with Disabilities Act, and other Federal disability rights laws and regulations.

3

I am a Board member and past president of the National Association of ADA Coordinators and, prior to the COVID national emergency, provided detailed training on the ADA twice yearly at that Association's conferences for many years.

A copy of my resume is attached as Appendix A.

**IV.    DOCUMENTS AND INFORMATION REVIEWED FOR THIS REPORT (Incomplete List)**

1.  Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. 794
2.  Americans with Disabilities Act of 1990, as amended, 42 U.S.C. 12101 et seq.
3.  Section 504 Regulation of the Department of Health, Education and Welfare, Fed. Reg. Vol. 42, No. 86 at 22676-22702, originally codified as 45 C.F.R. Part 84, which is now the same regulatory text as regulation of Department of Education
4.  Coordination Regulation for Section 504 of the Department of Health, Education and Welfare, Fed. Reg. Vol. 43, No. 9 at 2132-2139 (originally codified at 45 C.F.R. Part 85)
5.  Department of Justice Coordination Regulation for Section 504, 28 C.F.R. Part 41
6.  Department of Justice Regulations Implementing Titles II and III of the Americans with Disabilities Act (1991 version), 28 C.F.R. Parts 35 & 36 (2010 edition)
7.  Department of Justice Regulations Implementing Titles II and III of the Americans with Disabilities Act (2010 version), 28 C.F.R. Parts 35 & 36 (2011 edition)
8.  Department of Justice Regulation Implementing Section 504 for federally conducted programs, 28 C.F.R. Part 39
9.  HUD Section 504 Regulations for federally assisted programs, 24 C.F.R. Part 8
10. Standards for Accessible Design (1991 version), appendix A to 28 C.F.R. Part 36 (2010 edition)
11. ADA Standards for Accessible Design (2010 version), appendix A to 28 C.F.R. Part 36 (2011 edition)
12. U.S. Access Board, *Uniform Federal Accessibility Standards*, https://www.access-board.gov/aba/ufas.html
13. U.S. Department of Justice, *The Americans with Disabilities Act: Title II Technical Assistance Manual*, https://archive.ada.gov/taman2.htm
14. U.S. Department of Justice, *Americans with Disabilities Act: ADA Title III Technical Assistance Manual*, https://archive.ada.gov/taman3.html
15. ADA website of the Department of Justice, https://www.ada.gov
16. Website of the Access Board, https://www.access-board.gov
17. U.S. Department of Housing and Urban Development, *Section 504 of the Rehabilitation Act of 1973*, https://www.hud.gov/programdescription/sec504
18. Website of the ADA National Network, https://adata.org
19. Website of the National Association of ADA Coordinators, https://adacoordinators.org
20. Exec. Order No. 11914, 41 F.R. 17871 (1976)
21. Exec. Order No. 12250, 45 F.R. 72995 (1980)
22. Exec. Order No. 12291, 46 F.R. 13193 (1981)
23. *Southeast Cmty. Coll. v. Davis*, 442 U.S. 397 (1979)
24. *Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206 (1998)
25. *Alexander v. Choate*, 469 U.S. 287 (1985)
26. *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1062 (9th Cir. 2010)
27. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 286 (2d Cir. 2003)
28. *Hunter v. D.C.*, No. 1:12-CV-1960 (GK) (D.D.C. August 18, 2014)

29. *James v. Peter Pan Transit Mgmt.*, No. 5:97-CV-747, 1999 WL 735173, at *9-10 (E.D.N.C. Jan. 20, 1999)

30. *Deck v. City of Toledo*, 56 F. Supp. 2d 886, 895 (N.D. Ohio 1999)

31. Section 811 Supportive Housing Program for Persons with Disabilities, 42 U.S.C. § 8013

32. U.S. Department of Housing and Urban Development, *Section 504: Frequently Asked Questions*, http://portal.hud.gov/hudportal/HUD?src=/program_offices/fair_housing_equal_opp/disabilities/sect504faq

33. HUD Office of Fair Housing and Equal Opportunity, *Voluntary Compliance Agreement Between HUD and The Housing Authority of the City of Atlanta, Georgia*, http://portal.hud.gov/hudportal/documents/huddoc?id=DOC_7739.pdf

34. HUD Office of Fair Housing and Equal Opportunity, *Voluntary Compliance Agreement Between HUD and The Housing Authority of the City of El Paso* (2009), http://portal.hud.gov/hudportal/documents/huddoc?id=ElPasoTXHAVCA.pdf

35. HUD Office of Fair Housing and Equal Opportunity, *Voluntary Compliance Agreement Between HUD and The Housing Authority of Baltimore City* (2013), http://portal.hud.gov/hudportal/documents/huddoc?id=HBCVCA.pdf

36. U.S. Department of Housing and Urban Development Community Planning and Development, *Notice CPD-05-09* (December 26, 2000), https://archives.hud.gov/offices/cpd/affordablehousing/lawsandregs/notices/00-9.pdf.

37. U.S. Department of Housing and Urban Development Community Planning and Development, *Notice CPD-05-09* (November 3, 2005), https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.hud.gov%2Fsites%2Fdocuments%2F05-09CPDN.DOC&wdOrigin=BROWSELINK

38. U.S. Department of Housing and Urban Development, *Fair Housing for HOME Participants* (May 2005), https://archives.hud.gov/offices/cpd/affordablehousing/modelguides/200510.pdf

39. City of Chicago Fair Housing Plan 2000-2004 (PL_0025916-6004)

40. City of Chicago 2005-2009 Fair Housing Plan (C022514-79)

41. Analysis of Impediments to Fair Housing Choice and Fair Housing Plan 2010 (PL_0066222-80)

42. Analysis of Impediments to Fair House Choice (June 24, 2016) (PL_0030225-504)

43. PowerPoint Presentation to Cabinet Meeting by Rachel Arfa, *City-wide ADA Title II Self-Evaluation and Transition Plan* (March 25, 2021) (C0613309-27)

44. Complaint, *Access Living v. City of Chicago*, Case No. 18-cv-03399 (N.D. Il.), ECF No. 1

45. Defendant City of Chicago's Answer and Affirmative Defenses to Plaintiff's Complaint, *Access Living v. City of Chicago*, Case No. 18-cv-03399 (N.D. II), ECF No. 27

46. Memorandum Opinion and Order Denying Motion to Dismiss, *Access Living v. City of Chicago*, Case No. 18-cv-03399 (N.D. II), ECF No. 35

47. Defendant's Response to Plaintiff's Second Set of Requests for Admission (July 13, 2022)

48. The Parties' Joint Stipulated Facts, *Access Living v. City of Chicago*, Case No. 18-cv-03399 (N.D. II), ECF No. 185

49. Freedom of Information Act response from Department of Planning and Development (dated October 18, 2017) (PL_0031227-29)

50. Mayor's Office for People with Disabilities, *Accessibility Compliance Unit Accessibility Survey Reports* (2022) (C0633711-49)

51. Declarations of Angela Lacey (PL_0034779-82), Anna Williams (PL_0034783-5), Barbara Ann Fisher (PL_0034786-8), Candace Coleman (PL_0034792-5), Darryl Robinson (PL_0034806-9), Julie Falco (PL_0034816-9), Kevin McPhan (PL_0034820-1), Lashawn McKinney (PL_0034822-4), Laura Donaldson (PL_0034825-8), Leah Scott (PL_0034829-31), Michael Grice (PL_0034834-6), Monia Taylor (PL_0034840-2), Robert Ramos (PL_0034843-5), Steven Glass (PL_0034848-50), and Vincent Smith (PL_0034851-3)
52. Transcript of Deposition of Thomas Ciesielski (February 18, 2022)
53. Transcript of Deposition of Christopher Zafiris (March 30, 2022)
54. Transcript of Deposition of Grant Ullrich (May 3, 2022)
55. Transcript of Rule 30(b)(6) Deposition of James Horan (November 22, 2022)
56. Transcript of Deposition of Karen Tamley (August 16, 2022)
57. Transcript of Deposition of Joseph Russo (March 31, 2022)

## V.  EXPERT TESTIMONY AND PUBLICATIONS

I have previously provided testimony as an expert in 2016 in the matter of *Independent Living Center of Southern California v. City of Los Angeles*, in the Western Division of the Central District of California in the United States District Court.

I have not authored any publications during the last ten years.

## VI.  COMPENSATION

My fee for time expended in this case is $250 per hour. No portion of these fees is dependent on the outcome of the case.

## VII.  BACKGROUND AND HISTORY

### A.  Program Accessibility, New Construction, and Alterations

Section 504 of the Rehabilitation Act of 1973, as amended, (Section 504) provides that "(n)o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. 794.

