# EXHIBIT 59

# Expert Report of Erin Kemple

*Access Living of Metropolitan Chicago, Inc. v. City of Chicago,* No.: 1:18-cv-03399 (N.D.Ill.)

## I.    Executive Summary

I was retained by counsel for Access Living to offer an opinion concerning any damages suffered by Access Living on account of noncompliance by the City of Chicago (the "City") with its obligations under federal laws requiring architectural and program accessibility, as alleged in *Access Living of Metropolitan Chicago, Inc. v. City of Chicago,* No.: 1:18-cv-03399 (N.D.Ill.) (the "Litigation"). I offer the following opinions—with a reasonable degree of professional certainty—based on my review of the materials enumerated below and three decades of experience leading non-profit organizations devoted to the enforcement of disability and civil rights laws:

1. Because of the City's alleged acts and omissions, Access Living was required to divert its limited resources away from other advocacy and service work for its disabled constituents ("consumers") and toward efforts to secure the City's compliance with the accessibility requirements in the Affordable Rental Housing Program. The number of staff hours diverted was necessary given the scope of the City's noncompliance, and the hourly rates proposed for those staff persons are exceedingly reasonable.

2. The City's alleged acts and omissions frustrated Access Living's mission—which is to ensure that Chicagoans with disabilities are able to live independently and fully integrated into the community—and injured its reputation as an agency capable of promoting independent living and community integration.

I believe my opinions will assist the trier of fact in understanding the law and facts applicable to Access Living's claim for damages.

## II.    Qualifications

From 1995 through 2022, I was the chief executive officer of non-profit organizations devoted to the enforcement of disability and civil rights laws. Under my supervision, those organizations conducted investigations of alleged discriminatory acts and filed enforcement actions in federal and state courts, and with administrative agencies. Through that work, I became intimately familiar with proof of damages under the federal Fair Housing Act and related statutes, such as the Americans with Disabilities Act and the Rehabilitation Act of 1973, and with guidance provided by the U.S. Department of Housing and Urban Development ("HUD") and other recognized authorities in the field.

As is apparent from my *curriculum vitae* (attached as Exhibit 1), since August 2022 I have been the principal of a consulting firm that provides training and best practices advice to fair housing organizations throughout the country. During my tenure at the Connecticut Fair Housing Center (the "Center"), I worked—at the invitation of the Connecticut Department of Housing— with all of Connecticut's Centers for Independent Living ("CILs") that were receiving funding under the federal Money Follows the Person program. My charge was to train CIL staff to identify potential violations of disability rights laws that prevented the transition of people with disabilities from nursing homes and other institutional settings to community living. Following that training, the Center represented many CILs and their individual clients in matters where they had been denied housing because of disability. Where the Center was unable to secure compliance informally, we represented CILs in enforcement actions where their standing was based on diversion of resources and frustration of mission damages.

My work at the Center also gave me the opportunity to write three reports addressing the problems faced by people with disabilities in finding affordable, accessible housing, all of which were published by the Connecticut Department of Housing. In 2015, I was the principal author of the Connecticut Analysis of Impediments to Fair Housing Choice which found, among other things, a lack of affordable, accessible housing throughout Connecticut.[1] In 2018, I researched and authored a report entitled "A Study of Tenants in State-Funded Elderly/Disabled Housing" which examined the issues faced by young people with disabilities living in senior housing. The report concluded that—because of the dearth of accessible affordable housing in Connecticut—younger people with disabilities effectively had no alternatives to living in "senior" housing.[2] Finally, I was one of the principal authors of the 2023 Connecticut Analysis of Impediments to Fair Housing Choice, which again identified a lack of accessible affordable housing—and community resistance to building more—as significant impediments to fair housing choice for people with disabilities.[3]

## III.    Documents and Information Reviewed in Preparation for This Report

- Complaint, *Access Living v. City of Chicago*, Case No. 18-cv-03399 (N.D. Il.), ECF No. 1
- Access Living, *Federal ACL EZ 704 Reports* (2008-2017), Bates numbers PL_0034909, PL_0034973, PL_0035023, PL_0035153, PL_0035209, PL_0035244, PL_0043044, PL_0043044, PL_0043499, PL_0043707, PL_0043821, PL_0043982, and PL_0044234
- Statewide Independent Living Council of Illinois, *State Plan for Independent Living 2024 Amendment Final* (February 2021), https://silcofillinois.org/state-plan-for-independent-living-spil/
- City of Chicago, *Chicago Blueprint for Fair Housing* (October 2021), https://www.chicago.gov/content/dam/city/sites/chicagos-blu eprint-for-fair-housing/pdfs/ChicagoBlueprintforFairHousing-Full%20Report.pdf

---

[1] Connecticut Fair Housing Center, *Analysis of Impediments to Fair Housing Choice 2015*, https://portal.ct.gov/-/media/DOH/AnalysisofImpediments2015pdf.pdf?la=en.

