UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| ACCESS LIVING OF METROPOLITAN CHICAGO, INC., an Illinois non-profit corporation, | |
| Plaintiff, | Civil Action No. 1:18-cv-03399 |
| v. | Honorable Edmond E. Chang |
| CITY OF CHICAGO, an Illinois municipal corporation, | |
| Defendant. | |

**STATEMENT OF INTEREST
OF THE UNITED STATES OF AMERICA**

**Table of Contents**

INTRODUCTION ..................................................................................................................... 1

INTEREST OF THE UNITED STATES ................................................................................. 2

BACKGROUND ...................................................................................................................... 3

I.       Legal Background ....................................................................................................... 3

      A.    Section 504........................................................................................................ 3

      B.    Title II of the ADA .......................................................................................... 4

      C.    Program Accessibility Under Section 504 and Title II ............................................ 5

II.      Factual Background.................................................................................................... 5

DISCUSSION ........................................................................................................................... 7

I.      Chicago's Affordable Rental Housing Scheme is a Program or Activity of the City Under Section 504 and Title II........................................................................................................ 7

      A.    A "Program" or "Activity" Includes Anything a Public Entity Does and Providing Affordable Housing is a Normal Function of City Governments...................................... 8

      B.    Chicago Cannot Contract Away Its Section 504 and Title II Obligations............. 10

      C.    Chicago Has the Ability and Obligation to Ensure That Private Developers Provide Affordable and Accessible Rental Housing................................................................... 13

II.      Section 504 Obligations Extend to the Entire "Program" or "Activity" of a Recipient of Federal Funding. .................................................................................................................. 16

III.     Title II Program Accessibility Provisions Apply to Facilities Constructed or Altered on Behalf of, or For the Use of, Chicago's Affordable Rental Housing Program............................ 17

CONCLUSION......................................................................................................................... 19

**Table of Cases**

*Castle v Eurofresh, Inc.*, 731 F.3d 901 (9th Cir. 2013) ................................................................ 11

*Alexander v. Choate,* 469 U.S. 287, 297 (1985) .................................................................... 3, 4

*Am. Council of the Blind of Metro. Chi. v. City of Chi.*, No. 19 C 6322, 2023 U.S. Dist. LEXIS
56419, at *15 (N.D. Ill. Mar. 31, 2023) ...................................................................... 9

*Armstrong v. Schwarzenegger*, 622 F.3d 1058 (9th Cir. 2010) .................................................. 11

*Ashby v. Warrick Cnty. Sch. Corp.*, 908 F.3d 225 (7th Cir. 2018) ........................................... 7, 8

*Bacon v. City of Richmond, Virginia*, 475 F.3d 633 (4th Cir. 2007) ..................................... 14, 15

*Barden v. City of Sacramento*, 292 F.3d 1073 (9th Cir. 2002) ...................................................... 9

*City of LA v. AECOM Servs.*, 854 F.3d 1149 (9th Cir. 2017)..................................................... 11

*Ellison v. United States Postal Serv.*, 84 F.4th 750 (7th Cir. 2023) ............................................ 9

*Hason v. Med. Bd.*, 279 F.3d 1167 (9th Cir. 2002)..................................................................... 9

*Innovative Health Systems v. City of White Plains*, 117 F.3d 37 (2d Cir. 1997) .......................... 9

*Koslow v. Pennsylvania*, 302 F.3d 161 (3d Cir. 2002) ............................................................... 17

*Lang v. Oregon Shakespeare Festival Ass'n*, No. 1:12–cv–01844–CL, 2013 WL 5944184 (D. Or.
Oct. 31, 2013).............................................................................................................. 18

*Marks v. Colorado Department of Corrections*, 976 F.3d 1087 (10th Cir. 2020)...................... 11

*McDaniel v. Board of Education of City of Chicago*, 956 F. Supp. 2d 887 (N.D. Ill. 2013) . 14, 15

*Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775 (7th Cir. 2002) .... 8

*Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 210-12 (1998)................................ 8

*S.G. v. City of Los Angeles*, No. LA-CV-1709003 JAK (PJWx), 2020 WL 8837146 (C.D. Cal.
2020)........................................................................................................................... 16

*Schroeder v. Chicago*, 927 F.2d 957 (7th Cir. 1991).................................................................. 16

*Swan v. Board of Education of City of Chicago*, 956 F. Supp. 2d 913 (N.D. Ill. 2013)........ 14, 15

*Tyler v. City of Manhattan*, 849 F. Supp. 1429 (D. Kan. 1994) .................................................... 18

*Wright v. Bd. of Comm'rs of the Capital Area Transit Sys.*, 551 F. Supp. 3d 607 (M.D. La. 2021)

.............................................................................................................................................. 14, 15