Similarly, Title II of the Americans with Disabilities Act of 1990 (ADA) applies to State and local government entities and provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. 12132. Title II extends the prohibition on discrimination established by section 504 to all activities of State and local governments, regardless of whether these entities receive Federal financial assistance. 42 U.S.C. 12131(1). Both Section 504 and the ADA were designed by Congress to rely on more specific regulations to further define the nature of the prohibition on discrimination. 29 U.S.C. 794(a); 42 U.S.C. 12134(a).

"Program accessibility" is a legal requirement under Section 504 and Title II of the ADA. From its regulatory inception in 1977 it has required that recipients of Federal funds and, since 1990, all public entities must examine their programs, activities, and services and operate each of them so that, when each one is viewed in its entirety, it is accessible to persons with

disabilities. Similarly, the obligation to design and construct new facilities or to make alterations to existing facilities so that they are readily accessible to and usable by individuals with disabilities has been a requirement under Section 504 for all recipients of Federal financial assistance from 1977 and since 1990 for all public entities under Title II of the ADA. HUD issued its own Section 504 rule in 1988 and, effective as of July 11, 1988, adopted sections 3-8 of the Uniform Federal Accessibility Standards (UFAS) as a standard for accessible housing. The HUD rule allows recipients to depart from particular technical and scoping requirements of UFAS provided the method chosen provides substantially equivalent or greater access to and usability of the building.

In May 2014 HUD issued a "deeming" notice that now permits developers of federally funded construction projects to use the Department of Justice's 2010 ADA Standards for Accessible Design with certain exceptions as an alternative design standard to meet the new construction accessibility requirements of Section 504. See http://www.regulations.gov/#!documentDetail;D=HUD-2014-0042-0001.

The requirement to provide program access is in addition to and separate from other ADA requirements, including the requirement to communicate effectively with persons with disabilities[2], the requirement to make reasonable modifications to policies and procedures,[3] and other parallel ADA (and Section 504) requirements. Together, these requirements seek to fulfill two of Congress' central objectives in passing those statutes: an end to segregation of people with disabilities and a priority on welcoming people with disabilities into the American mainstream.

Above and beyond any architectural accessibility requirements at issue in this litigation (and imposed upon the City by Section 504 and the ADA), the City is also obligated to conduct a comprehensive self-evaluation to determine whether any of its programs, services, and activities with respect to housing constitute obstacles or barriers to the participation of people with disabilities. 28 C.F.R. 35.105 (ADA); 24 C.F.R. 8.51 HUD Section 504). Section 504 and the ADA require the City to take prompt corrective actions to remove such obstacles or barriers, and to ensure that people with disabilities enjoy "meaningful access" to their programs. *Alexander v. Choate*, 469 U.S. 287, 301-02 (1985).

The concept of program accessibility is a long-standing Federal requirement. It was first articulated in the regulation implementing Section 504 by the Department of Health, Education, and Welfare in 1977. It was then incorporated over a period of approximately the next ten years in the regulations of at least 26 Federal agencies for their federally assisted programs and in the regulations of over 100 Federal agencies for their federally conducted programs.

In 1988, after an extended review and negotiations with the Department of Justice in its coordination role, the Department of Housing and Urban Development (HUD) issued its final regulation implementing Section 504 for its federally assisted housing programs. 53 F.R. 20233 (1988). HUD adopted the now familiar general program accessibility language in its regulation:

. . . no qualified individual with handicaps[4] shall, because a recipient's facilities are

---

[2] 28 C.F.R. 35.160-64.
[3] 28 C.F.R. 35.130(b)(7).
[4] The Fair Housing Act uses the term "handicap" instead of the term "disability." Both terms have the same legal meaning. See *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998) (noting that definition of "disability" in the Americans with Disabilities Act is drawn almost verbatim "from the definition

inaccessible to or unusable by individuals with handicaps, be denied the benefits of, be excluded from participation in, or otherwise be subjected to discrimination under any program or activity that receives Federal financial assistance.

24 C.F.R. 8.20. Those regulations also provide that newly-constructed or substantially rehabilitated rental housing must comply with federal accessibility standards. 24 C.F.R. 8.22. They also provide the framework within which then-existing rental housing would be required to provide program accessibility:

> (a) *General.* A recipient shall operate each existing housing program or activity receiving Federal financial assistance so that the program or activity, when viewed in its entirety, is readily accessible to and usable by individuals with handicaps. This paragraph does not—

>> (1) Necessarily require a recipient to make each of its existing facilities accessible to and usable by individuals with handicaps;

>> (2) Require a recipient to take any action that it can demonstrate would result in a fundamental alteration in the nature of its program or activity or in undue financial and administrative burdens. If an action would result in such an alteration or such burdens, the recipient shall take any action that would not result in such an alteration or such burdens but would nevertheless ensure that individuals with handicaps receive the benefits and services of the program or activity.

24 C.F.R. 8.24. In plain terms, a public entity like the City has an affirmative obligation to ensure that its rental housing programs provide a meaningful level of accessibility to people with disabilities.

In 1990, the reach of the program accessibility requirements of Section 504 was extended when the Americans with Disabilities Act was signed into law. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. 12132. The ADA defined public entity expansively, covering all the activities of State and local governments, and "any department, agency, special purpose district, or other instrumentality of a State or States or local government," such as the City's funding agencies or the Department of Housing. See 42 U.S.C. 12131.[5] The law also expressly addressed the obligation to provide program accessibility by providing that Federal agency regulations implementing the ADA be consistent with the federal government's Section 504 regulations, giving a Federal statutory endorsement of a previous regulatory requirement. 42 U.S.C. 12134.

The Department of Justice issued a regulation implementing Title II of the ADA in July 1991. 28 C.F.R. Part 35. This detailed regulation contained extensive guidance on the requirements for program accessibility. See 28 C.F.R. 35.149-152. In addition, the Department of Justice Title II regulation adopted accessible design standards, known as the Standards for Accessible Design, which were based on ADAAG, the ADA Accessibility Guidelines, developed

---

of 'handicap' contained in the Fair Housing Amendments Act of 1988"). Except where quoting from the statute or guidance documents, this document uses the term "disability," which is more generally accepted.

[5] This expansive view of the reach of Title II of the ADA was upheld by the Supreme Court in *Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206 (1998).

by the U.S. Access Board. See 28 C.F.R. 35.152 and Appendix A.[6]

In 2010 the Department of Justice promulgated a proposed rule amplifying the program accessibility responsibilities of public entities. Fed. Reg.: Vol. 75, No. 178 (September 15, 2010). In this rulemaking the Department of Justice provided specific guidance on the provision of residential housing programs. 28 C.F.R. 151(j); see also 28 C.F.R. 151(e), (f), (h), (k). The 2010 regulation makes clear that public entities that operate residential housing programs are subject to Title II and must provide accessible residential housing. The regulation contains scoping and technical standards for residential dwelling units. See Section 233.3.2 of the 2010 Standards for Titles II and III Facilities: 2004 ADAAG (Residential Facilities).

In these 2010 Standards the Department of Justice specifically deferred to HUD for what constitutes accessible residential housing, thus making the ADA's Standards the same as those established by HUD under its own Section 504 regulation for housing covered by Section 504. Id. Thus, both Departments require that new and altered residential facilities will have a minimum of 5 percent of the units, but no fewer than one unit, of the total number of residential dwelling units that are accessible for persons with mobility disabilities and at least 2 percent, but no fewer than one unit, of the total number of residential dwelling units that provide communication features. As discussed below, these standards are significant: they not only provide standards for new construction and alteration requirements, but they also serve as benchmarks for making program accessibility determinations.

These requirements have an impact on a public entity's obligations to make its existing programs accessible under the Title II rule's self-evaluation and transition plan requirements. The obligation to make structural changes to facilities to achieve program accessibility now explicitly applies to an expanded universe, including residential units and recreation facilities like pools and playgrounds. The DOJ regulation makes clear that a public entity would not have to duplicate any action that "already complied with the transition plan requirement of a Federal agency regulation implementing section 504." 28 C.F.R. at 35.150(d)(4). However, new transition plan efforts would have to be undertaken for "those policies and practices that were not included in the previous transition plan." Id.

## B. Federal Agencies' Provision of Guidance and Technical Assistance

To encourage compliance with the ADA and Section 504, Federal agencies, including the Department of Justice and HUD, have engaged in extensive outreach to provide information to covered entities, persons with disabilities, and the general public. Title V of the ADA, in fact, requires the Department of Justice to provide "technical assistance" to entities covered by Title II. See generally 42 U.S.C. 12206.