[2] Connecticut Department of Housing, *A Study of Tenants in State-Funded Elderly/Disabled Housing: Final Report Including Public Comments* (March 2019), https://portal.ct.gov/-/media/DOH/final-report-with-public-comments.pdf.

[3] Connecticut Department of Housing, Analysis of Impediments to Fair Housing Choice (April 2023), https://portal.ct.gov/-/media/DOH/2023-Analysis-of-Impediments-to-Fair-Housing-Choice.pdf.

- Connecticut Fair Housing Center, *Analysis of Impediments to Fair Housing Choice 2015*, https://portal.ct.gov/-/media/DOH/AnalysisofImpediments2015pdf.pdf?la=en
- Connecticut Department of Housing, *A Study of Tenants in State-Funded Elderly/Disabled Housing: Final Report Including Public Comments* (March 2019), https://portal.ct.gov/-/media/DOH/final-report-with-public-comments.pdf
- Connecticut Department of Housing, Analysis of Impediments to Fair Housing Choice (April 2023), https://portal.ct.gov/-/media/DOH/2023-Analysis-of-Impediments-to-Fair-Housing-Choice.pdf
- National Council on Independent Living, About Independent Living, https://ncil.org/about/aboutil/
- Beloit College, In Remembrance: Disability Rights Advocate Marca Bristo '74, https://www.beloit.edu/live/news/1238-in-remembrance-disability-rights-advocate-marca
- Susan J. Popkin, Urban Institute, *Disability Justice Isn't Possible without Housing Justice* (March 2023), https://www.urban.org/urban-wire/disability-justice-isnt-possible-without-housing-justice
- Susan J. Popkin, et al., Urban Institute, *People with Disabilities Living in the US Face Urgent Barriers to Housing* (October 2022), https://www.urban.org/research/publication/people-disabilities-living-us-face-urgent-barriers-housing
- City of Chicago, *Analysis of Impediments to Fair Housing Choice* (February 16, 2016), https://www.chicago.gov/content/dam/city/depts/cchr/AdjSupportingInfo/AdjFORMS/2016%20Adjudication%20Forms/2016AItoFairHousing.pdf
- U.S. Department of Housing and Urban Development, Office of Fair Housing and Equal Opportunity, *Annual Report to Congress FY 2016* (January 2017), https://www.hud.gov/sites/documents/FY2016FHEOANNUALREPORT.PDF
- U.S. Department of Housing and Urban Development, Office of Fair Housing and Equal Opportunity, *Annual Report to Congress FY 2017*, https://www.hud.gov/sites/dfiles/FHEO/images/FHEO_Annual_Report _2017-508c.pdf
- U.S. Department of Housing and Urban Development, Office of Fair Housing and Equal Opportunity, *Annual Report to Congress FY 2018 - FY 2019*, https://www.hud.gov/sites/dfiles/FHEO/documents/21FHEO%20Report%20Final%201-15%20-%20Web%20Version.pdf
- National Fair Housing Alliance, *Reports & Research*, https://nationalfairhousing.org/resource-topic/reports-research/
- City of Chicago, *2020-2024 Consolidated Plan and 2020 Action Plan (Public Review Draft)*, https://www.chicago.gov/content/dam/city/depts/obm/supp_info/CDBG/2020ConPlan/ConsolidatedPlanDraft.pdf
- City of Chicago, *2015-2019 Consolidated Plan and 2015 Action Plan*, https://www.chicago.gov/content/dam/city/depts/obm/general/Final%20for%20Posting%20with%20Appendix.pdf
- Access Living, *Housing Resources* (2023), https://www.accessliving.org/wp-content/uploads/2023/03/List-of-Housing-Resources-Access-Living-2023.docx
- U.S. Department of Health and Human Services, Administration for Community Living, *Centers for Independent Living* (April 2023), https://acl.gov/programs/aging-and-disability-networks/centers-independent-living