## INTRODUCTION

The United States respectfully submits this Statement of Interest under 28 U.S.C. § 517[1]
to address the application of Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C.
§ 794 and Title II of the Americans with Disabilities Act ("ADA" or "Title II"), 42 U.S.C.
§§ 12131-34 to the City of Chicago's use of third parties to provide affordable housing
opportunities for its residents. Chicago is a recipient of federal financial assistance from the U.S.
Department of Housing and Urban Development (HUD) subject to Section 504 and a public
entity subject to Title II.[2]

Access Living of Metropolitan Chicago, Inc. brought this action against Chicago under
Section 504, Title II, and the Fair Housing Act, 42 U.S.C. §§ 3601-19, alleging the City
discriminates against individuals with disabilities by failing to ensure its "affordable rental
housing program" is accessible. Compl., Dkt. 1. Access Living uses the term "affordable rental
housing program" to describe "the City's efforts to develop and support affordable housing using
federal, state, and local funding—which has resulted in the construction or rehabilitation
of…more than 50,000 rental units." Compl. ¶2. Chicago moved for summary judgment,
arguing, in part, that it does not operate an "affordable rental housing program" and therefore
Title II and Section 504 do not apply. *See* Mem. of Law in Supp. of Mot. For Summ. J. ("City
Mem."), Dkt. 208 at 5-13. Chicago also argues that Section 504 and Title II do not apply to non-
federally funded developments.[3]

---

[1] The Attorney General is authorized "to attend to the interests of the United States" in any case pending
in federal court. 28 U.S.C. § 517.
[2] This Statement of Interest uses the term "public entity" to refer to both a recipient of federal financial
assistance under Section 504 and a public entity under Title II when discussing both statutes, for brevity.
[3] This Statement of Interest only addresses the Section 504 and Title II claims.

This Statement of Interest clarifies the correct interpretation of whether Chicago's affordable housing activities constitute a covered service, program, or activity under Section 504 and Title II, the benefits of which must be accessible to individuals with disabilities. First, it explains that Section 504 and Title II cover all programs or activities of a public entity, and the law and undisputed facts support that providing affordable rental housing opportunities is a program or activity of the City. Second, Section 504 and Title II govern a public entity whether it provides a benefit directly or through contractual or other arrangements. Thus, Chicago is liable for the accessibility of its program or activity even when it contracts with private developers to build the affordable housing. Third, Chicago has the authority, obligation, and ability to ensure the private developers it contracts with provide housing that is both affordable and accessible. Fourth, Section 504 obligations extend to the entire "program or activity" of a recipient of federal funding.

## INTEREST OF THE UNITED STATES

This litigation implicates the proper interpretation and application of Section 504 and Title II. The Department of Justice is charged with enforcing Section 504, 29 U.S.C. § 794(a), and with coordinating federal agencies' implementation and enforcement of Section 504, 28 C.F.R. pt. 41; Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (Nov. 2, 1980); *see also* 28 C.F.R. § 0.51(b)(3). Congress delegated authority to the U.S. Department of Housing and Urban Development (HUD) to promulgate regulations under Section 504, and HUD implements and ensures Section 504 compliance. 29 U.S.C. § 794; 24 C.F.R. pt. 8.

Congress charged the Department of Justice with implementing Title II of the ADA by promulgating regulations, issuing technical assistance, and bringing suits in federal court to enforce the statute. 42 U.S.C. §§ 12133-12134, 12206; 28 C.F.R. pt. 35. HUD is the designated

2

agency responsible for implementing the compliance procedures under Title II at 28 C.F.R. pt. 35, Subpart F, for purposes of all programs, services, and activities relating to state and local public housing, and housing assistance and referral.  28 C.F.R. § 35.190(b)(4).

The United States therefore has a strong interest in the proper and uniform application of Section 504 and Title II, and in furthering Congress's intent to create "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities" and reserve a "central role" for the federal government in enforcing the ADA's standards.  42 U.S.C.§ 12101(b)(2)-(3).

## BACKGROUND

### I.    Legal Background

#### A.  Section 504

Congress enacted Section 504 in 1973 to guarantee that no otherwise qualified individual with a disability in the United States, shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.  29 U.S.C. § 794(a); 24 C.F.R. §§ 8.1(a), 8.2, 8.4(a).  A central aim of Section 504 was the "elimination of architectural barriers."  *Alexander v. Choate,* 469 U.S. 287, 297 (1985) (citing S. Rep. No. 93-318, p. 4 (1973)).

The City is a primary recipient of federal financial assistance from HUD subject to Section 504.  24 C.F.R. §§ 8.2, 8.3.  A "primary recipient" includes a "State or local unit of government that is authorized or required to extend Federal financial assistance to another recipient for the purpose of carrying out a program or activity."  24 C.F.R. § 8.3.  Section 504 defines "program or activity" as "all of the operations of…a local government; or the entity of such…local government that distributes such assistance….  29 U.S.C. § 794(b)(1); 24 C.F.R.