The Department of Justice has issued a Technical Assistance Manual for Title II and a considerable volume of guidance on a wide array of ADA issues that the Department has made available on its website, https://www.ada.gov. In addition, the Department of Justice staffs an ADA Information Line that is available during business hours to provide answers to questions from covered entities, the general public, and persons with disabilities. In this manner, specific

---

[6] In its 2020 rulemaking, the Department of Justice updated these design standards, which are called the 2010 ADA Standards for Accessible Design, which consist of the 2004 ADA Accessibility Guidelines of the US Access Board and the requirements contained in § 35.151 of the Department of Justice's rule.

questions concerning compliance issues can be addressed at no cost to the entity making the inquiry.[7]

Since it first issued its Section 504 regulations, HUD has routinely produced provided technical assistance materials to its recipients to help them understand Section 504 requirements and how to comply with these requirements. In its Accessibility Notice, issued in December 2000 to a wide variety of recipients, including HOME and CDBG recipients, HUD provided notice of accessibility requirements and guidance on Section 504 obligations, including information on UFAS and self-evaluation. https://archives.hud.gov/offices/cpd/affordablehousing/lawsandregs/notices/00-9.pdf. This notice also provided a telephone number for recipients to get further information or their questions answered. Id.

On November 3, 2005, HUD once again issued a similar notice to its recipients. In its "Accessibility Notice: Section 504 of the Rehabilitation Act of 1973 and The Fair Housing Act and their applicability to housing programs funded by the HOME Investment Partnerships Program and the Community Development Block Grant Program," HUD specifically addressed the program access requirement, self-evaluation, and provided a list of "musts." See HUD Notice CPD-05-09 at https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.hud.gov%2Fsites%2Fdocuments%2F05-09CPDN.DOC&wdOrigin=BROWSELINK. HUD required its program participants to meet the following requirements:

- To the maximum extent feasible, distribute accessible units throughout the projects and make them available in a sufficient range of sizes and amenities so as not to limit choice.

- Adopt suitable means to assure that information regarding the availability of accessible units reaches eligible individuals with disabilities. They must also take reasonable nondiscriminatory steps to maximize use of such units by eligible individuals.

- When an accessible unit becomes vacant, before offering the unit to an individual without a disability, offer the unit: first, to a current occupant of the project requiring the accessibility feature and, second, to an eligible qualified applicant on the waiting list requiring the accessibility features.

- When an applicant or tenant requires an accessible feature or policy modification to accommodate a disability, a federally assisted provider must provide such feature or policy modification unless doing so would result in a fundamental alternation in the nature of its program or an undue financial and administrative burden. See 24 C.F.R. 8.4, 8.24, and 8.33 for further requirements and guidance.

- Providers are required to ensure that information about their programs is disseminated in a manner that is accessible to persons with disabilities. For example, special communication systems can greatly increase the effectiveness of outreach

---

[7] The Access Board, the Federal agency charged with developing accessibility design guidelines for the ADA, also provides extensive technical assistance on what makes facilities accessible, both through its own website and through answering specific telephone inquiries. See https://www.access-board.gov/aba/ufas.html.

and ongoing communication (e.g., Telecommunications Devices for the Deaf (TTY), materials on tape or in Braille).

- Providers must ensure that activities and meetings are conducted in accessible locations.

Id. at 6-7.

HUD also created a series, *Fair Housing for HOME Program Recipients*, that provided in depth, easily understandable information for its recipients. Most compelling in this series is the document, *Promoting Fair and Accessible Housing Opportunities in HOME Projects*. https://archives.hud.gov/offices/cpd/affordablehousing/modelguides/200510.pdf. It addressed a number of accessibility issues in detail, including accessible site selection, accessible design and construction requirements, information on UFAS, and how to navigate between housing access requirements under Section 504 and the Fair Housing Act. This document included a not-all-inclusive list of major requirements to ensure accessibility for UFAS-accessible dwelling units in straight-forward prose. It included:

- An accessible dwelling unit shall be on an accessible route;

- At least one bathroom must be fully accessible, including toilet, mirror, lavatory, medicine cabinet, and bathtub or shower;

- Kitchens must have accessible or adaptable features on ovens, refrigerators/freezers, dishwashers, storage, and work surfaces;

- All laundry facilities, whether in the unit or in a common laundry room, must be on an accessible route. Washers and dryers must be front-loading; washers and dryers in a dwelling unit may be top-loading, but controls must be accessible;

- Living and dining areas must be accessible and on an accessible route;

- Sleeping areas (the bedroom in a one bedroom unit, and at least two bedrooms in units with two or more bedrooms) must be accessible and on an accessible route;

- Common spaces and facilities serving accessible units must be accessible, including entry walks, parking, public transportation stops (if provided), trash disposal facilities, and mailboxes;

- Storage, including cabinets, shelves, closets and drawers, must be accessible;

- All controls in the unit must be in accessible locations, including heating, ventilation and air conditioning controls, and electrical outlets; and

- All accessible spaces must include a 60-inch turning space (a "T-turn"), including bathrooms and kitchens.

Id. at 7.

The HUD website is a treasure trove of information on how to comply with Section 504 and the ADA, including specific guidance on the scope of the program accessibility requirement and how to achieve voluntary compliance with program accessibility for housing programs. See http://portal.hud.gov/hudportal/HUD?src=/program_offices/fair_housing_equal_opp/disabilities/sect504docs. Particularly useful and straightforward is its guidance for program accessibility under Section 504, "Section 504 Frequently Asked Questions." http://portal.hud.gov/hudportal/HUD?src=/program_offices/fair_housing_equal_opp/disabilities/sect504faq.

HUD's website also provides copies of enforcement actions and voluntary settlements under Section 504 and the ADA, to serve as examples of what Federal disability rights laws require of covered entities. For example, the HUD website provides copies of Voluntary Compliance Agreements with major American cities, including Atlanta, GA, El Paso, Texas, and Baltimore, MD, which serve as a template on what the Department views as the necessary steps to take to achieve compliance with Section 504 and other Federal housing laws. See, e.g., http://portal.hud.gov/hudportal/documents/huddoc?id=DOC_7739.pdf (Atlanta).

Thus, if the Department of Housing wanted to know what HUD, as the Federal government's Section 504 enforcement agency, views as the major requirements for complying with Section 504, and also wanted to understand how to comply with the law, it could have availed itself of HUD's Voluntary Compliance Agreement with Miami-Dade in March 2005.[8] Had the Department of Housing reviewed HUD's guidance, it would have learned that its leases must "require[ ] an occupant without a disability to relocate to a vacant, non-accessible unit within fifteen (15) days of notice by the . . . that there is an eligible applicant or existing resident with a disability who requires the accessibility features of the unit." Or that it should have an updated occupancy and transfer set of policies that established for UFAS-accessible units that:

     (i)     transfers of residents with disabilities and placement of applicants with disabilities requiring UFAS-Accessible Units will be centrally coordinated through a Section 504/ADA Coordinator;

     (ii)    when an accessible unit becomes available, the unit will first be offered to a current occupant with disabilities in the same development that requires the accessibility features of the vacant, accessible unit and occupying a unit not having those features;

     (iii)   if there is no current resident in the same development that requires the accessibility features of the vacant, accessible unit, then it will be offered to a resident with disabilities residing in another development that requires the accessibility features of the vacant, accessible unit;

     (iv)   if there is no current resident who requires the accessibility features of the vacant, accessible unit, then the vacant, accessible unit will be offered to an eligible, qualified applicant with disabilities on the waiting list who can benefit from the accessible features of the available, accessible unit;

---

[8] Voluntary Compliance Agreement Between the Department of Housing and Urban Development Office of Fair Housing and Equal Opportunity and Miami-Dade County Through its Department Miami-Dade Housing Agency (March 2005), http://portal.hud.gov/hudportal/documents/huddoc?id=mdha-vca.pdf.

      (v)     if there is not an eligible, qualified resident or applicant with disabilities on the waiting list who wishes to reside in the available, accessible unit, then it will be offered to an applicant on the waiting list who does not need the accessible features of the unit. *See* 24 C.F.R. § 8.27. Id. at 17.

Furthermore, the Miami Dade VCA required the housing provider, upon initial leasing or lease renewal of UFAS-accessible unit to include a lease provision "that requires a family without a resident with a disability to relocate to a vacant, non-accessible unit within fifteen (15) days of notice … that there is an eligible applicant or existing resident with a disability who requires the accessibility features of the unit. See 24 C.F.R. § 8.27." Id. at 20.

Had the Department of Housing reviewed the HUD guidance, it would have understood that these policies had to be given to each applicant at the time of lease signing and to each resident during the annual re-certification.

If covered public entities, like the City and its Department of Housing, are reticent to approach HUD or DOJ—the agencies that enforce Section 504 and the ADA—they could seek guidance from the ADA National Network, ten regional centers that provide information, guidance, and training on the ADA, tailoring services to meet the needs of businesses, government and individuals at local, regional, and national levels. In fact one of these ten regional centers is located in Chicago, the ADA Great Lakes Center. See https://adata.org.

Taken together, all these resources offer a rich and detailed compendium of information on what constitutes compliance with the ADA and with Section 504 and a roadmap on how to achieve compliance. This information is provided at no cost and is offered to ensure that public entities have the means to learn what is required of them and how they can achieve compliance.