- Access Living, *Woman Denied Shelter Due to Disability Files Lawsuit Against Chicago* (March 2019), https://www.accessliving.org/newsroom/press-releases-and-statements/woman-denied-shelter-due-to-disability-files-lawsuit-against-chicago/
- U.S. Department of Housing and Urban Development, Housing Choice Voucher (HCV) Data Dashboard, https://www.hud.gov/program_offices/public_indian_housing/programs/hcv/dashboard
- Declarations made by the following individuals:
  - Angela Lacey
  - Anna Williams
  - Barbara Ann Fisher
  - Candace Coleman
  - Darryl Robinson
  - Julie Falco
  - Kevin McPhan
  - Lashawn McKinney
  - Laura Donaldson
  - Leah Scott
  - Michael Grice
  - Monia Taylor
  - Robert Ramos
  - Steven Glass
  - Vincent Smith
- Access Living's Corporate Bylaws (2008 and 2020 Revisions), Bates number PL_0087462
- Access Living, *Who We Are*, https://www.accessliving.org/who-we-are/
- Diane K. Levy, et al., U.S. Department of Housing and Urban Development, *Discrimination in the Rental Housing Market Against People who are Deaf and People who use Wheelchairs: National Study Findings* (June 2015), https://www.huduser.gov/portal/publications/fairhsg/hds_disability.html
- D. Scott Chang, *Remedies and Damages in Fair Housing Cases and the Physical and Emotional Impact*, National Fair Housing Training Conference and Housing Policy Summit, June 14-16, 2004
- Cases and statutes reviewed:
  - Section 504 of the Rehabilitation Act of 1973
  - Americans with Disabilities Act
  - *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)
  - *Olmstead v. L.C.*, 527 U.S. 581 (1999)
  - *Village of Bellwood v. Dwivedi, 895 F.2d 1521, 1526 (7th Cir. 1990)*
  - Federal Fair Housing Act

## IV.  Hourly Rate

Erin Kemple's hourly fee for time spent preparing this report is $300 per hour. No portion of these fees is dependent on the nature of Ms. Kemple's findings or on the outcome of this case.

## V.     Background and History of CILs

### 1.     General Information

From colonial days until the 1960s, people with disabilities in the United States were consigned to second-class citizenship. Because the built environment did not consider their accessibility needs, they lived much of their lives outside of their communities, often in institutional settings or hidden in their own families' homes. While government policy has gradually moved toward greater inclusion, through passage of the Rehabilitation Act of 1973, the Fair Housing Act Amendments of 1988, and the Americans with Disabilities Act of 1990, as well as through Supreme Court decisions such as *Olmstead v. L.C.*, 527 U.S. 581 (1999), implementation at the local level of accessibility mandates often lagged, leaving people with disabilities at the margins.

Where change has occurred, it has often been as the result of a strong group of committed activists who see disability not as a cluster of impairments to be corrected or cured, but as conditions requiring societal action to remove barriers standing in the way of independence and self-determination.[4] Stated more clearly by Marca Bristo, founder of Access Living of Chicago, "Instead of looking at my wheelchair as being too wide for the bathroom, I now look at the doors of the bathroom as too narrow for my chair. And that's what the disability rights movement has been about."[5] In other words, the disability rights movement stands for the proposition that but for physical, programmatic, and attitudinal barriers, people with disabilities can live independently, hold jobs, make decisions about their own lives, and participate fully in their communities. CILs sprang into existence in the early 1970s to effectuate this change in orientation.

### 2.     Problems that CILs Face and Seek to Address

The Berkeley Center for Independent Living was the first CIL. Founded in 1972 and inspired by the civil rights movement for racial justice, its founders, including the late Judith Heumann, and allies helped draft the Rehabilitation Act, Section 504 of which prohibits discrimination on the basis of disability by any recipient of federal funds. When Congress passed that statute in 1973 ("Section 504"), it made clear that its objective is to "promote a philosophy of independent living including a philosophy of consumer control, peer support, self-help, self-determination, equal access, and individual and system advocacy, in order to maximize the leadership, empowerment, independence, and productivity of individuals with disabilities, and the integration and full inclusion of individuals with disabilities into the mainstream of American society." [6]

Title VII of the Rehabilitation Act provides for federal funding of CILs so they can provide services to people with disabilities that allow them to participate in all aspects of community life. To receive funding under Section 504, states must create a State Plan for

---

[4] National Council on Independent Living, About Independent Living, https://ncil.org/about/aboutil/.
[5] Beloit College, In Remembrance: Disability Rights Advocate Marca Bristo '74,
https://www.beloit.edu/live/news/1238-in-remembrance-disability-rights-advocate-marca.
[6] 29 USC §796.