3

§ 8.3. Under Section 504, individuals with disabilities "must be provided with meaningful access to the benefit that the grantee offers." *Alexander v. Choate*, 469 U.S. at 301. A recipient, in providing the benefits of a program that receives federal financial assistance may not, directly or through contractual, licensing, or other arrangements, discriminate against individuals with disabilities. 24 C.F.R. § 8.4(b)(1).

### B. Title II of the ADA

In 1990, Congress enacted the ADA, expanding protections to individuals with disabilities by providing "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Congress found that "discrimination against individuals with disabilities persist in such critical areas as…housing…and access to public services" and "individuals with disabilities continually encounter various forms of discrimination, including…the discriminatory effects of architectural…barriers. *Id*. § 12101(a)(3), (5). Title II of the ADA applies to public entities and provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id*. § 12132.

The City is a public entity subject to Title II of the ADA. 42 U.S.C. § 12131(1)(B); 28 C.F.R. § 35.104. At its core, the ADA requires that individuals with disabilities be provided with "equality of opportunity." 42 U.S.C. § 12101(a)(7); *see also* 28 C.F.R. § 35.130(b)(1)(ii). Equality of opportunity means the City must provide individuals with disabilities an equal opportunity to participate in and benefit from any aid or benefit provided to others. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(1). The Title II regulation makes clear that Title II applies to programs "made available" by a public entity and that when providing an aid or benefit, the public entity "may not,

directly or through contractual, licensing, or other arrangements" discriminate on the basis of disability.  28 C.F.R. §§ 35.102(a), 35.130(b)(1).

### C.  Program Accessibility Under Section 504 and Title II

Both Section 504 and Title II regulations require that a public entity operate each program or activity so that the program or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities.  24 C.F.R. §§ 8.20, 8.24 (Section 504); 28 C.F.R. §§ 35.149, 35.150 (Title II).  And both the Section 504 and Title II regulations contain physical accessibility requirements for facilities.  24 C.F.R. §§ 8.20, 8.22, 8.23, 8.24, 8.32 (Section 504); 28 C.F.R. §§ 35.149, 35.150, 35.151 (Title II).

## II.    Factual Background

One self-described mission of the City is to develop and administer programs and policies to encourage and promote the availability of adequate and affordable housing in the City.[4]  As part of this mission, the City helps to build, rehabilitate, and preserve rental housing to ensure that it is available to residents throughout Chicago.[5]  To accomplish its mission, the Chicago Department of Housing ("DOH") is tasked to work with private developers to increase the supply of affordable housing in every Chicago neighborhood through a litany of targeted

---

[4] Municipal Code of Chicago, 2-44-050(a)(1), available at https://codelibrary.amlegal.com/codes/chicago/latest/chicago_il/0-0-0-2598874 (last visited Dec. 11, 2023); *see also* Chicago Department of Housing, Housing, DOH – Mission, https://www.chicago.gov/city/en/depts/doh/auto_generated/doh_mission.html (last visited Dec. 11, 2023).

[5] *See* Chicago Department of Housing, Affordable Rental Housing Resource List, https://www.chicago.gov/city/en/depts/doh/provdrs/renters/svcs/affordable-rental-housing-resource-list.html (last visited Dec. 11, 2023); *see also* City Ex. 8 at 2.

programs.[6]  One of Chicago's "affordable housing programs" includes the Multi-Family Housing Financial Assistance Program.[7]

The City of Chicago is a recipient of $100 million annually, on average, of HUD funds, including Home Investment Partnerships Program (HOME) and Community Development Block Grant (CDBG) funds.[8]  Since 1988, the City has used this funding, along with other funding sources and tax credits, to provide grants and loans to private developers and nonprofits to facilitate the construction or rehabilitation of affordable housing in at least 517 developments.[9] The City instructs developers seeking DOH funds or other assistance to rehabilitate, construct, or refinance multi-family affordable rental housing developments to complete a Multi-Family Housing Financial Assistance Application ("Application").[10]  If a proposed development proceeds past the application stage, it will go to City Council for approval.[11]

The City enters into standardized written agreements with developers when it provides funds or tax credits.[12]  The contracts require developers to comply with federal, state, and local laws, including Section 504 and the ADA.[13]  Under the contracts, among other provisions: 1) the