Given the significant evidence of accessibility noncompliance in the Affordable Rental Housing Program, it is my opinion that the City and the Housing Department either failed to consult these materials or ignored them.

## VIII.   REQUIREMENTS: NEW CONSTRUCTION, ALTERATIONS, PROGRAM ACCESSIBILITY

Public entities across the country have been applying these program accessibility principles to their own programs for over 35 years. Cities across the country have applied them to their education programs, health care services, polling places, emergency preparedness programs, housing programs, and, more recently, recreation and park programs. The Department of Justice's Project Civic Access has entered into over 200 voluntary settlements with cities and counties in every state in the country focusing on achieving access to their programs, services, and activities. See http://www.ada.gov/civicfac.htm.

While Section 504 and the ADA provide a public entity some flexibility in addressing accessibility issues, and do not necessarily require it to make each of its existing facilities architecturally accessible, the public entity must adopt methods[9] that actually provide people

---

[9] HUD regulations, at 24 C.F.R. § 8.24(b), define the term "Methods" and provide that "[a] recipient may comply with the requirements of this section through such means as reassignment of services to accessible buildings, assignment of aides to beneficiaries, provision of housing or related services at

with disabilities an opportunity to participate in a rental housing program in a manner that is equal to the opportunities provided to others, i.e., having access to the same range of opportunities, benefits, choices, and amenities available to others eligible for the same program.[10] A public entity cannot comply with Section 504 and the ADA by simply doing nothing, or by insisting that third party owners and managers of developments in the Affordable Rental Housing Program are responsible for the violations. Rather, Section 504 and the ADA impose affirmative obligations on the City and its Housing Department to ensure the compliance of such third parties.

In addition, in making decisions about program accessibility, public entities must give priority to those methods that provide for the integration of persons with disabilities. Id. Thus, for housing programs, public entities may not separate or unnecessarily segregate persons with disabilities, e.g., limiting accessible units to the first floor of elevator buildings, providing accessible units in only one building of a multi-building project, only providing accessible units in one part of town, or failing to provide accessible housing with the same range of amenities and benefits that are offered to others.[11]

One of the guiding principles of program accessibility is that no person with a disability can be excluded from a public entity's program, services, or activities because of inaccessible facilities. Thus, public entities must look to applicable accessibility design standards to ensure that their programs are accessible. The Uniform Federal Accessibility Standards (UFAS) or the 2010 ADA Standards are benchmarks for ensuring that programs are accessible. As a consequence, the starting point for ensuring program accessibility is determining whether the public entity provides an appropriate number of accessible units as required by the applicable standards (in this case, UFAS).

However, the requirement that public entities provide equal opportunity to persons with disabilities may require a public entity to go beyond what any applicable design standard requires. For example, a housing development may have the appropriate number of parking spaces in terms of the UFAS requirements, but if the actual number of residents with disabilities who need accessible parking exceeds the number of accessible parking spaces, equal opportunity would require the provision of additional accessible parking spaces. Similarly, most accessibility standards do not routinely require automatic doors at the entrance to a building. However, the presence of a resident who, because of her disability is unable to open an exterior door, would trigger the obligation to provide automatic doors. This concept is based on the

---

alternate accessible sites, alteration of existing facilities and construction of new facilities, or any other methods that result in making its programs or activities readily accessible to and usable by individuals with handicaps. A recipient is not required to make structural changes in existing housing facilities where other methods are effective in achieving compliance with this section or to provide supportive services that are not part of the program."

[10] The flexibility afforded by the program accessibility requirement is a separate requirement from the obligation to design and construct all new housing in an accessible manner and from the obligation to ensure that alterations are made in an accessible manner. In addition to the program access obligation, any new housing would be required to have 5% of its units accessible for those with mobility disabilities and 2% for those with hearing disabilities.

[11] There are HUD-provided, limited exceptions to this integration requirement: when it is necessary to segregate clients to provide special services or when authorized by a Federal statute such as the Housing Opportunities for Persons with AIDS (HOPWA) program, or the Section 811 Supportive Housing Program for Persons With Disabilities. But even under these programs, HUD proposes limiting segregation by using scattered site units in an integrated setting.

language of Section 504 itself, which makes clear that no person with a disability should be denied participation in, be excluded from, or otherwise be subjected to discrimination on the basis of disability in a program or activity that is supported by Federal funds.

The fact that use of UFAS requirements may not, even if fully implemented, meet the law's equal opportunity requirements has implications for ensuring that municipal rental housing programs meets its ADA and Section 504 obligations citywide. The Department of Housing could address this issue by instituting appropriate policies and an implementation process, including effective monitoring, to ensure that those persons whose disabilities are not effectively addressed by the UFAS requirements are provided with housing that addresses their disability-related needs. Common examples include persons with quadriplegia who cannot open doors and persons who are morbidly obese and cannot use standard toilet appliances.

In addition to the flexibility in choosing among methods of providing accessibility, there are limitations on the obligation to make programs accessible. A public entity is not required to take any action that it can demonstrate would result in a fundamental alteration in the program, service, or activity, or take any action that would threaten or destroy the historic significance of an historic property. 28 C.F.R. 35.150(a)(2) & (3). If a public entity chooses to avail itself of any of these limitations, Federal rules provide explicit procedures to be followed. For example, if a public entity determines that achieving program accessibility is an undue burden, such a decision must be made by the head of the public entity or his or her designee, after considering all resources available within the agency. 28 C.F.R. 35.150(a)(3); see generally 42 U.S.C. 12134. In addition, the decision must be in writing, and must include a statement of reasons for that conclusion. Id. In addition, the public entity must take other actions that will not result in such an undue burden, but still provide access. Id.

## IX.  APPLICATION TO THE CITY'S AFFORDABLE RENTAL HOUSING PROGRAMS

Section 504 and ADA accessibility standards apply to "all of the operations" of the City and its funding agencies, including the Department of Housing. 29 U.S.C. §794(b)(1). These covered entities cannot adequately understand and respond to the scope of their obligations or measure their compliance if they do not have basic information including the number of total housing units they offer to the public, a description of the basic features of those units, e.g., number of bedrooms, types of amenities, location, affordability, eligibility requirements (such as low income, family, specialized services). Put simply, in order to comply with their Section 504 and ADA program accessibility obligations, the City and the Department of Housing would need to know the number and location of the units having accessible features and the nature of those features, including accessible parking, accessible route to the units from parking or from the street or public transit, extent of the accessibility of common use areas, nature of access to amenities, (mailboxes, laundry facilities, storage areas, and any specialized amenities like a swimming pool, exercise room, playground, or party room), and the accessible features of the accessible unit for persons with mobility disabilities, for persons who are deaf or hard of hearing, for persons who are blind or have low vision, and for other persons with disabilities.

Because the Affordable Rental Housing Program encompasses housing units at multiple locations, the concept of "accessibility in its entirety" requires them to analyze the range of opportunities provided and whether persons with disabilities are given equal opportunity to avail themselves of the range of housing afforded to persons without disabilities. Factors to analyze for this analysis include location, size and type of housing projects (number of bedrooms, high-rise v. garden apartments), specialized amenities, affordability, access to public transit, and the extent of community integration.

15

For example, if the Department of Housing had conducted an analysis of its existing and planned affordable housing portfolio and found that accessible units were concentrated exclusively in low income neighborhoods, or absent from buildings with specialized amenities, or lacking in family units with two to three bedrooms or limited to a certain section or neighborhoods of the city, it would then be required to take remedial action to correct any such deficiency. From my review of the materials listed above, I can find no evidence that the City or the Department of Housing either possessed the necessary information to undertake such a review or ever actually undertook such an analysis. See, e.g., FOIA of DPD Response of 10/18/2017 (Department has no record of accessible units before 2014); Deposition of Joseph Russo at 30-1. (Department of Housing never gave MOPD a comprehensive list of location of accessible units); Response to Request for Admissions #13 and #14 (admitting contents of October 18, 2017 FOIA response indicating that Department of Housing did not have records reflecting existence or location of accessible units prior to 2014).

The City and its Department of Housing would also need a detailed understanding of the need for accessible housing by persons with disabilities in Chicago. Outreach to the disability community through organizations representing persons with disabilities is essential. Working with other government agencies, whether local, county, or State, that serve persons with disabilities is also a source of information. This outreach effort is particularly important in areas that census figures show have large concentrations of persons with disabilities because it may be that the need for accessible housing is larger than the 5% - 2% threshold established by Federal law.

The City, through its analysis of Impediments to Fair Housing, was aware that there was a shortage of accessible, affordable housing as early as 2000. However, in his Rule 30(b)(6) deposition, James Horan testified that "[d]espite the shortage of accessible housing in Chicago, there is no consistent review of accessible units for people with disabilities by the City of Chicago when issuing a building permit." Deposition of James Horan at 276-77. See also Deposition at 237 (the City has conducted no empirical study of the need for accessible affordable housing). Mr. Horan's deposition is replete with information that the Department of Housing did not take effective action to assess the need for accessible housing in Chicago nor take steps to address the shortage. The Department of Housing left such things to the owners and managers of the apartment units (Deposition at 54-5, 208-11,) and the Department of Housing auditors do not have the expertise to determine the accuracy of owners' assertions. (Id. at 82.)