Independent Living (SPIL).[7] Once the SPIL is approved by the Department of Health and Human Services, the state is then permitted to distribute those funds to CILs who agree to provide the services designated under the plan. To qualify for such funding, CILs must be consumer-controlled, community-based, cross-disability, nonresidential private nonprofit organizations that are designed and operated in a local community by individuals with disabilities and provide a variety of services that promote independence. CILs provide the following five core services: peer support; information and referral; individual and systems advocacy; independent living skills training; and transition support.[8]

In *Olmstead v. L.C.,* 527 U.S. 581 (1999), the U.S. Supreme Court held that state and local governments had an obligation to serve people in integrated community settings appropriate to their needs, and that a failure to do so was actionable under the Americans with Disabilities Act. That holding informs the work of CILs (like Access Living) that seek to "liberate" people with disabilities from nursing homes and other institutional settings and move them to integrated, community-based housing. This "community integration mandate" drives the work of CILs and makes it clear that a local government housing program that fails to comply with federal accessibility requirements may perpetuate the institutionalization of people with disabilities.

**Promoting independent living:** Assisting people with disabilities to find accessible affordable housing outside of institutional settings is central to the CIL objective of "promot[ing] a philosophy of independent living." It also underpins a CIL's ability to provide the five core services (referenced above) it must provide to qualify for federal funding:

- Information and referral;
- Independent living skills training;
- Peer counseling;
- Individual and systems advocacy; and
- Services that facilitate transition from nursing homes and other institutions to the community.[9]

These requirements have shaped a standard industry practice applicable to CILs, namely that in providing core services, CILs attempt to balance their work between the needs of individual consumers for services or supports with the broader goal of systems advocacy that can provide accessibility benefits to the broader community.

Everyone's life is powerfully shaped by where they live because that affects where we work, our access to healthcare, where we shop for groceries, where our children go to school, and for some, where they attend church or temple. This is more emphatically so for people with disabilities because the lack of accessible affordable housing leaves them isolated away from

---

[7] Statewide Independent Living Council of Illinois, *State Plan for Independent Living 2024 Amendment Final* (February 2021), https://silcofillinois.org/state-plan-for-independent-living-spil/.
[8] 29 USC §705(17); U.S. Department of Health and Human Services, Administration for Community Living, *Centers for Independent Living* (April 2023), https://acl.gov/programs/aging-and-disability-networks/centers-independent-living.
[9] U.S. Department of Health and Human Services, Administration for Community Living, *Centers for Independent Living* (April 2023), https://acl.gov/programs/aging-and-disability-networks/centers-independent-living.

community, locked out of jobs, access to transportation and amenities, medical care, recreation, entertainment, and community life. Living in a community that fails to afford access to community resources promotes isolation and subverts independence.

**Individual and systems advocacy:** CILs use several types of advocacy to ensure their clients are able to live independently. By working on the national, state, and local level, CILs challenge the barriers that have kept people with disabilities from living as full members of the community. Despite decades of individual and systems advocacy around housing, complaints about housing discrimination on the basis of disability have grown exponentially, to the point that they have comprised more than half of such complaints nationwide for the past decade.[10] While HUD has not done a survey of accessible housing since 2011, the fair housing cases filed by DOJ and private fair housing groups make clear that builders of new multifamily housing have failed to comply with accessibility rules, which has contributed to the the a severe shortage of accessible housing.[11] This shortage will only become more acute as the U.S. population ages.

On top of the obstacles caused by discriminatory treatment by housing providers and a shortage of accessible housing, people with disabilities also face the hurdle of finding housing that is affordable. The affordability barrier is partially alleviated by the presence of federally subsidized housing programs such as the 811 program, the housing choice voucher program for people with disabilities, and various supported living programs.[12] The Chicago Housing Authority's affordable housing programs for people with disabilities are almost fully subscribed with nearly all units occupied and most waiting lists closed.[13]

---

[10] U.S. Department of Housing and Urban Development, Office of Fair Housing and Equal Opportunity, *Annual Report to Congress FY 2016* (January 2017) at 8, https://www.hud.gov/sites/documents/FY2016FHEOANNUALREPORT.PDF; U.S. Department of Housing and Urban Development, Office of Fair Housing and Equal Opportunity, *Annual Report to Congress FY 2017* at 15, https://www.hud.gov/sites/dfiles/FHEO/images/FHEO_Annual_Report_2017-508c.pdf; U.S. Department of Housing and Urban Development, Office of Fair Housing and Equal Opportunity, *Annual Report to Congress FY 2018 – FY 2019* at 23, https://www.hud.gov/sites/dfiles/FHEO/documents/21FHEO%20Report%20Final%201-15%20-%20Web%20Version.pdf.