---

[6] Pl. Ex. 30, available at *For Developers*, Chicago Dep't of Housing, available at https://www.chicago.gov/city/en/depts/doh/provdrs/developers.html (last visited Dec. 11, 2023).
[7] Pl. Ex. 33, available at *Inclusionary Housing Task Force Staff Report* at 24–25, available at Chicago Dep't of Housing, available at https://www.chicago.gov/content/dam/city/depts/doh/ihtf/doh_ihtf_report.pdf (last visited Dec. 11, 2024).
[8] In 2022, the City received $21,593,700 in HOME funds and $76,233,766 in CDBG funds. *See* HUD EXCHANGE, CHICAGO, IL, https://www.hudexchange.info/grantees/chicago-il/ (last visited Dec. 11, 2023).
[9] Answer at ¶ 2; Local Rule 56.1 Statement of Material Fact by Defendant City of Chicago in Support of Its Motion for Summary Judgment ("City SOMF"), Dkt. 309 at ¶ ¶¶ 2,4, 6, 7.
[10] Pl. Ex. 31, Multi-Family Housing Financial Assistance Application Instructions at 3; available at Chicago Dep't of Housing, at https://www.chicago.gov/content/dam/city/depts/doh/qap/qap_2023/2023%20Multifamily%20Application%20Instructions%20and%20Policies_Updated%206.9.23.pdf (last visited Dec. 11, 2023).
[11] City SOMF ¶ 33.
[12] City SOMF at ¶¶ 8-19, 39; *see also* City Exs. 8-38.
[13] *See e.g.* City Exs. 8 § 2.27, 34 § 6.01(a).

City may enforce a developer's compliance with federal accessibility requirements, including by filing a lawsuit seeking to compel specific performance; 2) the City may enter and inspect affordable housing developments to assess and ensure compliance with federal law; 3) developers must document compliance with federal accessibility requirements, and 4) remedies for noncompliance are set out.[14] In exchange for City funding, the developers agree to provide some apartment units at below market rate to tenants who meet various income requirements.[15] Before construction can begin, DOH requires approval of several City Departments.[16]

## DISCUSSION

**I.    Chicago's Affordable Rental Housing Scheme is a Program or Activity of the City Under Section 504 and Title II.[17]**

Under Section 504 and Title II, a program or activity is anything the public entity does, covers all the normal functions of a government entity, and includes those activities that are carried out through contractual, licensing, or other arrangements. Chicago has committed to providing the benefit of affordable rental housing to its residents as expressed through its Municipal Code, website, and contracts with private developers. Chicago carries out this program through various activities, including contracting with private developers to build and rehabilitate affordable rental housing for Chicago residents. And Chicago has the authority, obligation, and ability to ensure that the private developers with whom it contracts provide affordable housing that is accessible to individuals with disabilities. Thus, Chicago is liable

---

[14] *See* City Exs. 8-38.
[15] *See, e.g.,* City Ex. 8, Ex, B (C0266412) (requiring 65 units to be occupied by "low-income families" and 28 units by "very-low-income families."); City Ex. 33 at 2, 5, Ex. B (C0486250, C0486252, C0486263) (requiring 30 units to be occupied by "low-income families" at a rent determined by the City).
[16] City SOMF ¶ 34.
[17] Title II of the ADA and Section 504 are construed in a consistent manner. *Ashby v. Warrick Cnty. Sch. Corp.*, 908 F.3d 225, 230 n. 10 (7th Cir. 2018).

under Section 504 and Title II to ensure that individuals with disabilities have equal access to the benefits of its affordable rental housing program. 29 U.S.C. § 794(a) (Section 504), 42 U.S.C. § 12132 (Title II).

### A. A "Program" or "Activity" Includes Anything a Public Entity Does and Providing Affordable Housing is a Normal Function of City Governments.

The statutory phrases "program or activity" and "service, program or activity" are intentionally expansive. Section 504 defines "program or activity" as "all of the operations of…a local government; or the entity of such…local government that distributes such assistance…. 29 U.S.C. § 794(b)(1); 24 C.F.R. § 8.3. The same phrase in the ADA, expanded to include "services" as well, is at least as broad. *See* 42 U.S.C. 12201(a) ("Except as otherwise provided in this Act, nothing in this Act shall be construed to apply a lesser standard than the standards applied under [Section 504] or the regulations issued by Federal agencies pursuant to such title."). The Title II regulation specifies that Title II of the ADA "applies to all services, programs, and activities provided *or made available* by public entities." 28 C.F.R. § 35.102(a) (emphasis added), *see also* 28 C.F.R. § 35.130(b)(1). The Supreme Court has recognized the breadth of the phrase "benefits of the services, programs, or activities of a public entity," rejecting arguments that it does not apply to state prisons. *Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 210-12 (1998).