Mr. Horan testified that the City did not have comprehensive data on the location of accessible units and, prior to 2021, the Department of Housing took no steps to inform people of the location of accessible units. Id. at 255-56. It was only in late 2022 that the Department of Housing turned to doing the research and due diligence necessary to build a verified list of units meeting Federal accessibility standards. (Deposition at 250-52; 255-56). In addition, Mr. Horan was unaware that the City has ever taken any enforcement action against owners and developers of accessible housing for failing to build accessible units. Id. at 214-15.

I was not able to identify any step the City or Department of Housing had taken with respect to waiting list procedures to ensure that people who needed the accessibility features required by Section 504 and the ADA would have meaningful access to such units. As a consequence of this omission and the failure to require owners and managers of rental units assisted by the City or Department of Housing to adopt policies on the utilization of accessible units, the City has no knowledge of if and to what extent its accessible units are accessible or are occupied by persons with disabilities who need the accessible features of the units. See

16

Deposition of James Horan at 256-57. (Mr. Horan is unaware of any process to ensure that owners/managers have in place a process to move persons without disabilities who occupy accessible units out of the units to make way for persons with disabilities who need the accessible units.)

My review of the evidence listed above also leads me to conclude that neither the City nor its Department of Housing had in place policies and procedures to ensure that, when an accessible unit becomes vacant, the unit is given to a person with a disability who needs the accessible features of the unit. Because the City leaves this process to the developers and others that built and own the rental housing, such policies and procedures would need to address the units owned by private entities and developers that are part of the department's program. Monitoring, oversight, and follow-up procedures are essential to ensure that accessible units are occupied by tenants who need them, and there is no evidence that the Department of Housing or any other City agency had any such monitoring, oversight or follow-up with respect to these obligations.

The City or Department of Housing could have achieved program accessibility by following the procedural requirements of HUD's Section 504 regulation: appointing an ADA coordinator, establishing a grievance procedure for the handling of complaints of discrimination, conducting a self-evaluation of its housing program, and, if it needed to make structural alterations, implementing a transition plan. These bare-bones steps would have provided basic information for City officials and laid the foundation for further action, such as establishing operating procedures for determining how many accessible units were being created in each project and the nature of the accessible features at each development. It would have provided information about the types of housing being constructed (one-bedroom, efficiency apartments and the like; senior housing, low-income housing, garden-type apartments, high rises), the amenities and accessibility features provided in each project (swimming pools, recreation or party rooms, laundry facilities, etc.).

With this information the City officials could begin to construct a program accessibility analysis of the range of apartments available to persons with disabilities and whether that range was comparable to the apartments being offered to able-bodied persons and families. In addition, the City could require information from its developers and project managers about waiting lists for housing, for what types of units and formulated information on whether the demand for accessible housing was being met. City officials could then use this information in their annual planning to ensure that new projects were developed to meet the needs of the City's residents. If they had done so, City officials might have determined that too many of the accessible units were in high crime neighborhoods, in luxury buildings, or in senior housing, effectively denying many persons with disabilities ready access to housing and putting them for long periods of time on waiting lists.

Particularly important is developing a means of monitoring the activities of the various entities that a recipient uses to carry out its own responsibilities. Section 504 and ADA requirements apply regardless of whether the programs and services are provided directly or by a third party through contract, partnership, or the provision of assistance. For example, a municipal housing program that provides funds or incentives to private developers would need to have a process in place to ensure that third-party entities were complying with the accessibility obligations imposed on the City by Section 504 and the ADA.

This process would best be carried out by the provision of detailed information and guidance about the City's and Department's disability rights obligations, including what accessibility standards to apply. A formal contract or agreement would need to contain an assurance from the private entity that it would develop the property in compliance with the Federal accessibility standards, and an agreement to participate in a monitoring process, where the municipal authority would collect and review construction documents and would conduct periodic on-site visits, including perhaps an independent review of the facility by an independent contractor at various phases of the construction contract to ensure that the project is accessible.

While the Department of Housing apparently used Loan Agreements and Regulatory Agreements with private owners of developments in the Affordable Rental Housing Program that detail various accessibility obligations, including those under Section 504 and sometimes the ADA, my review of the materials listed above reveals that the Department of Housing did absolutely no oversight of accessibility compliance to ensure that these requirements were carried out. See generally, Horan Deposition and specific citations above and below, including at 41 (no on-site inspections by MOPD prior to March 2022); at 65 (Department of Housing does not confirm whether units are accessible); at 249 (City lacks knowledge about location of accessible units); 197 (City does not have expertise to verify that accessibility features meet Federal standards); at 256-57 (No policies in place for ensuring that persons with disabilities are prioritized for accessible units and no process for requiring a non-disabled tenant to move out of an accessible unit for a person with a disability who needs the accessible features of the unit).

It is therefore my opinion that the City and the Department of Housing did not establish necessary methods of administration to ensure that its Affordable Rental Housing Program met the architectural or program accessibility requirements of Section 504 and the ADA that were applicable during the period at issue in this litigation.

## X.     CONCLUSIONS

Based on a review of documents referenced above, it is my opinion, with a reasonable degree of professional certainty, that the City and its Department of Housing have operated the Affordable Rental Housing Program in a manner that violates the requirements of the Section 504 and Title II of the ADA and their implementing regulations, and in a manner that denies persons with disabilities an equal opportunity to participate in the City's affordable housing program.

HUD's Section 504 regulation and the Justice Department's Title II regulation require that newly constructed or altered housing facilities shall be designed and constructed so that a minimum of 5% of the total dwelling units must be accessible to people with mobility impairments, and that an additional 2% shall be accessible to person with vision or hearing impairments (pursuant to specific technical standards prescribed in UFAS or the 2010 ADA Accessibility Standards). In addition, both Federal Regulations require that the City examine its existing housing stock and ensure that its existing housing program, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities.

Because of the manner in which it has chosen to operate the Affordable Rental Housing Program, the City cannot meet these requirements. I base this conclusion on the following:

1. **City Lacks Information About Existence and Location of Accessible Units**: The City does not know how many accessible housing units have been constructed with Federal and other financial assistance administered by the Department of Housing. It does not know which units are the accessible units; it does not know if those units designated as accessible meet the Federal accessibility standards; it does not know which—if any—accessible features are present at the designated accessible units. See Defendant's Responses to Second Set of Requests for Admission at #13, #14, and #95; deposition of James Horan at 267.

2. **City Has No Process for Ensuring Accessible Units are Reserved for People with Disabilities Needing the Accessibility Features of Those Units**: The City does not know if persons with disabilities are housed in the accessible units and if so whether the persons housed there need the accessible features of each of the units (e.g., if there a blind person in one of the units that is designed for those who are blind). Conversely, it does not know if there are persons without disabilities who are living in the designated accessible rental units and whether there are persons with disabilities living in inaccessible units or on the waiting list for accessible units.

3. **City Has No Process for Moving Able-Bodied Tenants Out of Accessible Units**: The City does not have a process for moving persons with disabilities who are eligible for accessible housing into the accessible units, nor for moving able-bodied persons from accessible units when there are persons with disabilities on housing waiting lists who need accessible features.

4. **City Has No Process for Ensuring Required Distribution of Accessible Units by Geography and Unit Type**: The City does not know with any specificity if the accessible units that it does have are distributed throughout projects and sites and available in a sufficient range of sizes and amenities so that a qualified individual with disabilities' choice of living arrangements is, as a whole, comparable to that of other persons eligible for housing assistance. This failure is particularly important because the City does not know if it provides a range of affordable housing opportunities for persons with disabilities who are of low income. The City is aware, through its reports on Impediments to Fair Housing, that there is a shortage of accessible, affordable units and that there is a significant waiting list of persons with disabilities who need accessible housing. These reports also evidence rudimentary information that the few accessible units are concentrated in certain areas and types of housing and do not provide the same range of types of housing for persons with disabilities. Despite this knowledge, there is little evidence that the City or the Department of Housing has taken action to address this information.

5. **City Has Failed to Conduct a Complete Self-Evaluation and Transition Plan Governing the Affordable Rental Housing Program**: The City has never completed the self-evaluation process required both by Section 504 and Title II of the ADA for the Department of Housing or the Department of Buildings. The City did begin an extensive city-wide effort beginning in or about 2011, but it never completed the process. In March 2021—nearly three years after Access Living commenced this litigation—the MOPD Commissioner observed in a "Cabinet Meeting" that the City never completed its transition plan. She noted that between 2009-2013 the City, with

the assistance of LCM Architects, prepared efforts including draft reports for many departments, but that no further progress has been made. She specifically noted:

> When I came in as Commissioner, upon my review of the department, I saw this was unfinished, and immediately began taking steps to prepare to finish the Transition Plan, city wide. Not having the plan completed will hold us back at achieving the truly accessible city that we are all building, and to uphold and demonstrate our values as in our work in advocating for Equity and Inclusion.