[11] U.S. Department of Justice, *Housing and Civil Enforcement Cases*, https://www.justice.gov/crt/housing-and-civil-enforcement-cases; National Fair Housing Alliance, *Reports & Research*, https://nationalfairhousing.org/resource-topic/reports-research/.

[12] Access Living, *Housing Resources* (2023), https://www.accessliving.org/wp-content/uploads/2023/03/List-of-Housing-Resources-Access-Living-2023.docx.

[13] U.S. Department of Housing and Urban Development, Housing Choice Voucher (HCV) Data Dashboard, https://www.hud.gov/program_offices/public_indian_housing/programs/hcv/dashboard (96.12% of all CHA's Non-Elderly Disabled Housing Vouchers in use compared to 85.48% of all CHA's housing choice vouchers and 84.7% of all housing choice vouchers statewide).

### 3.  Mission and Work of Access Living

Founded in 1980 as the fifth CIL in the United States, Access Living's mission is to ignite disability power and pride, provide critical services, and break down systemic barriers to create a stronger, more inclusive world.[14] To fulfill its mission, Access Living provides the independent living core services required by Title VII of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 705(17) and the Workforce Innovation and Opportunity Act, 45 C.F.R. § 1329.4.

Consistent with the CIL industry practice of allocating its resources efficiently across all five core services to achieve greater accessibility in Chicago, Access Living has engaged in the following types of advocacy related to accessible affordable housing:

**Individual Advocacy:** As stated above, Access Living receives federal funds to provide independent living services and advocacy to people with disabilities. Year after year, help finding accessible affordable housing is one of the most-demanded services, because it is key to achieving other forms of independence. Access Living is acutely aware—as the City has reported in its own official assessments—that the most significant impediment to fair housing choice for Chicagoans with disabilities is "an insufficient supply of affordable housing in the City."[15] The City's own 2015-2019 and 2020-2024 Consolidated Plans and its 2016 Analysis of Impediments to Fair Housing Choice show that Chicago is home to a significant population of disabled people and that it lacks affordable housing. In 2020, 600,000 people with physical and/or developmental disabilities lived in Chicago. In 2016, the City reported that 11% of Chicagoans were disabled people living in the community.

The dearth of accessible affordable housing in Chicago, exacerbated by the City's noncompliance with federal accessibility requirements, has made it more difficult for Access Living to find accessible affordable housing for more than a fraction of its consumers. This fact is supported by the declarations of Angela Lacey, Anna Williams, Barbara Ann Fisher, Candace Coleman, Darryl Robinson, Julie Falco, Kevin McPhan, Lashawn McKinney, Laura Donaldson, Leah Scott, Michael Grice, Monia Taylor, Robert Ramos, Steven Glass, and Vincent Smith, all of which I reviewed in preparation for writing this report.

While Access Living's fair housing staff have won victories for individual clients, it has not expanded the number of units with accessible features for people with disabilities. The number of people who set a goal of obtaining housing in the community has gone up while the number of people who have achieved this goal has gone down. During the period from 2008 – 2016, the number of Access Living's clients who had community-based living as a goal went up by 68%. Yet during that same time period, only 15.7% of those who set that as a goal actually achieved it.[16] As evidenced by the Declarations of Access Living consumers, the lack of

---

[14] Access Living, *Who We Are*, https://www.accessliving.org/who-we-are/.

[15] City of Chicago, *Analysis of Impediments to Fair Housing Choice* (February 16, 2016) at 5, https://www.chicago.gov/content/dam/city/depts/cchr/AdjSupportingInfo/AdjFORMS/2016%20Adjudication%20Forms/2016AItoFairHousing.pdf.

[16] Access Living, *Federal ACL EZ 704 Reports* (2008-2017), Bates numbers PL_0034909, PL_0034973, PL_0035023, PL_0035153, PL_0035209, PL_0035244, PL_0043044, PL_0043044, PL_0043499, PL_0043707, PL_0043821, PL_0043982, and PL_0044234.

accessible housing is pervasive and makes living independently difficult for people with physical and sensory disabilities.