The Seventh Circuit has recognized that the statutory terms service, program, or activity are unambiguously broad, holding "whenever a public entity or federal funding recipient 'does ... anything,' it must extend 'the benefits of,' and cannot 'discriminat[e]' in, that thing on the basis of disability." *Ashby v. Warrick Cnty. Sch. Corp.*, 908 F.3d 225, 232 (7th Cir. 2018) (citation omitted); *see e.g. Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 782 (7th Cir. 2002) (zoning decisions covered under Title II); *Hason v. Med. Bd.*, 279 F.3d 1167,

1173 (9th Cir. 2002) (medical licensing covered under Title II).  In determining whether something is a service, program, or activity under Section 504 and Title II, some courts have focused on whether the function is a "normal function of a government entity."  *See Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (maintaining public sidewalks is a normal government function); *Innovative Health Systems v. City of White Plains*, 117 F.3d 37, 45 (2d Cir. 1997) (zoning decisions are a normal function of a government entity); *Am. Council of the Blind of Metro. Chi. v. City of Chi.*, No. 19 C 6322, 2023 U.S. Dist. LEXIS 56419, at *15 (N.D. Ill. Mar. 31, 2023) (maintenance of signalized intersections and the pedestrian grid is a normal function of a government entity).

The City's own municipal code makes clear that one function of the city is to "develop and administer programs and policies to encourage and promote the availability of adequate and affordable housing in the City."  Municipal Code of Chicago, 2-44-050(a)(1); *see Ellison v. United States Postal Serv*., 84 F.4th 750, 756 (7th Cir. 2023) (using the statute establishing the Postal Service to define the contours of the program at issue).  On its website, Chicago states that the "mission of [DOH] is to expand access and choice for residents and protect their right to quality homes that are affordable, safe, and healthy."  *See* Chicago Department of Housing, Housing, DOH – Mission, https://www.chicago.gov/city/en/depts/doh/auto_generated/doh_mission.html (last visited Dec. 11, 2023).  Chicago's website also states that it "works to develop and support affordable housing initiatives citywide" and that "the City helps to build, rehabilitate and preserve rental housing to ensure that it is available to residents throughout Chicago."  *See* Chicago Department of Housing, Affordable Rental Housing Resource List,

https://www.chicago.gov/city/en/depts/doh/provdrs/renters/svcs/affordable-rental-housing-resource-list.html (last visited Dec. 11, 2023).

Chicago also affirms in its contracts with private developers that developing and supporting affordable housing is a City function. One agreement with a private developer, for example, states that the City has received funding from HUD "to increase the number of families served with decent, safe, sanitary and affordable housing and to expand the long-term supply of affordable housing, through, among other things, acquisitions, new construction, reconstruction and rehabilitation." *See* City Ex. 8 at 2. The agreement requires, among other things, that at least 28 of the units in the "Low-Income Project" shall be occupied by "Very-Low Income Families." *See* City Ex. 8 at Exs. A, B. In another agreement, the City states that pursuant to the Municipal Code of Chicago, it "supervises and coordinates the formulation and execution of projects and programs creating safe, decent and affordable housing for residents of the City." *See* City Ex. 33 at 2. The agreement requires, among other things, that all of the units in the "Low-Income Project" (as defined by the contract) shall be leased only to tenants who are Low-Income Families at the time of initial occupancy by such Low-Income Families. *Id*. at 5. Chicago, like many cities, develops affordable housing as a normal function of city government. Thus, this constitutes a program or activity covered under Section 504 and Title II.

### B. Chicago Cannot Contract Away Its Section 504 and Title II Obligations.

Section 504 and Title II cover all programs and activities of a public entity, and do not distinguish between a program provided directly by the public entity and a program provided through a contractual or other arrangement. 29 U.S.C. § 794(a) (Section 504), 42 U.S.C. § 12132 (Title II). The regulations make clear that when a city's program is carried out through "contractual, licensing, or other arrangements," the city maintains its Section 504 and Title II obligations. 24 C.F.R. § 8.4(b)(iii), (viii) (Section 504); 28 C.F.R. §§ 35.102(a), 35.130(b)(1)

10

(Title II); City Mem. at 7 (acknowledging that it cannot avoid its obligations by "ceding its governmental functions to private entities").[18]  For example, in *Castle v. Eurofresh, Inc*., Arizona contracted with a private company to provide a work incentive program to Arizona state inmates, and the inmate alleged that the private company discriminated against him because of his disability.  731 F.3d 901, 909-10 (9th Cir. 2013).  The Ninth Circuit determined the work incentive program was a benefit provided to the inmate by the State, and not the private company, and that the State was liable to ensure compliance with Title II.  *Id*.; *see also Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1066 (9th Cir. 2010) (state maintained its Title II obligations to state inmates who were housed in county jails through arrangements between the State and County); *Marks v. Colorado Department of Corrections*, 976 F.3d 1087, 1098 (10th Cir. 2020) (public entities can "farm out operations to others, but doing so would not prevent liability under [Section 504 or Title II]").