PowerPoint Presentation to Cabinet Meeting by Rachel Arfa, "City-wide ADA Title II Self-Evaluation and Transition Plan (March 25, 2021) (C0613309-27, at C0613312).

Unfortunately, the process that the City employed for the 2011 effort was flawed and, even if completed, would not have provided an analysis of the City's housing program. The City limited its self-evaluation to properties owned by the City. (Deposition of Joseph Russo at 100.) Because the City has chosen to operate its housing program by providing both financial, in-kind and technical assistance support to private developers who will build, own and operate the rental housing, these properties would never have been included in the City's self-evaluation process. Thus, the City used the self-evaluation process to identify at least some of the barriers to access in the Department of Housing office buildings where its *employees* work, it closed its eyes to the accessibility barriers in the Affordable Rental Housing Program buildings where low-income Chicagoans live. Because it did not engage in the kind of self-evaluation required by Section 504 and the ADA, the Department of Housing has no information on the accessibility of the rental units that it provides, including the number and location of the designated accessible units, what accessible features are present in each of the units, whether the features meet Federal accessibility design standards, and whether the designated accessible units are occupied by persons with disabilities who need the features of the particular unit.

The City's self-evaluation process reflects a misunderstanding of the Federal requirements under Section 504 and Title II of the ADA. For its housing programs, the Federal regulation requires that the self-evaluation look at the accessible housing that it provides to residents of the city, not just to the facilities where their employees work or where city residents may enter to transact city business. In addition, the City's inaction demonstrates its failure to follow the Department of Justice's 2010 ADA regulatory changes on the ADA self-evaluation requirement. At 28 C.F.R. 105, the Department restates its self-evaluation requirement, and notes at section 105(d) that "the requirements of this section shall apply only to those policies and practices that were not included in the previous self- evaluation."

6. **City Lacks Substantive and Procedural Safeguards to Ensure That Private Developers Comply with Federal Accessibility Requirements in City-Funded Affordable Housing Developments**: The City and the Department of Housing do not have processes in place to ensure that the developers that received Federal funds from the City to build housing are carrying out the City's Section 504 and ADA responsibilities. A public entity is obligated to ensure compliance with its Title II obligations, even if a private entity provides services on behalf of the entity. 28 C.F.R. Pt. 35, App. A, at 634 (2012); 28 C.F.R. Pt. 35, App. B, at 661 (2012); DOJ

Title II Technical Assistance Manual, II-1.3000.

Federal Courts have upheld this fundamental ADA principle: a Title II entity is liable for the discriminatory actions of private entities with which it has contracted. See, e.g., *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1062 (9th Cir. 2010) (state prisons); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 286 (2d Cir. 2003) (access to public benefits); *Hunter v. D.C.*, No. 1:12-CV- 1960 (GK) (D.D.C. August 18, 2014) (shelters for people who are homeless); *James v. Peter Pan Transit Mgmt.*, No. 5:97-CV-747, 1999 WL 735173, at *9-10 (E.D.N.C. Jan. 20, 1999) (public bus transit); *Deck v. City of Toledo*, 56 F. Supp. 2d 886, 895 (N.D. Ohio 1999) (curb ramps on city streets).

James Horan, representing the City and the Department of Housing, has laid out the City's process to determine if its housing units are being built accessibly. While the Department of Housing distributed hundreds of millions of dollars to private developers during the period covered by this litigation, the City never developed a unit within the Department of Housing to ensure compliance with federal accessibility standards by those developers. Instead, it shunted all responsibility onto the Accessibility Compliance Unit (ACU) at the Mayor's Office on Persons with Disabilities (MOPD). MOPD review is limited to inspecting blueprints, requiring minutes of any meetings between the developers, and requiring revisions to plans in the event changes are made after initial review. Deposition of James Horan at 42-3.

Prior to the filing of the Complaint in May 2018, ACU funding never exceeded $380,000 per year, and ACU was tasked with reviewing accessibility in all new or renovated apartment buildings, offices, stores, City school and agency buildings, transportation facilities, and places of public accommodation in a city with a population of 2.75 million people. As several present and former MOPD staff testified, scarce resources limited ACU to reviewing proposed blueprints for buildings ("plan reviews") and its review was limited to those buildings in the Affordable Rental Housing Program that submitted plans from approximately 2008 to the present. MOPD never conducted a comprehensive review of all the buildings in the Program and never even received a list from the Department of Housing of the buildings containing accessible units.

While the Department of Housing conducts long term monitoring and requires owners to submit an annual owner certification as to the units that are accessible, the Department of Housing never verifies that the properties' actual built conditions comply with accessibility requirements of the HOME program (id. At 50), that MOPD conducted no on-site end-of-construction inspections prior to 2022 (id. at 53), and that the Department of Housing does not confirm accessible units "are indeed accessible to whatever the degree that they're supposed to be accessible." Id. at 65. MOPD confirmed this view that it did not routinely go into the field to look at accessibility, but did a plan, permitting review. Deposition of Karen Tamley at 121.

MOPD also noted that, if the developer or building contracted made changes to the permitting plans and didn't resubmit them, MOPD would not know if the units were built accessibly. Id. At 28. Ms. Tamley also had concerns about plans for building that didn't come to MOPD for its permitting review. Id. at 129. MOPD also noted that, in its experience, changes from drawings does occur during construction, and the only way to know what has happened is to do a full investigation post-construction.

21

Deposition of Joseph Russo at 128. Christopher Zafiris, an architect who worked with MOPD for 27 years (ending in 2020), said that he "very, very, very rarely" went on-site to inspect built conditions over 27 years with the ACU (first the Architectural Services Unit, and later the Accessibility Compliance Unit). Deposition of Christopher Zafiris at 22-3. He also stated that "as far as I know" the only assurances that a particular City-funded multifamily residential building was accessible during his tenure was his review of building plans. Id. at 72.

In 2022—four years after the Complaint was filed—the City finally provided sufficient resources for MOPD to hire one inspector to conduct on-site inspections. MOPD's inspections of nine developments in the Spring of 2022 each found significant violations of Section 504 and ADA accessibility requirements. In the reports of three of the on-site investigations that I have reviewed, each one contains violations of the Federal standards for accessible housing that the City of Chicago is required to meet. For example, the property called LCDC Lazarus Apartments fails to disperse accessible units to its 3-bedroom apartments, has a five-inch step on the "accessible" walkway to the building from the courtyard, and has thermostats that are way too high. This lack of enforcement has created a system and electrical outlets that are too low. These reports demonstrate that up to the present, units that are being called accessible are not being designed and constructed in compliance with the applicable Federal standards.

It is my opinion that had the City required an on-site inspection of any City-funded apartment development prior to issuing a certificate of occupancy, the Affordable Rental Housing Program would currently be providing a substantially greater number of fully accessible units to low-income Chicagoans with disabilities, perhaps numbering in the thousands.

7. **Available Evidence Confirms that the Affordable Rental Housing Program Fails to Comply with Federal Accessibility Requirements, to the Detriment of Chicagoans with Disabilities**: One must account for the possible outcome that, even though the City does not know if or how many of its rental units are accessible and even though it does not have in place the usual and necessary administrative requirements to ensure that required Federal accessibility standards have been followed, a sufficient number of accessible units have been built and maintained by the developers and owners to which the City provided funding for the construction of its rental housing. Of course, these developers and owners would also have had to, on their own, institute a program of identifying which persons who seek housing need accessible housing and placing them in the accessible units that contain the features that they need, as well as a having a process in place for moving persons without disabilities who are in accessible units out of the accessible units into other units to accommodate the needs of persons with disabilities on any waiting lists for housing. While such an outcome is unlikely, it is not impossible.

This potential outcome is contradicted by the evidence in this case. First, the City's own analysis of its housing situation reveals its knowledge of the scarcity of accessible housing in Chicago. Periodically, the City issues its City Fair Housing Plan for a five-year period. These plans provide a status report on fair housing in Chicago and list initiatives that the City will undertake to address any identified impediments to fair housing choice. The City's Fair Housing Plan for 2000-2004 notes that many landlords and owners continue to discriminate on the basis of

disability (among many other factors) and contains this analysis: "Several factors have contributed to housing discrimination among people with disabilities. The lack of information regarding the rights of people with disabilities under FHAA, the extremely limited supply of available rental units for the disabled in Chicago, and the high demand for affordable housing with accessibility has resulted in hundreds of individuals being relegated to extensive waiting lists with scarce hope of obtaining suitable housing within a reasonable time period." City's Fair Housing Plan 2000-2004 at 30, 34 (PL_0025916-6004). The City's Housing Plan for 2005-2009 contains a similar assessment. Owners and landlords continue to discriminate on the basis of disability, and "The supply of available rental units for the disabled continues to be extremely limited in Chicago. The demand has resulted in hundreds of individuals being relegated to extensive waiting lists with scarce hope of obtaining suitable housing within a reasonable period of time." City's Fair Housing Plan 2005-2009 at 2, 35 (C022514-79). A similar report for 2010, Analysis of Impediments to Fair Housing Choice and Fair Housing Plan, Chicago 2010, found that the supply of accessible housing continues to be limited.