**Systems Advocacy:** The staff of Access Living learned early in the organization's history that assisting people with living independently required more than just helping individual clients. Systems advocacy takes place at the national, state, or local level, and can include advocacy for new legal protections. Marca Bristo helped lead the movement to pass the Americans with Disabilities Act of 1990 and Access Living helped secure the passage of the Fair Housing Act Amendments of 1990, which prohibited discrimination on the basis of disability. Each of these laws contains accessibility requirements for multifamily housing and have given Access Living additional leverage with which to promote the independence, self-determination, and community integration of Chicagoans with disabilities.

Access Living's success in securing the rights of people with disabilities on a national level was combined with success on the local level. Even before the ADA was passed, and due to Access Living's advocacy, the City of Chicago made its public transit system more accessible for people with disabilities. The organization fought for and ensured that people with disabilities had better access to employment, education, health care, and rehabilitation services.

**Litigation:** Because of systemic barriers, including the City's noncompliance with its federal accessibility obligations, Access Living has had limited success over the past decade or more in helping its consumers connect with accessible affordable housing or homeless services. It filed the present litigation in May 2018 when its years-long efforts at individual and systems advocacy had not moved the City meaningfully toward compliance. Similarly, in March 2019, because the City had not addressed the inaccessibility of its homeless shelters—even after years of individual and systems advocacy—Access Living determined that federal litigation was necessary.[17]

---

[17] Access Living, *Woman Denied Shelter Due to Disability Files Lawsuit Against Chicago* (March 2019), https://www.accessliving.org/newsroom/press-releases-and-statements/woman-denied-shelter-due-to-disability-files-lawsuit-against-chicago/.

## VI.     Assessment

### 1.     *Harm to Access Living*

I have had the opportunity to review the leading federal cases concerning organizational damages and Title III standing, including *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) and *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990). Based upon my more than thirty years of experience investigating, litigating, and settling fair housing cases, my work overseeing two different fair housing organizations, and the many hours spent consulting with fair housing centers around the country, I conclude that Access Living has two distinct and valid claims for damages flowing from the City's noncompliance with its accessibility obligations under federal law: one claim based on the diversion of its resources in order to identify and counteract discrimination by the Defendants and another claim based on frustration of its mission to promote independent living and community integration.

It is my opinion, to a reasonable degree of professional certainty, that the time Access Living spent on its accessible affordable housing activities to counteract the City's noncompliance was consistent with the industry standard for CILs or private fair housing enforcement agencies, and was reasonable and necessary. Further, it is my opinion, to a reasonable degree of professional certainty, that the hourly rates Access Living seeks for each job classification are reasonable.

### a.   *Diversion of Resources*

The City's alleged failure to comply with the federal accessibility requirements applicable to the Affordable Rental Housing Program forced Access Living to divert its resources away from its other established priorities and toward additional efforts to assist consumers in finding accessible affordable housing. Over the past two decades, the City has consistently reported to HUD and to the public that there is an acute shortage of accessible affordable housing for disabled Chicagoans. In its 2022 Blueprint for Fair Housing, the City states that people with disabilities are often forced to choose between accessible infrastructure and affordable rent.[18] In its 2020-2024 and 2015-2019 Consolidated Plans, the City's own words recognize the problem of access to housing by stating: "The duel [sic] effect of a low income and decreasing affordable housing stock has proven extremely problematic to . . . those with disabilities."[19] The City makes the same observation in its Analysis of Impediments, noting: "The City of Chicago has limited affordable housing that is accessible by persons with physical disabilities."[20] As a result, according to the City, disabled people face an increased risk of homelessness.[21]

---

[18] City of Chicago, *Chicago Blueprint for Fair Housing* (October 2021) at 30, https://www.chicago.gov/content/dam/city/sites/chicagos-blu eprint-for-fair-housing/pdfs/ChicagoBlueprintforFairHousing-Full%20Report.pdf.
[19] City of Chicago, *2015-2019 Consolidated Plan and 2015 Action Plan* at 41, available at https://www.chicago.gov/content/dam/city/depts/obm/general/Final%20for%20Posting%20with%20Appendix.pdf.
[20] City of Chicago, *Analysis of Impediments to Fair Housing Choice* (February 16, 2016) at 158, https://www.chicago.gov/content/dam/city/depts/cchr/AdjSupportingInfo/AdjFORMS/2016%20Adjudication%20Forms/2016AItoFairHousing.pdf.
[21] City of Chicago, *2020-2024 Consolidated Plan and 2020 Action Plan (Public Review Draft)* at 32,