Here, Chicago contracts with private developers to build and rehabilitate affordable rental housing for Chicago residents.[19]  In its contracts with developers, Chicago requires them to comply with Section 504 and ADA. *See e.g.* City Ex. 8 § 2.27 (requiring Section 504 and ADA compliance when City provides funding from a federal source); City SOMF ¶ 17, City Ex. 34 § 6.01(a) (requiring Section 504 and ADA compliance when providing city funding).  This helps to ensure that Chicago complies with its own legal obligations.  *See City of LA v. AECOM Servs.*, 854 F.3d 1149, 1157-58 (9th Cir. 2017) ("[A]n important component in a city's doing all it can

---

[18] HUD's Section 504 regulation further requires subrecipients of federal financial assistance to submit an assurance to the primary recipient of federal financial assistance that it will comply with the requirements of HUD's Section 504 regulation.  24 C.F.R. § 8.50(a).

[19] While the City relies heavily on *Ashby v. Warrick Cnty. Sch. Corp*., 908 F.3d 225 (7th Cir. 2018), the case has limited value for the instant case because it did not involve a contractual relationship between a public and private entity.  Instead, the case addressed a scenario where a school choir was an invitee to a private event.

to fulfill its duties under Title II and § 504 is to require as part of its contracts with necessary third party entities that the requirements of those statutes be met.").

Despite including these requirements in its contracts, Chicago argues that it is not liable for the lack of accessibility in affordable housing built by the private developers because "the existence of a contractual relationship does not *per se* create a program." City Mem. at 11. In doing so, Chicago misconstrues the Department of Justice's Title II Technical Assistance Manual 1994 Supplement by omitting the complete guidance and further illustrations that support Chicago's liability. City Mem. at 11. For example, the manual explains that:

> if a State highway authority leases a facility in one of its highway rest areas to a privately owned restaurant, the public entity would be responsible for making the space accessible, because the restaurant is part of the State's program of providing services to the motoring public. The private entity operating the restaurant would have an independent obligation to meet the requirements of title III. [20]

Additional examples in the guidance illustrate that a public entity is liable for ensuring accessibility in the part of its program carried out by contract with private entities, such as a private restaurant operating by concession in a state park or a privately operated group home under contract with a state agency. *See* Section II-1.3000 of the Department's Title II Technical Assistance Manual.[21] As in these examples, Chicago's obligations under Section 504 and Title II are established not simply because of a contractual relationship with the developers. Rather, Chicago has obligations under these laws with respect to its affordable housing program, one of the normal functions of DOH, even when units are built by private developers with whom the City contracts.

---

[20] Americans with Disabilities Act, Title II Technical Assistance Manual 1994 Supplement at II-5.1000, available at https://archive.ada.gov/taman2up.html (last viewed Dec. 11, 2023).
[21] The Americans with Disabilities Act, Title II Technical Assistance Manual, available at https://archive.ada.gov/taman2.html (last viewed Dec. 11, 2023).

### C. Chicago Has the Ability and Obligation to Ensure That Private Developers Provide Affordable and Accessible Rental Housing.

Chicago has the ability and obligation to ensure that the private developers with whom it contracts provide housing that is both affordable and accessible to individuals with disabilities. First, as discussed above, Chicago's contracts require the private developers to comply with Section 504 and the ADA. *See e.g.* City Ex. 8 § 2.27; City Ex. 34 § 6.01(a). This includes requiring the affordable housing units to remain in compliance with the accessibility requirements of Section 504 after the construction or rehabilitation of the housing. *See* City Ex. 8 § 2.32.

Second, Chicago must ensure that the federal funds it receives from HUD for affordable housing are used in compliance not only with Section 504, but also with statutory and regulatory obligations with respect to HUD funding programs. For instance, under the HOME program, recipients are obligated to comply with program requirements and must monitor their subrecipients for such compliance. *See* 24 C.F.R. §§ 92.219(b)(2)(iii), 92.504(a) ("…The participating jurisdiction must have and follow written policies, procedures, and systems, including a system for assessing risk of activities and projects and a system for monitoring entities…to ensure that the requirements of this part are met."); 92.504(c)(2) (subrecipients' agreements "must set forth and require the subrecipient to follow the participating jurisdiction's requirements…"); 92.504(c)(2)(iv) (subrecipient's agreement "must require the subrecipient to carry out each activity in compliance with all Federal laws and regulations described in subpart H of this part…," which includes the requirements at 24 C.F.R. § 5.105(a)(1), requiring compliance with nondiscrimination and equal opportunity requirements under the Fair Housing Act, Section 504, and Title II, among others). This includes conducting inspections of each project, both upon completion to ensure compliance with the HOME property standards at 24

C.F.R. § 92.251,[22] and periodically during the period of rental housing affordability to ensure ongoing compliance with the property standards and other requirements. *See* 24 C.F.R. § 92.504(d). Thus, Chicago cannot argue that it is unable or is not obligated to monitor private developers, and thus lacks sufficient control over its affordable housing program to meet its own Section 504 and Title II obligations.