A more detailed and extensive report, Analysis of Impediments to Fair Housing Choice, was issued on June 24, 2016. In this document, the leadership of MOPD listed several impediments that exist for persons with disabilities in Chicago that need to be addressed including, among other issues, the limited number of accessible units within subsidized housing that developers fail to comply with HUD's new construction provisions to ensure accessibility for persons with disabilities, and the lack of accessible residential parking, particularly in condominiums. Analysis of Impediments to Fair Housing Choice (June 24, 2016) at 82-3 (PL_0030225-504). These reports issued by the City evidence that there is a lack of accessible housing in the City of Chicago and that this lack of accessible housing has devastating consequences for persons with disabilities who need the features of accessible housing.

In addition, in his deposition, James Horan made clear that the City and the Department of Housing were aware that there was a lack of accessible housing for persons with disabilities in the City of Chicago. Deposition of James Horan at 269-271.

The lack of accessible housing and its consequences for persons with disabilities are also demonstrated by the declarations of persons with disabilities in this litigation and by the on-site review and investigation of a sample of housing units in the City carried out by both the Defendant and the Plaintiff. The declarations provided by Plaintiff provide a litany of the current state of the lack of accessible housing and the consequences for individuals with disabilities.

- Monia Taylor is a person with a disability who, because of a variety of autoimmune diseases and surgeries, needs a variety of accessible features including a raised toilet seat, a walk-in shower, a small number of stairs, lowered shelves, and door handles rather than door knobs. In over 30 years, she has never been able to find an affordable, accessible apartment in Chicago that meets her needs. Declaration of Monia Taylor (PL_0034840-2).

- Vincent Smith has cerebral palsy, uses a power wheelchair, and has lived for the past 30 years in an apartment that does not meet his needs. The three steps to his apartment mean he cannot get his wheelchair into his apartment

and, even when he has significant help with a temporary ramp, his chair cannot go to all parts of his apartment. He has been on waiting lists for the City's voucher program and for an accessible apartment. He has been told that most of the accessible units in the City are in senior housing and he is too young to live in them. He would like to live in a safer neighborhood with proximity to public transportation and continues to search for an apartment that meets his accessibility needs. Declaration of Vincent Smith (PL_0034851-3).

- Laura Donaldson, who has cerebral palsy and uses a wheelchair, is now a success story because of the help of Access Living and her own advocacy. However, she was on the Chicago Housing Authority's wait list for accessible apartments for twenty years and during that time lived in substandard, inaccessible housing and for some time also lived in one of the City's shelters and depended on Catholic Charities for her meals. Declaration of Laura Donaldson (PL_0034825-8).

- Candace Coleman has cerebral palsy, uses a wheelchair, and also has allergies and asthma. Her accessibility needs include an apartment without carpet, mold, or smoke. She has endured inaccessible housing, including living in an apartment building where she had to crawl up 25 stairs each day. Even though she has close ties to Chicago through her work, she has had to leave the City of Chicago to find accessible housing. Her housing situation makes her feel inferior and she states, "[w]ithout a place to live comfortably and independently, I'm left optionless, vulnerable, and dependent on other people's decisions." Declaration of Candace Coleman (PL_0034792-5).

- Anna Williams had a leg amputated and uses a wheelchair or a cane and lives in a nursing home. She received a Chicago Housing Authority voucher through the lottery and despite looking online every day and visiting 10-12 apartment buildings, couldn't find accessible housing within the 90-day time period and lost her voucher. She continues to live in a nursing home. Declaration of Anna Williams (PL_0034783-5).

- Michael Grice became disabled as a result of an accident and has quadriplegia. For 34 years he has lived in nursing homes and only at the age of 58 did he move into his own apartment: "the first time since my injury at age 23 that I had found accessible, affordable housing and could live independently." He credits Access Living with helping him find an accessible apartment, but he has learned through his search for an accessible apartment that units marked as accessible do not meet the needs of a wheelchair user. Declaration of Michael Grice (PL_0034834-6).

Section 504 and the ADA were enacted into law to provide opportunities for persons with disabilities. Many consider Federal accessibility laws as dry and technical because, in truth, the difference of a few inches can create an insurmountable barrier. However, these declarations show that the City's violations have a profound impact on the lives of persons with disabilities in the City of Chicago.

Despite all of this, between 1988 and 2022 the City pursued no sanctions against owners or developers with respect to noncompliance with Federal accessibility standards in multi-family housing development as part of its Affordable Rental Housing Program. See Defendant's Responses to Plaintiff's Second Set of Requests for Admission, #50. The lack of management controls and the absence of any real enforcement efforts have created an environment where real estate developers and apartment building managers of affordable housing see an easy path to getting grants and low-interest loans from the Department of Housing with no strings attached, where they can turn a profit without having to comply with pesky accessibility requirements. They know that the City will not look behind their mere confirmation that they are complying with Federal requirements.

The lack of accountability is total and widespread. It applies to the design and build requirements, having the appropriate number of accessible units with a wide range of accessible features in a full range of types of housing and housing locations. It applies also to the management of the units, covering a wide range of requirements: ensuring that wait lists and transfer lists are developed so that persons with disabilities actually get into the accessible units, that leases given to able-bodied persons who use accessible units state that the able-bodied tenants will vacate the accessible unit for similar non-accessible units when the accessible units are needed for persons with disabilities, and that reasonable accommodations are made for individual requests. The City's derogation of its Section 504 and ADA responsibilities creates an atmosphere where there is no incentive for the developers and managers to understand or follow Federal disability rights law.

8. **City's Laissez Faire Attitude Toward Accessibility in the Affordable Rental Housing Program Demonstrates a Profound Lack of Commitment to Compliance with its Obligations under Section 504 and the ADA:** The City's hands-off approach to accessible housing is in marked contrast to how it handles its obligations to ensure compliance with obligations regarding housing quality and affordability. The Department of Housing conducts periodic on-site inspections of HOME-funded developments to ensure that they comply with Federal Regulations. Defendant's Response to Plaintiff's Second Set of Request for Admissions, #54. According to the deposition of James Horan, every three years the Department of Housing does on-site inspections of HOME-funded developments to ensure that the housing quality meets Federal standards. Deposition of James Horan at 63. But the Department of Housing does not confirm that the accessible units are indeed accessible, id., at 65, because DOH inspectors are construction specialists that do not have the expertise to make accessibility determinations. Id at 56. Grant Ullrich, the Deputy Commissioner of the Department of Building, did roughly five on-site inspections of multifamily developments each year, but none of these dealt with accessibility. Deposition of Grant Ullrich at 12-3. He also stated that the Department of Buildings does not do accessibility reviews but leaves those to MOPD (id. at 38) and that MOPD did not start on-site accessibility inspections of multifamily residential properties until 2022. Id. at 38. In my view, the Department of Housing has demonstrated its capacity to ensure compliance with other Federal standards; that it fails to do so with respect to accessibility standards is inexplicable. Further, following accessibility standards when constructing a building is a construction issue and construction specialists can be trained to identify accessibility issues if there is a commitment to do so.

The City has been aware of its obligations to provide accessible housing in projects funded by the Federal government and has been aware of its shortcomings in meeting this obligation for years. While the City has analyzed the problem and proposed solutions, the proposed solutions have proven insufficient. One solution was to engage MOPD in doing plan reviews. Under this process, MOPD staff review plans during the permitting process. However, MOPD reviews these plans according to the Chicago Building Code and the Illinois Accessibility Code, but not the Federal ADA and Section 504 Standards. Deposition of Joseph Russo at 26-27. See also Deposition of Karen Tamley at 67-8 (MOPD did not go and verify that projects met Federal standards). In fact, if a private developer's plans were reviewed and MOPD noticed that it did not meet Federal access standards, MOPD would tell the developer of the problem, but, if the project met the State and City code standards, MOPD, under its operating procedures, would have to approve the project because it had no authority to do otherwise. Deposition of Joseph Russo at 41-43.

The action of MOPD and the Department of Housing in updating the City's accessibility standard is instructive. For a five-year period leading up to 2019, the City was engaged in updating its city building code. Officials at MOPD developed a proposal to update the code, including a line-by-line review of the ADA Standards. Deposition of Joseph Russo at 78. Under such a proposal, developers in meeting the City Code would be compliant with the ADA Standards and the City enforcement officials would have the ability to withhold permits and construction approvals if the facility did not meet the new City Code (which would have included the ADA Standards). The Department of Buildings did not like this proposal because it was too hard on developers and as a result the code did not meet the ADA Standards. Id. at 79.