The City's Consolidated Plans and Analysis of Impediments provide several data points that illuminate the lack of affordable, accessible housing in the City. For example, the City notes that there were 3,716 households seeking accessible units on the Chicago Housing Authority's ("CHA") waitlists in 2020.[22] In 2014, the City noted that the Mayor's Office for People with Disabilities received 2,381 calls from people seeking information about accessible and affordable housing.[23] In its Analysis of Impediments, the City reports that between 2003 and 2013, 23% of fair housing complaints to the Chicago Commission on Human Relations, HUD, and the State of Illinois were allegations of disability discrimination.[24]

It is my opinion that—in the face of the City's actions and inactions, as described in the Complaint—it was reasonable and necessary for Access Living to expend its limited resources to secure the City's compliance with its accessibility obligations under federal law.

Access Living has an obligation to provide a wide range of services (discussed above) annually to thousands of low-income Chicagoans with disabilities and has finite resources to do so. While it receives some government assistance, the amount is capped and there is no automatic replenishment of the resources it is forced to divert in order to address civil rights violations affecting its consumers and the community. Access Living's resources, once expended, are lost and cannot be devoted to the provision of its core services. For example, when Access Living has to spend hundreds of hours per year advocating for consumers to get the accessible, affordable housing the City was legally required to provide, those hours cannot be spent on Access Living's other mandated core services.

Here, Access Living has been forced to redirect its resources away from its stated priorities to respond to, investigate, and counteract the City's discriminatory, noncompliant affordable housing program. Because of the City's failure to provide accessible, affordable housing, Access Living has been forced to redirect resources away from its other activities, including:

- Advocating for consumers to get the accessible, affordable housing that the City should have provided, such as: meeting with City officials, submitting comments on the City's proposed housing plan, testifying at public hearings, and working with its constituents to convey their challenges with securing accessible, affordable housing in Chicago;

- Attempting to provide core services to unhoused disabled people who have been unable to secure accessible, affordable housing due to the City's failures;

- Making programmatic changes to address the challenges disabled people in Chicago confront in securing accessible, affordable housing, such as creating a new full-time

---

https://www.chicago.gov/content/dam/city/depts/obm/supp_info/CDBG/2020ConPlan/ConsolidatedPlanDraft.pdf; City of Chicago, *supra* n. 19 at 40-41.

https://www.chicago.gov/content/dam/city/depts/obm/general/Final%20for%20Posting%20with%20Appendix.pdf.

[22] City of Chicago, *supra* n. 21 at 47.

[23] City of Chicago, *supra* n. 19 at 37.

[24] City of Chicago, *supra* n. 15 at 110.

position (the "Information and Referral Housing Coordinator"), establishing a new communications system for its Housing Counselor and Information and Referral Housing coordinator, and setting up monthly meetings with staff at CHA;

- Attempting to identify accessible units within the City's affordable housing inventory and assisting consumers in their efforts to obtain accessible, affordable housing;

- Moving people out of institutions and into the community, a task made more difficult by the City's failure to ensure accessibility in its affordable housing program; and

- Investigating the City's actions and policies concerning architectural and programmatic accessibility in the Affordable Rental Housing Program.

If not for the City's actions, Access Living would have devoted more time to educational programs (for its consumers as well as the general public), counseling, research, policy advocacy, and to developing the capacity of disabled people to live independently. Access Living would have also devoted more time to addressing the many other barriers to the full integration of disabled people, such as barriers in transportation, criminal justice, education, and health care.

Not only has Access Living diverted its resources up to this point, but Access Living will be forced to continue to divert its resources in the future, after the City ceases its discriminatory conduct. For example, Access Living will need to conduct outreach to disabled people and assist them in securing newly accessible units. It will also need to monitor the City, along with owners and managers of developments within the affordable housing program, to ensure compliance with remedial requirements. Access Living will also need to conduct additional programming to remedy the harm to the broader community and its reputation, as discussed below.

Access Living has devoted significant staff time and other resources to identify affordable, accessible housing for its clients. After reviewing the Section 704 Annual Performance Reports (704 Reports), it is clear that Access Living spent more than 10,333 hours assisting clients who wished to move into the community of their choice. The time spent seeking and not finding affordable, accessible housing diverted Access Living from systemic advocacy such as securing services for people who are incarcerated and disabled, making sidewalks and public areas more accessible to people with disabilities, and providing services to clients on assistive technology and independent life skills training.