Chicago makes several unavailing arguments that it lacks operational control and thus liability because: 1) it is merely a funding entity; 2) it does not operate the housing units; and 3) it merely issues building permits. But the facts and cases relied on by Chicago fail to support its claims.

First, Chicago relies on *Bacon v. City of Richmond, Virginia*, 475 F.3d 633 (4th Cir. 2007) and *McDaniel v. Board of Education of City of Chicago*, 956 F. Supp. 2d 887 (N.D. Ill. 2013) to argue that "funding entities" are not liable under Title II. Second, Chicago cites *Swan v. Board of Education of City of Chicago*, 956 F. Supp. 2d 913 (N.D. Ill. 2013) and *Wright v. Bd. of Comm'rs of the Capital Area Transit Sys.*, 551 F. Supp. 3d 607 (M.D. La. 2021) to argue that it cannot be liable because it does not operate the housing developments at issue. But as explained below, all four cases address situations involving two separate public entities where only the public entity with the legal authority to carry out the program at issue was found liable under Section 504 or Title II. Here, Chicago is the only public entity at issue and has the legal authority to carry out its affordable rental housing program. Accordingly, these cases support that Chicago is liable for Section 504 and Title II violations in its affordable rental housing program.

_____

[22] Among other things, the HOME property standards at 24 C.F.R. § 92.251 contain accessibility requirements, which obligates recipients and subrecipients to comply with Section 504 and HUD's implementing regulation, as well as Title II of the ADA and DOJ's implementing regulation.

*Bacon* involved claims against a school board and the City of Richmond for accessibility violations in the schools.  The Court found the school board liable under Title II because it had the statutory authority to make the improvement projects at issue.  *Bacon*, 475 F.3d at 639.  The City of Richmond, in contrast, had no authority to fix the accessibility violations and thus was not liable, even though it provided capital funding to the school district.  *Id*.  Without a finding that the City violated the law, the Court could not require the City to fund the remedial order to correct the school board's violations.  *Id*. at 639-40.

Similarly in *McDaniel*, the Court dismissed the City of Chicago from a lawsuit on the grounds of redressability, where the lawsuit challenged a public-school district's decision to close 53 elementary schools.  The Court found that the school board, not the City, had the authority to close or keep open the schools.  *McDaniel*, 956 F. Supp. 2d at 895.  Even if the City provided some funding to the school district, the City lacked the statutory authority to carry out the requested injunction—to keep schools open.  *Id*. at 893-94.  Likewise, *Swan* and *Wright* address situations involving two public entities and the Court found that only one of the two public entities had the statutory authority to carry out the program at issue.  In *Swan*, only the school board had the statutory authority to close schools, *Swan*, 956 F. Supp. 2d at 92, and in *Wright*, only the Capital Area Transit System had the authority to ensure the accessibility of the bus stops.  *Wright*, 551 F. Supp. 3d at 614.

Here, Chicago is *the* public entity with authority to provide affordable rental housing to its residents.  Chicago solicits and accepts funding from local, state, and federal sources and then uses those funds to administer a program to further its mission of providing affordable rental housing for its residents.  Chicago enters into written agreements to allow it to conduct on-site inspections and enforce private parties' compliance with local and federal accessibility laws

throughout the program.  Chicago is the public entity that can ensure that its affordable rental

housing program complies with Section 504 and the ADA.  Here, Chicago sits in a position akin

to that of the school boards in *Bacon*, *McDaniel*, and *Swan*, and the Capital Area Transit System

in *Wright*, all of which had the authority to take the actions at issue to comply with Section 504

and the ADA, and thus were found to be the proper defendants.

Finally, Chicago makes a similar mistake by relying on *S.G. v. City of Los Angeles*, No.

LA-CV-1709003 JAK (PJWx), 2020 WL 8837146, at *12 (C.D. Cal. 2020) to support its

argument that it is not liable under Title II and Section 504 because it merely issues building

permits.  City MOL at 10.  *S.G.* in fact supports Chicago's liability.  In *S.G.*, the Court correctly

held Title II does not "extend to discrimination in connection with private services, programs or

activities that are licensed, certified or permitted by a public entity" but they do extend to

"discrimination where a public entity has a public service, program or activity that is operated by

a designated private entity that acts on behalf of the public entity." *S.G.* at *9.  As applied here,

Chicago is liable under Section 504 and Title II for the affordable housing program carried out

by private entities.