# APPENDIX A

**John L. Wodatch**
645 A Street, N.E.
Washington, D.C. 20002
jlwodatch@gmail.com
202-738-6565

Practicing attorney on disability rights issues, specializing in the Americans with Disabilities Act, the civil rights provisions of the Rehabilitation Act, other Federal disability rights laws, the Federal accessibility design standards, and the U.N. Convention on the Rights of Persons with Disabilities.

**Experience:**

**Contractor with Nationwide IT Services**                           **May 2020 to Present**

Serve as Senior Disability Policy Advisor to the Office for Civil Rights of the U.S. Department of Health and Human Services, providing advice and guidance on Section 504 of the Rehabilitation Act of 1973, Title II of the Americans with Disabilities Act, and other Federal disability rights laws and regulations, including:

*Developed online history with interviews for the 30th anniversary of the signing of the Americans with Disabilities Act

*Assisted in drafting of policy guidance concerning healthcare issues relating to the COVID-19 pandemic, including "FAQs for Healthcare Providers during the COVID-19 Public Health Emergency: Federal Civil Rights Protections for Individuals with Disabilities under Section 504 and Section 1557," in February 2022 and "Guidance on "Long COVID" as a Disability Under the ADA, Section 504, and Section 1557" in July 2021

*Reviewing existing Section 504 regulations for federally assisted and federally conducted programs, identifying issues for updating the regulations, and developing draft notices of proposed rulemaking for agency consideration

*Providing guidance and recommendations on policy issues raised by the COVID-19 pandemic, including face mask and vaccination issues

*Providing assistance to OCR regional staff on the investigation of complaints

**Self-Employed**                                                    **July 2011 to Present**

Provide advice and information on the Americans with Disabilities Act, the Convention on the Rights of Persons with Disabilities, Section 504 of the Rehabilitation Act, and other disability rights laws and regulations:

*Assisted the United States International Council on Disabilities in efforts to secure US ratification of the Convention on the Rights of Persons with Disabilities

*Worked with the State Department and US embassies in providing guidance to foreign nations on implementation of their own disability rights laws and the CRPD, including visits to Japan, Korea, Sri Lanka, Mongolia, Georgia, Trinidad and Tobago, Armenia, and Montenegro

      \*Trained staff of Federal agencies on Section 504
      \*Instructor for executive education at the Harvard University School of Design
      \*Training for the ADA Information Centers and the National Association of ADA Coordinators
      \*Served as an expert in Federal litigation on Section 504 and housing in major, precedent-setting case

**Civil Rights Division, U.S. Department of Justice**
*Deputy Assistant Attorney General*        **January to July 2011 and January to July 2009**

At start of Obama Administration, oversaw the Civil Rights Division's active enforcement on disability rights issues, including implementation of the Supreme Court's *Olmstead* decision so that persons with disabilities may live independently in their local communities, ensuring that the United States signed the Convention on the Rights of Persons with Disabilities, and issuing comprehensive and updated regulations under the Americans with Disabilities Act (ADA)

**Disability Rights Section, Civil Rights Division, U.S. Department of Justice**
*Section Chief*        **March 1993 to January 2011**

As head of the office charged with carrying out the Department of Justice's obligations under the ADA, maintained an aggressive, vigorous, balanced, effective program enforcing the ADA's provisions applying to State and local governments (including employment) and to public businesses. In this capacity, achieved favorable action for persons with disabilities in over 3,000 cases and matters affecting people in every state, using formal settlements, informal resolutions of complaints, successful mediations, consent decrees, and court decisions under the ADA. These matters provided injunctive relief and compensatory damages for people with disabilities and set major ADA precedents in important areas, including:

- Ensuring accessible seating in this country's sports arenas
- Providing test accommodations on the SAT's and other standardized exams
- Allowing persons with disabilities to serve as jurors
- Removing barriers in major hotel chains and quick service restaurants
- Making America's major attractions accessible from the Empire State Building to Disney World
- Making the full gamut of civic services accessible, including town halls, emergency shelters, polling places, city parks, websites, and sign language interpreters in courts
- Making 9-1-1 emergency call systems usable by persons who are deaf and use TTY's
- Establishing important Supreme Court precedent on the coverage of those who are HIV positive, on unnecessary segregation in large state institutions, on providing reasonable modifications in programs, and on full coverage of all state and local government services
- Making interstate buses accessible and providing hand controls for rental cars
- Providing reasonable accommodation and new work opportunities for injured police officers and fire fighters

- ❑ Ensuring that children with disabilities are not denied access to child care
- ❑ Ensuring that electronic information technology, including websites and e-readers, is accessible.

Created and operated an extensive public outreach and technical assistance program, providing the public with practical information on how to comply with the ADA in a cost-effective manner, through the development of guides and pamphlets, a grant program, extensive public speaking and training, an ADA website, and a telephone information service

Pioneered the use of mediation to resolve ADA cases and investigations, resulting in over 2800 individual mediated settlements

Developed comprehensive regulations for State and local governments and over seven million businesses, including the new ADA Standards for Accessible Design

Championed innovative personnel policies to create a positive work environment for employees, including extensive use of alternative work schedules, having employees work part-time at home, and providing a full range of reasonable accommodations to employees with disabilities

Established Federal program for the certification of State accessibility codes and certified the codes of five State codes as meeting the ADA's accessibility requirements
Represented the Department of Justice on the U.S delegation to the United Nations, playing an active role in the development of the Convention on the Right of Persons with Disabilities and helped ensure signing of the treaty by the United States

**Office on the Americans with Disabilities Act, Civil Rights Division, U.S. Department of Justice**
*Director*                                                                              **October 1990 to March 1993**

In office established by Attorney General Dick Thornburgh, oversaw the development of the Department of Justice's regulations implementing titles II and III of the Americans with Disabilities Act and the publication of the Department's statutorily required Technical Assistance Manuals. Created the Department's technical assistance and public outreach program and assembled the Division's ADA enforcement staff.

**Coordination and Review Section, Civil Rights Division, U.S. Department of Justice**
*Deputy Section Chief*                                                          **December 1980 to October 1990**

Implemented a new Presidential initiative under Executive Order 12250 to coordinate civil rights enforcement in the Executive Branch, ensuring that over 100 federal agencies issued regulations making their programs accessible to persons with disabilities. In 1989 and 1990 served as chief technical expert and advisor to the Attorney General on the development of the Americans with Disabilities Act and played a key role in the passage of the ADA, working for the Domestic Policy Counsel on the legislation and serving as a member of President Bush's negotiating team.

**Office for Civil Rights, Education Department and Department of Health, Education, and Welfare**
*Director of Office of New Programs and Branch Chief*          **July 1975 to December 1980**

Authored the Department's regulation implementing section 504 of the Rehabilitation Act, establishing new comprehensive federal civil rights policies for persons with disabilities that for the first time enunciated important disability rights nondiscrimination principles, including reasonable accommodation in employment, integration in programs and services, and the removal of architectural barriers in facilities. Created the first nationwide technical assistance program for disability rights and established a nationwide complaint program that for the first time addressed and resolved complaints from persons with disabilities. Enforced Department's title IX policies prohibiting sex discrimination in college athletics.


**Office of the General Counsel, Department of Health, Education, and Welfare**
*Attorney*          **July 1969 to July 1975**

Handled cases concerning school desegregation under title VI of the Civil Rights Act of 1964 in administrative enforcement actions, sex discrimination in college hiring and race discrimination in Philadelphia trade unions under Executive Order 11246, racial discrimination in the provision of health care, and discrimination based on national origin in the U.S. welfare system.

## Education:

- Georgetown University Law Center, J.D.
- John F. Kennedy School of Government, Harvard University, M.P.A.
- Trinity College, Hartford, Connecticut, B.A.

## Other:

- Member of the Bar of the District of Columbia
- Board Member, National Association of ADA Coordinators
- Frequent speaker on the ADA and disability rights issues
- At the Department of Justice, recipient of John Marshall Award in 1990, the Attorney General's Award for Distinguished Service in 1995, and the Presidential Distinguished Rank Award for exceptional achievement in 2010
- Received John F. Kennedy Center for the Performing Arts 2012 Award for Excellence in Accessibility Leadership
- Received ADA Lifetime Achievement Award from ADA National Network of Technical Assistance Centers in 2011
- Received Edward M. Kennedy Lifetime Achievement Award from Disability Rights Education & Defense Fund in 2012
- Received Dole-Harkin Award for International Policy from the US International Council on Disability in 2022
- Interests include Shakespeare, attending theater, singing in a choral group, reading fiction, modern and Renaissance art, gardening, and D.C. area sports teams