In my opinion, not only is 10,333 hours reasonable, it most likely undercounts the actual number of hours diverted from Access Living's other work. The trier of fact may consider the extent of injury to Access Living in assessing diversion of resources damages.

    *b. Rates*

I have reviewed the hourly consulting rates for the job classifications of the Access Living employees who engaged in housing advocacy and services for people who contacted the organization for assistance. I find these rates reasonable in that they are in-line, if not lower, than

the rates often used by other fair housing advocacy organizations around the country. For instance, at the Connecticut Fair Housing Center, we received at least $125 per hour for testing coordinators and $200 for managers and team leaders. Other housing staff such as intake specialists or education and outreach coordinators were generally awarded between $100 - $125 per hour.

c. *Frustration of Mission*

In addition to the tangible, documented time and expenses related to Access Living's diversion of resources, fair housing advocacy organizations like Access Living are entitled to damages for intangible, non-economic harm based on frustration of mission. Frustration of mission damages compensate an organization for the harm a defendant's actions have done to its reputation and status as well as the costs of counteracting the discrimination in the future.[25] Here, to the extent it concludes that the City's noncompliance caused an injury to Access Living's mission (or damaged its reputation and status as an effective disability rights advocacy organization), the trier of fact may determine the extent to which Access Living is entitled to frustration of mission damages.

As noted above, Access Living has a national, statewide, and local reputation as a leader in securing access for people with disabilities to all parts of society, yet on a local level, its ability to expand the number of accessible affordable units available to people with disabilities in Chicago was severely hampered by the City's refusal to comply with its accessibility obligations. Its inability to achieve that objective leaves its consumers, public and private funders, and the public at large with the impression it is ineffectual. In addition, the City of Chicago's actions were not subtle or covert. Instead, the City issued report after report documenting the need for additional accessible affordable housing even as it failed to respond to that need. Access Living attended meeting after meeting asking that the defendant comply with its legal obligation, yet the City did not create additional affordable housing. As a result of the defendant's open and notorious conduct, Access Living's reputation and status was severely damaged.

Access Living provides training to the public about fair housing laws as a central part of its mission and works with housing providers to ensure compliance with housing discrimination laws. Yet, the organization's efforts to use its trainings, reputation, and status to combat discriminatory practices have been stymied by the Defendants' steadfast refusal to comply with the law. Given the very large size of Chicago's affordable housing program and the extent of the City's noncompliance with its accessibility obligations, it is likely the negative consequences to Plaintiff's mission are significant.

To a reasonable degree of professional certainty, it is my opinion that the discrimination alleged in the Complaint hurts not only people with disabilities who currently seek housing, but the larger community as well. Disability discrimination in housing—including the failure to comply with accessibility requirements—denies and compromises the rights guaranteed to all members of the community and its effects do not end when the discriminatory actions end.

---

[25] *Havens v. Coleman,* 455 U.S. at 368, n. 20.

## VII.   Conclusion

The leading cases on organizational standing allow nonprofits such as Access Living to seek two types of damages: diversion of resources and frustration of mission.

**Diversion of resources:** Diversion of resources damages are the harm caused when an organization is required to stop work on its stated priorities and work to counteract a defendant's discriminatory conduct. In this case, Access Living redirected 10,333 hours of its resources away from its stated priorities to respond to, investigate, and counteract the City's discriminatory, noncompliant affordable housing program. Further, it is my opinion, to a reasonable degree of professional certainty, that the hourly rates Access Living seeks for each job classification are reasonable.

**Frustration of mission:** Frustration of mission damages compensate an organization for the harm defendant's actions have done to its reputation and status as well as the costs of counteracting the discrimination in the future. Access Living has a national, statewide, and local reputation as a leader in securing access for people with disabilities to all parts of society, yet on a local level, its ability to expand the number of accessible affordable units available to people with disabilities in Chicago was severely hampered by the City's refusal to comply with its accessibility obligations. Its inability to achieve that objective leaves its consumers, public and private funders, and the public at large with the impression it is ineffectual. In addition, the City of Chicago's actions were not subtle or covert. Instead, the City issued report after report documenting the need for additional accessible, affordable housing yet failed to respond to that need even as Access Living attended meeting after meeting asking that the defendant comply with its legal obligation. As a result of the defendant's open and notorious conduct, Access Living's reputation and status was severely damaged.

*Erin Kemple*

_____

Erin Kemple                                             Date: April 24, 2023