## II.     Section 504 Obligations Extend to the Entire "Program" or "Activity" of a Recipient of Federal Funding.

Chicago argues that it is not liable under Section 504 for any developments that only

received non-federal funding or tax credits for affordable housing.[23]  City Mem. at 15.  But

Chicago is incorrect. Section 504 defines "program or activity" as "all of the operations" of the

recipient.  29 U.S.C. § 794(b)(1); 24 C.F.R. § 8.3; *see Schroeder v. Chicago*, 927 F.2d 957, 962

(7th Cir. 1991) (explaining that Congress expanded the definition of "program or activity" to

---

[23] This argument does not affect the City's liability under Title II, which does not rely on federal funding.

include "all the operations" of the entity receiving the federal funding); *Koslow v. Pennsylvania*, 302 F.3d 161, 171-72 (3d Cir. 2002) (Section 504 "sweeps 'all the operations' of a department or agency receiving federal financial assistant under the Act's coverage" even if "a particular 'activity'…might be the state's only link to federal funds."). Thus, because Chicago receives federal funding for its affordable rental housing program, its Section 504 obligations extend to all of the operations of that program, and not only to the portions of the program the city funds through federal sources. Accordingly, Chicago's obligation to comply with Section 504 relates to its affordable rental housing program as a whole, as well as on a development-by-development basis.[24]

### III. Title II Program Accessibility Provisions Apply to Facilities Constructed or Altered on Behalf of, or For the Use of, Chicago's Affordable Rental Housing Program.[25]

Chicago next attempts to limit its ADA obligations by arguing that it has no Title II obligations because the housing developments were not constructed or altered "by the City." City Mem. at 17. But this too narrowly construes the Title II regulation, which requires accessibility in facilities (or part of the facility) newly constructed or altered "by, *on behalf of, or for the use of a public entity*." 28 C.F.R.§ 35.151(a)(1), (b)(1) (emphasis added). Here, when Chicago enters into contracts with private entities to construct or alter a building to be used as part of its affordable rental housing program, the affordable rental housing units must be rented to low-income tenants at a rate directed by the City—not at market rate—to further the City's

---

[24] While the City's administration of the program as a whole must comply with Section 504, how the architectural standards apply may differ for developments that receive federal financial assistance and developments that only received non-federal funding or tax credits.
[25] Section 504 also requires recipients and subrecipients to provide program accessibility in any program or activity receiving federal financial assistance.

mission of providing affordable housing opportunities. Accordingly, the construction or alteration is "on behalf of, or for the use of a public entity."

Chicago cites several cases that purport to address what constitutes a "facility altered by, on behalf of, or for the use of a public entity." City Mem. at 17. But they do not support Chicago's argument. Chicago cites to *Swan* and *Wright,* addressed above, which analyze which of two public entities has the statutory authority to carry out the program at issue. Neither case describes what constitutes a facility altered "on behalf of, or for the use of a public entity." Nor is *Lang v. Oregon Shakespeare Festival Ass'n*, No. 1:12–cv–01844–CL, 2013 WL 5944184 (D. Or. Oct. 31, 2013) instructive. In *Lang,* a city leased land to a private entity that operated a year-round festival, which the court found was a private event. *Id*. at *1. As such, there were no allegations that the private entity altered any facilities on behalf of, or for the use of, the City. *Id*. at *1-4. Similarly, Chicago's reliance on *Tyler v. City of Manhattan*, 849 F. Supp. 1429 (D. Kan. 1994) is misplaced. There, the Court held that a city was not liable for the inaccessibility of taverns and restaurants. *Id*. at 1441-42. But as in *Lang*, there were no allegations that the taverns and restaurants carried out any program or activity of the public entity or that the taverns or restaurants altered any facilities on behalf of, or for the benefit of the City. As the public entity that develops and administers its affordable rental housing program, Chicago is liable under Title II and Section 504 for ensuring that individuals with disabilities have equal access to the benefits of its affordable housing program, even if the buildings were not built or rehabilitated directly by the City but instead done so through contractual relationships.

## CONCLUSION

For these reasons, the United States asks the Court to consider this Statement of Interest in this litigation.

Dated: December 12, 2023

        Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General for
Civil Rights

REBECCA B. BOND
Chief

AMANDA MAISELS
Deputy Chief
U.S. Department of Justice
Civil Rights Division –
Disability Rights Section
950 Pennsylvania Avenue, N.W. –
4CON
Washington, D.C. 20530

JANE E. ANDERSEN
Trial Attorney, Civil Rights
Division –
Disability Rights Section
(202) 258-6580
jane.andersen2@usdoj.gov

MORRIS PASQUAL
Acting United States Attorney

By: /s/ Patrick Johnson
PATRICK JOHNSON
Assistant United States Attorneys
219 South Dearborn Street
5th Floor
Chicago, Illinois 60604
(312) 353-5327
patrick.johnson2@usdoj.gov

19