UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ACCESS LIVING OF METROPOLITAN
CHICAGO, INC., an Illinois non-profit
corporation,

                            Plaintiff,

                  v.

CITY OF CHICAGO, an Illinois municipal
corporation,

                        Defendant.

:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:18-cv-03399

Honorable Edmond E. Chang

**<u>REPLY IN SUPPORT OF DEFENDANT
CITY OF CHICAGO'S MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

I.    The City's Motion for Summary Judgment ....................................................... 1

II.    ADA and Section 504: Program ..................................................................... 2

    A.    The City Did Not Create A Housing Program ......................................... 2

    B.    Supervisory Liability ............................................................................ 4

    C.    The City's Alleged Control .................................................................... 9

        1.    The City's Regulatory Role to Issue Building Permits Is A Red-Herring ....................................................................................... 9

        2.    The Funding Agreements Do Not Give Rise to Liability ......................... 10

    D.    Access Living Concedes It Is Not Challenging The Funding or Tax Credit Process ............................................................................................. 12

III.    ADA and Section 504: Non-Federal Funding ................................................ 13

    A.    Section 504 ......................................................................................... 13

    B.    ADA Title II ....................................................................................... 14

IV.    FHA ......................................................................................................... 16

    A.    §3604(f)(2) ......................................................................................... 16

    B.    §3604(f)(3)(C) .................................................................................... 17

V.    Statute of Limitations .................................................................................. 18

VI.    Conclusion ................................................................................................ 20

**Page(s)**

**Cases**

*Alliance for Mentally Ill v. City of Naperville*,
  923 F.Supp. 1057 (N.D. Ill. 1996) .......................................................................16

*Am. Council of Blind of Metro. Chicago v. City of Chicago*,
  No. 19 C 6322, 2023 WL 2744596 (N.D. Ill. Mar. 31, 2023) ....................5, 19, 20

*Armstrong v. Schwarzenegger*,
  622 F.3d 1058 (9th Cir. 2010) ..........................................................................6, 7

*Ashby v. Warrick Cnty. Sch. Corp.*,
  908 F.3d 225 (7th Cir. 2018) ....................................................................... *passim*

*Bacon v. City of Richmond, Virginia*,
  475 F.3d 633 (4th Cir. 2007) ............................................................................6, 8

*Baltimore Neighborhoods, Inc. v. Rommel Builders, Inc.*,
  3 F.Supp.2d 661 (D. Md. 1998) ..........................................................................17

*Bridewell v. Eberle*,
  730 F.3d 672 (7th Cir. 2013) ...............................................................................18

*Cnty. of Livingston v. PSA-Dewberry, Inc.*,
  No. 19-CV-01334-JES-JEH, 2023 WL 5962079 (C.D. Ill. Sept. 13, 2023)............15

*Deibel v. Hoeg*,
  998 F.3d 768 (7th Cir. 2021) ...............................................................................18

*Disability Advocs., Inc. v. Paterson*,
  598 F.Supp.2d 289 (E.D.N.Y. 2009) .....................................................................7

*Doering v. Pontarelli Builders, Inc.*,
  No. 01 C 2924, 2001 WL 1464897 (N.D. Ill. Nov. 16, 2001)...............................17

*Hemisphere Bldg. Co. v. Vill. Of Richton Park*,
  171 F.3d 437 (7th Cir. 1999) ...............................................................................16

*Henrietta D. v. Bloomberg*,
  331 F.3d 261 (2d Cir. 2003)...............................................................................7, 8

*Hunter v. D.C.*,
  64 F.Supp.3d 158 (D.D.C. 2014) ...........................................................................8

*Indep. Living Ctr. of S. California v. City of Los Angeles*,
  No. CV1200551SJOPJWX, 2012 WL 13036779 (C.D. Cal. Nov. 29, 2012) ....................8, 18

*Knowlton v. City of Wauwatosa*,
  No. 20-CV-1660, 2023 WL 2480353 (E.D. Wis. Mar. 13, 2023) ..........................................14

*Lacy v. Cook Cty., Illinois*,
  897 F.3d 847 (7th Cir. 2018) ........................................................................................5

*Liberty Res., Inc. v. Philadelphia Hous. Auth.*,
  528 F.Supp.2d 553 (E.D. Pa. 2007) ...........................................................................10

*Louis v. New York City Hous. Auth.*,
  152 F.Supp.3d 143 (S.D.N.Y. 2016).............................................................................11

*McDaniel v. Bd. of Educ. of City of Chicago*,
  956 F.Supp.2d 887 (N.D. Ill. 2013) .............................................................................3

*McDaniel v. Bd. of Educ. of City of Chicago*,
  9567 F.Supp.2d 887 (N.D.Ill. 2013) ........................................................................3, 8

*Monta Fair Hous., Inc. v. Am. Cap. Dev., Inc.*,
  81 F.Supp.2d 1057 (D. Mont. 1999)...........................................................................17

*Nat'l Fair Hous. All., Inc. v. HHHunt Corp.*,
  919 F.Supp.2d 712 (W.D. Va. 2013) ...........................................................................18

*Nat'l Fair Hous. All. v. A.G. Spanos Const., Inc.*,
  542 F.Supp.2d 1054 (N.D. Cal. 2008) .........................................................................18

*Oconomowoc Residential Programs v. City of Milwaukee*,
  300 F.3d 775 (7th Cir. 2002) .....................................................................................5, 6

*Pitts v. City of Kankakee, Ill.*,
  267 F.3d 592 (7th Cir. 2001) ......................................................................................19

*Reed v. Columbia St. Mary's Hosp.*,
  915 F.3d 473 (7th Cir. 2019) ........................................................................................5

*Schroeder v. City of Chicago*,
  927 F.2d 957 (7th Cir. 1991) ......................................................................................14

*Schwarz v. The Villages Charter Sch., Inc.*,
  165 F.Supp.3d 1153 (M.D. Fla. 2016), *aff'd sub nom. Schwarz v. Bd. of
  Supervisors on behalf of Villages Cmty. Dev. Districts*, 672 F. App'x 981
  (11th Cir. 2017)...........................................................................................................10

*T.S. by & through T.M.S. v. Heart of CarDon, LLC,*
  43 F.4th 737 (7th Cir. 2022) ...................................................................14

*United States v. City of Chicago Heights,*
  161 F.Supp.2d 819 (N.D. Ill. 2001) .......................................................16

*United States v. Hartz Construction Co.,*
  No. 97 C 8175, 1998 WL 42265 (N.D. Ill. Jan. 28, 1998) ....................17

*United States v. Midwest Generation, LLC,*
  720 F.3d 644 (7th Cir. 2013) ...................................................................18

*United States v. Taigen & Sons, Inc.,*
  303 F.Supp.2d 1129 (D. Idaho 2003) ......................................................17

*United States v. Tanski,*
  No. 1:04-CV-714, 2007 WL 1017020 (N.D.N.Y. Mar. 30, 2007) .........17

*Winfrey v. City of Chicago,*
  957 F. Supp. 1014 (N.D. Ill. 1997) .........................................................14

*Woody v. City of Granite City, Illinois,*
  No. 17-CV-534-SMY-RJD, 2019 WL 1326884 (S.D. Ill. Mar. 25, 2019)............19

*Wright v. Bd. of Commissioners of Cap. Area Transit Sys.,*
  551 F.Supp.3d 607 (M.D. La. 2021).................................................11, 12

**Statutes**

29 U.S.C. 794......................................................................................... *passim*

29 U.S.C. 794(b) ...............................................................................................6

42 U.S.C. 3604.................................................................................1, 16, 17

42 U.S.C. 3604(f)(2) .......................................................................................16

42 U.S.C. 3604(f)(3)(C) ............................................................................16, 17

42 U.S.C. § 2000d, *et seq.*...............................................................................14

42 U.S.C. § 12131, *et seq.*........................................................................ *passim*

**Other Authorities**

24 C.F.R. § 8.4(b)(1)........................................................................................8

24 C.F.R. § 8.4(b)(1)(v)....................................................................................8

24 C.F.R. § 982.53 ........................................................................................11

24 C.F.R. § 982.162 ......................................................................................11

24 C.F.R. § 982.404(a)(2) .............................................................................11

24 C.F.R. § 982.405 ......................................................................................11

24 C.F.R. § 982.452 ......................................................................................11

28 C.F.R. § 35.130(b)(1) .................................................................................8

28 C.F.R. § 35.151 ...................................................................................14, 15

28 C.F.R. § 35.151(a)(1) ...............................................................................15

28 C.F.R. § 35.151(b)(1) ...............................................................................15

Americans with Disabilities Act, Title II Technical Assistance Manual 1994
    Supplement, available at https://archive.ada.gov/taman2up.html ...........12

Black's Law Dictionary (11th ed. 2019) ......................................................15

## I.    The City's Motion for Summary Judgment

The City's Motion for Summary Judgment (Dkt No. 307) and Memorandum of Law in Support (Dkt. No. 308, "City Memo.") challenges the application to the City of the three causes of action raised by Access Living.  Under ADA Title II and Section 504, the City argues that the claims fail for lack of a program, service or activity, and these claims should be dismissed on this threshold basis.  For Access Living's claim under the FHA, the City argues that it does not apply to the City under the circumstances of this case.  The City also makes alternative arguments that (1) ADA Title II and Section 504 do not apply to properties not receiving federal financial assistance, (2) the statute of limitations mostly bars Access Living's claim stretching back to the 1980s, and (3) to the extent Access Living seeks to enforce regulatory requirements, these are unenforceable.

Along with its Motion for Summary Judgment, the City submitted a Statement of Material Facts (Dkt. No. 309, "City SOF" or "City's Facts"), to which Access Living responded.  Dkt. No. 313, "Access Living Resp. to City SOF."  Most of the City's Facts were not meaningfully disputed. *See id.*[1]  In Opposition (Dkt. No. 312, "Access Living Opp."), Access Living largely relies on its own set of Additional Facts.  Dkt. No. 314, "SOAF" or "Additional Facts."  However, some of the Additional Facts are not material to the arguments raised by the City and can be disregarded. Notably, Additional Facts ¶¶ 30, 34-36 (relating to allegations regarding the inaccessibility of properties) are not relevant or material: the accessibility or inaccessibility of properties has no

---

[1] Access Living adds the disclaimer that many of the City's SOF are somehow "immaterial when applying the appropriate legal framework…"  Access Living Resp. to City SOF, at ¶¶ 45-46, 48-50, 52-56.  In short, Access Living argues that the Court should ignore these facts because Access Living believes it knows what the law is.  Suffice to say, the Court, not Access Living, determines the law.

bearing on the City's arguments which challenge threshold application of Access Living's claims to the City.[2]  Additionally, Additional Facts ¶¶ 38, 40 (relating to Access Living's alleged damages) are not relevant or material to the City's Motion which does not address the merits of a damage element.[3]

## II.    ADA and Section 504: Program

The touchstone question in the program analysis is straightforward: what did the City do? The answer is equally simple: the City provided gap funding or tax credits to private developers. City SOF, ¶¶ 24-25, City Ex. 3, Horan Declaration, ¶ 19 ("City is only involved with funding or tax credits to the extent it provides gap funding.").  "Gap," means, as the name implies, the last piece of funding a developer secures for a project.  *See Id.*  Access Living does not challenge the City's funding activities: *i.e.*, Access Living does not complain about what the City did.  Instead, Access Living seeks to springboard from that funding, have this Court declare that the City was operating an expansively defined but factually unsupported "housing program" for the last three decades, and declare that the City was required to guarantee third party developments in an alleged "housing program."[4]  While dancing around the extreme outcomes of this view, Access Living tries to craft a view of the world that is not supported by the record at all.

### A.    The City Did Not Create A Housing Program

Foundational to Access Living's arguments is the idea that the City created a housing program.  *See* Access Living Opp., at 2, 17, 26-27.  Access Living variously alleges that the City

---

[2] At various points in its Opposition, Access Living accuses the City of not disputing these facts.  They are, of course, disputed, but are simply not relevant to the City's Motion.  The Court should ignore them.

[3] The City referenced Access Living's alleged damage claims, (City SOF, ¶¶ 57-61), for the purpose of arguing that Access Living has no claim over the City's funding or tax credit process.  City Memo., at 13-14.  Given that Access Living has indeed conceded it does not base its claim over this process (*see infra* Section II.D.), the Court can simply ignore Access Living's Additional Facts ¶¶ 38, 40.

[4] The City notes that the United States filed a Statement of Interest just three days ago (Dkt. No. 317).  The City will request an appropriate opportunity to respond to that filing.

"brought the entire Program into existence" was the "creator of the Program," and that "many of these buildings likely exist only *because* of the City's efforts to facilitate and fund affordable developments." Access Living Opp., at 2, 17, 26-27 (emphasis in original). In support of its argument, Access Living relies on text from the City's website, visited November 2023 (SOAF, ¶¶ 4-5), 2023 multi-family housing financial assistance application instructions and application (SOAF, ¶¶ 6-7), a 2020 housing task force staff report (SOAF, ¶¶ 8-9), 2009-2013 and 2019-2023 housing plans (SOAF, ¶¶ 10-11).

Access Living's reliance on small portions from stray documents does not support Access Living's view. First, Access Living's Complaint alleges that the City has been operating a housing program since 1988. Dkt. No. 1, "Compl." at ¶ 2. In Access Living's view, at some point in the 1980s, the City determined that it wanted to operate like a housing authority, and so it created a housing program. None of this is in the record, and the various, mostly recent, application and report documents cited in the SOAF do not support the creation of some grand City plan from three decades ago. Second, Access Living's selective quoting of documents contradicts *Ashby*'s instruction that the program determination is a complicated, fact-specific analysis. *Ashby v. Warrick Cnty. Sch. Corp.*, 908 F.3d 225, 234 (7th Cir. 2018). The City submitted actual facts, while Access Living submits stray documents with selectively quoted words hoping that the Court will join in a semantic exercise in order to locate a fact issue. The court in *McDaniel* rejected this very tactic. *McDaniel v. Bd. of Educ. of City of Chicago*, 956 F.Supp.2d 887, 899-900 (N.D. Ill. 2013) (rejecting plaintiffs' reliance on a press release from the Mayor to establish that Chicago was liable for alleged ADA violations of Chicago Public Schools). Third, the documents cited in SOAF ¶¶ 4-11 merely illustrate the undisputed fact that the City provided gap funding or tax credits

(a process over which Access Living concedes it does not have a claim, *see infra* Section II.D.).

They do not demonstrate that the City operates a housing program.

- SOAF ¶¶ 4-5: quotations from the City's website and reference to the words "help" and "targeted programs," which indicate the undisputed fact that the City provided funding or tax credits.
- SOAF ¶¶ 6-7: relating to the fact that the City has an application process for the funding or tax credits.
- SOAF ¶ 8: citing to an inclusionary housing task force staff report which references how the City provides funding or tax credits.
- SOAF ¶ 9: referring to how City funding or tax credits may originate from a variety of sources.
- SOAF ¶ 10: referring to the fact that the City provides statistics on its funding or tax credits.
- SOAF ¶ 11: referring to the fact that the City will continue to provide funding or tax credits.

The documents all confirm the same activity: the City provides gap funding or tax credits.

None of the documents indicate that the City runs a housing program, or that the City decided, at some point in time, to delegate the responsibility of being a massive landlord because it did not want to take on the job itself. In essence, Access Living hands the Court a handful of documents with the instruction that the Court find and define a program somewhere among the sentences. The Court should reject this exercise and reject the unsupported theory that the City was the "creator" of a housing program.

### B.    Supervisory Liability

Access Living's idea of a program is a moving target. It admits that it "does not challenge accessibility violations at any individual development" and that it does not "seek to hold the City responsible for the day-to-day management of any individual development," (Access Living Opp., at 21). Instead, Access Living wants the City to occupy an oversight or supervisory role. Access Living Opp. at 13-15. This contrasts with the Complaint which alleges, for example, that the City needs to ensure that day-to-day things like "respond[ing] to requests from members of the public" are done appropriately. *See* Compl., ¶ 74. Additionally, while Access Living states that it is not "merely" challenging the accessibility of individual developments (Access Living Opp., at 34), the

Complaint alleges that the City needs to make sure developments are built accessibly. *See* Compl., ¶¶ 66, 68, 71. It is not clear Access Living even knows what its idea of a program is. On the one hand, when confronted with the extreme outcomes that would require the City to operate as a sort of housing authority (*see* City Memo., at 12-13), Access Living says that it does not expect the City to operate as such. Access Living Opp., at 21. On the other hand, if something goes wrong, perhaps multiple times, at the individual level of the housing, Access Living alleges a violation because the City failed a yet-to-be defined responsibility.

Access Living's argument that the City is subject to a supervisory role that makes it a guarantor for a myriad of possible accessibility issues across 517 different developments should be rejected because the housing is not a program of the City. In short, the City does not have a supervisory obligation over something that is not a City program, whether at an individual level or at a massive level. The City's Motion seeks a dismissal on the ADA Title II and Section 504 claims at this fundamental level. Both laws necessarily require the existence of a program for there to be any sort of denial of it. *Lacy v. Cook Cty., Illinois*, 897 F.3d 847, 853 (7th Cir. 2018) (ADA Title II elements); *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 484 (7th Cir. 2019) (Section 504 elements).

*Ashby* held that the program determination is a fact intensive inquiry. *Ashby v. Warrick Cnty. Sch. Corp.*, 908 F.3d 225, 234 (7th Cir. 2018).[5] Seeking to avoid this factual inquiry, Access Living relies on cases like, *Am. Council of Blind of Metro. Chicago v. City of Chicago*, No. 19 C 6322, 2023 WL 2744596, at *1 (N.D. Ill. Mar. 31, 2023) and *Oconomowoc Residential Programs*

---

[5] Plaintiffs argue that *Ashby* reinforces their case. *See* Plaintiffs' Opp., at 16. But *Ashby* is not *factually* relevant. The City cites *Ashby* because it is precedential authority on the standard for a program determination. The facts here are not nearly as close to a program relationship as in *Ashby*. There is no allegation, for example, that the City held some event (like the concerts in *Ashby*) at some private building that was inaccessible. *Ashby v. Warrick Cnty. Sch. Corp.*, 908 F.3d 225, 227 (7th Cir. 2018).

*v. City of Milwaukee*, 300 F.3d 775, 777 (7th Cir. 2002), both of which did not address the program determination in the context of third parties. *See* Access Living Opp. at 12. Access Living wants to avoid *Ashby*'s clear indication that not everything a public entity does results in a program finding. *See Ashby v. Warrick Cnty. Sch. Corp.*, 908 F.3d 225, 232 (7th Cir. 2018) (acknowledging the definition of program or activity under 29 U.S.C. 794(b) and cases like *Oconomowoc* were of "limited utility" in deciding the case before the court). Though Access Living wants the standard to be easy, the City is not automatically subject to supervisory, guarantor liability because the City provided gap funding or tax credits to third party owners or developers. As the court in *Bacon* recognized in rejecting funding liability: "To single out the City for responsibility when it is but one source of funds not only raises serious equitable concerns, but also demonstrates the breadth of the district court's theory of funding liability." *Bacon v. City of Richmond, Virginia*, 475 F.3d 633, 642 (4th Cir. 2007).

Access Living cites some case examples for its supervisory argument. Access Living Opp. at 14-15. *Armstrong* was a suit by disabled state prison inmates against California state officials for prison conditions. *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1063-4 (9th Cir. 2010). On occasion, California utilized county jails and had agreements with and statutory authority over counties to "house[] prisoners and parolees in county jails." *Id*. The court held that California had an ADA obligation to the prisoners in the county jails. *Id*. at 1066-69. *Armstrong* is not close: a penal system is not the same as hundreds of independently owned, operated, and managed housing units. In contrast to California, the City does not house any persons in any of the housing units; indeed, it has absolutely no interaction with the tenants or potential tenants concerning the housing. City SOF, ¶¶ 45-46, 48-50, 52-56. At most, the City's MOPD department can provide lists of the actual housing providers that persons can contact, no different than any online or news resource.

City SOF, ¶ 51.  There is no evidence that the City is a necessary actor in the landlord/tenant relationships.

*Armstrong* highlights the stark differences here.  In *Armstrong*, the State had a job: house prisoners.  It was a government function of California's penal system.  Needing assistance in performing this job, California, enlisted the help of the counties.  ADA Title II and Section 504 may extend to this situation.  *See Ashby v. Warrick Cnty. Sch. Corp.*, 908 F.3d 225, 232 (7th Cir. 2018) ("a governmental entity cannot avoid its obligations under the statute by ceding its governmental functions to private entities.").  Here, however, there is no evidence that it was the City's job to build or place people in affordable housing: it was the City's job to provide gap funds or tax credits.  The City is a municipal government, it is not a housing authority or residential landlord, nor did it decide (at some point long ago) to be one.  So, when the City provides gap funding or tax credits to third party owners or developers, it is not enlisting the services of these third parties to carry out the City's non-existent mission to operate a housing program.  It is simply fulfilling its job to provide gap funding or tax credits.  For similar reasons, Access Living's reliance on *Disability Advocates* and *Henrietta* is misplaced because the defendants had a benefits system in place, were required to implement that system, provided those benefits by utilizing other actors, and plaintiffs were suing over those specific benefits.  *Disability Advocs., Inc. v. Paterson*, 598 F.Supp.2d 289, 313, 317 (E.D.N.Y. 2009) ("Defendants are obligated under State law to develop a 'comprehensive, integrated system of treatment and rehabilitative services for the mentally ill.'"); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 266 (2d Cir. 2003) (State of New York oversaw

its benefits system but tasked county districts to administer the benefits, and, under New York law, State was "required to 'supervise all social services work.'").[6]

    *Hunter* and *Independent Living* are not persuasive for similar reasons: both cases were decided at the motion to dismiss stage without the benefit of a factual record. *Hunter v. D.C.*, 64 F.Supp.3d 158, 163 (D.D.C. 2014); *Indep. Living Ctr. of S. California v. City of Los Angeles*, No. CV1200551SJOPJWX, 2012 WL 13036779, at *1 (C.D. Cal. Nov. 29, 2012). *Ashby* all but forecloses the possibility of a program determination at this early stage in view of its fact-specific analysis. *Ashby v. Warrick Cnty. Sch. Corp.*, 908 F.3d 225, 234 (7th Cir. 2018). Moreover, the allegations of *Hunter* and *Independent Living*, which had to be accepted as true, suggested a much different relationship between the public entities and the third parties than what the evidence shows in this case. *Hunter on behalf of A.H. v. D.C.*, 64 F.Supp.3d 158, 163 (D.D.C. 2014) (allegation that D.C. provides services to at-risk or homeless persons, D.C. owned shelters, and contracted with a third party to manage the shelters); *Indep. Living Ctr. of S. California v. City of Los Angeles*, No. CV1200551SJOPJWX, 2012 WL 13036779, at *1 (C.D. Cal. Nov. 29, 2012) (allegation that defendants used "money to 'acquire property [for], finance, operate, build, or substantially alter' units").[7]

---

[6] To the extent Access Living relies on language in *Henrietta* regarding a contract analogy to find a duty to supervise, it should not apply. Access Living Opp., at 15 (citing *Henrietta*, 331 F.3d at 286). This aspect of *Henrietta* has never been followed by the Seventh Circuit or any District Court in the Seventh Circuit. Moreover, it conflicts with *Bacon*'s rejection of funding liability, which *has* been followed by the Northern District of Illinois. *McDaniel v. Bd. of Educ. of City of Chicago*, 9567 F.Supp.2d 887, 898-99 (N.D.Ill. 2013) (citing *Bacon v. City of Richmond*, 475 F.3d 633, 642 (4th Cir. 2007).

[7] Access Living also relies on the regulations under Section 504 and ADA Title II, *see* Access Living Opp., at 13-14 (citing 24 C.F.R. § 8.4(b)(1)(v) and 28 C.F.R. § 35.130(b)(1)). These regulations set forth the framework for how to comply with the law in the presence of a program. *See* 24 C.F.R. § 8.4(b)(1) ("A recipient, in providing any housing, aid, benefit, or service in a program or activity…"). Because the City does not run a housing program, these regulations are inapplicable. Access Living assumes the regulations applied without establishing that foundation.

## C.   The City's Alleged Control

While not disputing that the City does not own, operate, or manage any of the housing, (Access Living Resp. to City SOF ¶¶ 45-46, 48-50, 52-56), Access Living argues that there is still a disputed fact issue regarding the City's control over the housing.  Access Living, Opp. at 18-20. It relies on (1) the City's role in the construction or rehabilitation process to approve permits, and (2) the City's agreements with owners or developers. *See* Access Living, Opp. at 18 (citing SOAF, ¶¶ 13-17, 19-20, 24-25, 28, and 32).  Neither of these things are legally significant.

### 1.   The City's Regulatory Role to Issue Building Permits Is A Red-Herring

The City, like other cities across the country, has a building department that must grant permits in order for buildings to be constructed.  City SOF, ¶ 35, 44.  Access Living takes this rather unremarkable fact and tries to elevate it to the level of the City being in some sort of partnership with the various third parties.  Access Living Opp., at 19.  For example, Access Living tries to convince the Court that Christopher Zafiris, an employee with the City, was working with the developers in an "active partnership" to get the housing built.  Access Living Opp., at 7; SOAF, ¶ 25; City Resp. to SOAF, ¶ 25. This is wholly unsupported.  If accepted, this would mean that the City's building department was in active partnership with restaurants, movie theaters, stadiums, libraries, etc… whenever any third party came to the City for a building permit.  Accordingly, Access Living's argument that the City bore some level of control over the third party owners or developers by way of its regulatory permitting role is insignificant.[8]

---

[8] The City does reference this regulatory role in its SOF, *see e.g.*, SOF, ¶ 35, but only to provide the Court with a full picture so the Court can make its determination under *Ashby*'s fact-intensive standard.  However, while it is a fact, the City's regulatory role is not legally significant to a program determination.

Access Living does not disagree with this principle, but ignores it, falling back on its circular argument that there was a public housing program run by the City. Access Living Opp., at 19-20. As repeatedly stated, the City did not create or run an affordable housing program, nor is it a housing authority. It provided the last piece of funding through gap funding or tax credits to independent third parties who actually planned, owned, operated, and managed the housing. City SOF ¶¶ 24, 27, 30, 45-46, 48-50, 52-56. It did not enlist the help of various third parties to do a job (*i.e.* be landlord to hundreds of housing developments) that it otherwise did not want to do for itself. *See Schwarz v. The Villages Charter Sch., Inc.*, 165 F.Supp.3d 1153, 1181 (M.D. Fla. 2016), *aff'd sub nom. Schwarz v. Bd. of Supervisors on behalf of Villages Cmty. Dev. Districts*, 672 F. App'x. 981 (11th Cir. 2017) (granting summary judgment for lack of a program where there was no evidence that defendant contractually delegated responsibility for a program that it otherwise would have been responsible for itself).

### 2. The Funding Agreements Do Not Give Rise to Liability

Access Living's reliance on language in the funding or tax credit agreements (*i.e.*, anti-discrimination, right of inspection, and remedy) does not dictate a contrary result. In the City's Memorandum, it cited to the analogous situation where a housing authority contracts with private property owners to provide rental payments for Section 8 tenants. City Memo., at 10-11. Under these analogous circumstances, courts have held that issuance of funding for private housing does not trigger liability under Section 504 and ADA Title II for failure to ensure access to accessible housing. City Memo., at 10-11. The same provisions in the agreements that Access Living highlights in its SOAF are also present in the Section 8 context. For example, private property owners are subject to inspections by the housing authority. *See Liberty Res., Inc. v. Philadelphia Hous. Auth.*, 528 F.Supp.2d 553, 559 (E.D. Pa. 2007) ("PHA inspects the unit premises for compliance with HUD standards). Further, pursuant to federal regulations, the agreements that a

housing authority enters into with a private owner include provisions prohibiting discrimination, subjecting the properties to routine inspection, and granting housing authorities remedies to address noncompliance, closely analogous to the loan or regulatory agreements here. *See* 24 C.F.R. § 982.162 (use of HUD-required contracts);[9] 24 C.F.R. § 982.452 (setting forth landlords' responsibilities, including complying with equal opportunity requirements); 24 C.F.R. § 982.53 (defining equal opportunity to include prohibition against discrimination); 24 C.F.R. § 982.405 (inspections required by PHA); 24 C.F.R. § 982.404(a)(2) (listing the housing authorities' remedies when units fail to comply with HUD standards). Despite all of these standard contractual mechanisms, courts have repeatedly rejected claims alleging failure to ensure accessible housing in the Section 8 voucher context. *See Louis v. New York City Hous. Auth.*, 152 F.Supp.3d 143, 153 (S.D.N.Y. 2016) ("benefits of the Section 8 program administered by NYCHA do not include the provision of housing or the modification of common use portions of private buildings"); City Memo., at 10-11.

Courts have rejected claims based on alleged failure to ensure accessibility in the presence of standard contractual mechanisms in other contexts as well. For example, *Wright v. Bd. of Commissioners of Cap. Area Transit Sys.*, 551 F.Supp.3d 607, 614 (M.D. La. 2021), which the City cited in its Memorandum (City Memo., at 10), also involved the presence of an agreement. The city/parish entered into an operating agreement with the transit system that permitted the transit system to install bus stops and shelters on land owned by the city/parish. *Wright v. Bd. of Commissioners of Cap. Area Transit Sys.*, 551 F.Supp.3d 607, 614 (M.D. La. 2021). The operating agreement (like the loan/regulatory agreements here[10]) defined the rights and duties of the parties

---

[9] The standard contract is published by HUD. https://www.hud.gov/sites/dfiles/OCHCO/documents/52641ENG.pdf
[10] The City also cited to the agreements as they delineate that the third parties own, manage, and operate the housing and that the City disclaims any relationship with the third parties. City SOF, ¶¶ 22-24. Without citation to any

and contained a general provision requiring the transit system to abide by "all applicable federal and state laws." *Id.* at 614. Yet, the fact that the city/parish had contractual rights (and even owned the land) did not alter the court's conclusion that the city/parish was not responsible for accessibility compliance of the bus stops. *Id.* at 615.

Accordingly, the fact that the loan and regulatory agreements contain anti-discrimination language and rights of inspection does not render the City liable for the accessibility claims raised here. To hold otherwise would result in public entities being guarantors and discourage public entities from agreeing to contracts with any limitations, lest a public entity be judicially entangled into a third party's program. As referenced in the City's Memorandum (City Memo., at 11), the Department of Justice's Supplement to the ADA Title II Technical Assistance Manual affirms the fundamental point that a public entity may contract with a private entity for the leasing of inaccessible space without entangling the public entity into the programs of the private entity.[11] Access Living completely ignores the City's citation to the Manual, arguing instead that if the same public entity chose to insert anti-discrimination and right of access provisions into its lease, then the public entity would be liable for the private entity's operations because contractual rights create a program. Access Living fails to cite a single case to support this view, and the Court should reject its arguments on this point.

### D. Access Living Concedes It Is Not Challenging The Funding or Tax Credit Process

Access Living misunderstands the City's argument at Section II.D. of its Memorandum which points out an obvious problem: Access Living's ADA Title II and Section 504 claims ignore

---

authority, Access views these provisions as irrelevant. Access Living Opp., at 16 n. 5. Yet, Access Living tries to rely on other provisions (anti-discrimination and right to inspect) for its argument, all while accusing the City of improperly doing the same.

[11] Americans with Disabilities Act, Title II Technical Assistance Manual 1994 Supplement, available at https://archive.ada.gov/taman2up.html

what the City does and instead are premised on a conception of the City operating a housing program, which is not factually or legally true.[12] Access Living argues that the City runs a housing program, with the benefit of this program being: accessible housing. But, what the City actually does is provide gap funding or tax credits, the benefits of which are: gap funds and tax credits. As the City stated in its Memorandum, to the extent the funding or tax credit process was deemed a program, Section II.D.'s purpose was to clarify that Access Living lacked standing or was otherwise unqualified to assert some denial of the City's funding or tax credits. *See* City Memo., at 13-14. Access Living concedes it is not seeking to bring a claim for denial of the funding or tax credits process (*see* Access Living Opp., at 22). Given this concession, the Court can comfortably dismiss Access Living's ADA Title II and Section 504 claims without hesitation that there might be anything left.

## III.    ADA and Section 504: Non-Federal Funding

On alternative grounds, the City moved for summary judgment to the extent that Section 504 and ADA Title II, and their respective accessibility standards, do not apply to non-federally funded developments. City MSJ at ¶ 2; City Memo., at 15-18. Of the 517 developments on the Stipulated List, approximately 28% are not listed as receiving federal funding. *See* City SOF, ¶ 6. Access Living would have this Court retroactively declare that non-federally funded buildings built potentially decades ago were, in fact, subject to different standards.

### A.    Section 504

Access Living does not challenge the City's argument that tax credits or any of the other types of funding noted in the City's Memorandum (at p. 15-16) are not considered federal financial

---

[12] Judge Dow's Opinion on the motion to dismiss and the City's arguments on standing have no bearing on the City's Motion for Summary Judgment. *Cf* Access Living Opp. at 22. At the motion to dismiss stage, the City did not argue the absence of a housing program, and the Court necessarily presumed, for the purposes of a motion to dismiss, that there was a housing program. *See generally*, Dkt. No. 35

assistance under Section 504.  *See* Access Living Opp., at 23-24.  Instead, Access Living relies on *T.S. by & through T.M.S. v. Heart of CarDon, LLC*, 43 F.4th 737 (7th Cir. 2022) to argue that Section 504 applies without the presence of federal financial assistance.  Access Living Opp., at 23-24.

*T.S.* concerned the interpretation of the Section 504 as it applies to entities providing healthcare.  *Id* at 742 (citing definition of Section 504 relating to "business of providing … health care").  *T.S.* is inapplicable because Section 504, as it applies to local governments, is different.  In *Schroeder*, the Seventh Circuit held that the definition under Section 504 "was not intended to sweep in the whole state or local government." *Schroeder v. City of Chicago*, 927 F.2d 957, 962 (7th Cir. 1991).  Accordingly, "every program of an entire governmental entity, such as a municipality, is not regulated because some other program or division receives financial assistance.  Rather, section 504 continues to regulate each department, agency or similar instrumentality of the local government only if that instrumentality receives federal financial assistance." *Winfrey v. City of Chicago*, 957 F. Supp. 1014, 1024 (N.D. Ill. 1997) (citing *Schroeder v. City of Chicago*, 927 F.2d 957, 962 (7th Cir. 1991)); *see also Knowlton v. City of Wauwatosa*, No. 20-CV-1660, 2023 WL 2480353, at *8 (E.D. Wis. Mar. 13, 2023) (reasoning the same under Title VI).  Accordingly, that some other properties received federal financial assistance does not sweep in the properties that did not.  When concerning local governments, Section 504 does not apply so bluntly.

## B.    ADA Title II

Access Living appears to fault the City for relying upon 28 C.F.R. § 35.151.  Access Living Opp., at 26.  It is unclear why Access Living would view 28 C.F.R. § 35.151 to be unimportant given that it is cited and relied upon in the Complaint, *see* Compl., ¶ 66, and Access Living does not dispute that the housing is a "facility," *see* Access Living Opp., at 25-27.  It is appropriate for

this Court to consider 28 C.F.R. § 35.151.  As for construing 28 C.F.R. § 35.151, the Court should reject Access Living's reading of the regulation.

Access Living does not argue that the housing was constructed or altered *by* the City and so concedes the point.  *See* Opp. at 26-27; 28 C.F.R. § 35.151(a)(1), (b)(1).  As for the "on behalf of" part, Access Living (like the City) cites to Black's Law Dictionary definition: "in the name of, on the part of, as the agent or representative of."  Black's Law Dictionary (11th ed. 2019).  Access Living does not add any new authority on this point.[13]  Instead, it reiterates its belief that the City created a housing program (it did not), and then offers the wholly unsupported speculation that many of the buildings "likely exist only because of the City" (Access Living Opp., at 26-27).  As for "use," Access Living cites to Black's Law Dictionary for the incorrect term "beneficial use." Access Living Opp., at 27.  It is unclear why this other term has any bearing on the term "use" in 28 C.F.R. § 35.151.  In any event, Access Living again stretches its conclusions beyond supported facts to say that a jury could determine that the City uses the housing because of some excerpted language from a document regarding DOH funding.  Access Living Opp., at 27 (citing SOAF, ¶ 11).  Access Living makes this more complicated than it needs to be.  There simply is no evidence that the City uses the housing.  *See* City Memo., at 18;  *Cf. Cnty. of Livingston v. PSA-Dewberry, Inc.*, No. 19-CV-01334-JES-JEH, 2023 WL 5962079, at *1 (C.D. Ill. Sept. 13, 2023) (county filing indemnification lawsuit against its architects in response to ADA Title II violations at the county's courthouse).

---

[13] Access Living also cites to Black's Law Dictionary definition for "in behalf of" but it is unclear why.  The phrase "in behalf of" is not in the regulation.  Access Living Opp., at 26; 28 C.F.R. § 35.151.

## IV. FHA

Access Living argues that the Fair Housing Act ("FHA") is broad and encompasses the City here. Access Living relies on two provisions of the FHA: §3604(f)(2) (relating to "discrimination in the provision of services or facilities") and §3604(f)(3)(C) (relating to design and construction). Access Living Opp., at 27-28. Neither provision applies to the City here.

### A. §3604(f)(2)

In contrast to its §3604(f)(2) argument, Access Living devotes a significantly larger portion of its Opposition to arguing under §3604(f)(3)(C). Access Living. Opp., at 30-34. It is not clear what allegations Access Living relies upon for its §3604(f)(2) argument, and it appears that Access Living only targets the City's alleged role in design and construction process. Access Living Opp., at 28. Conceding that the City does not own, operate, or manage any of the housing, Access Living argues that the City need not do this for it to be subject to the FHA's provision of "services or facilities" subsection. Access Living Opp., at 29. Access Living relies on cases involving zoning and permit issues (Access Living Opp., at 29),[14] but these cases are not applicable because there is no allegation that the City unlawfully withheld a zoning or other permit or denied a reasonable accommodation (like the cases cited) to issue a land use permit. *See e.g.*, *United States v. City of Chicago Heights*, 161 F.Supp.2d 819, 833 (N.D. Ill. 2001) (determining whether the city should have awarded a special use permit as a reasonable accommodation). Indeed, the existing housing on the Stipulated List necessarily had to receive permits. *See* City SOF, 44.

---

[14] The only case that does not concern an alleged discriminatory denial of a permit is *Alliance for Mentally Ill v. City of Naperville*, 923 F.Supp. 1057, 1078-79 (N.D. Ill. 1996), which Access Living parenthetically notes relates to discriminatory enforcement of a life safety code. Access Living Opp., at 29. *Alliance*, however, was abrogated by *Hemisphere Bldg. Co. v. Vill. Of Richton Park*, 171 F.3d 437 (7th Cir. 1999), for the very issue that Access Living cites. *Id.* at 441 ("We thus disapprove the district court cases in this circuit which have held that a city must, if requested by a handicapped person, waive its requirements for the installation of sprinklers because the requirements make homes more expensive for the handicapped—as for everyone.") (citing *Alliance*, 923 F.Supp. at 1078).

## B.     §3604(f)(3)(C)

The express language of the FHA which exempts governmental entities, like the City, from a design or construction claim. City Memo., at 19-20. In addition, there is no evidence that the City acted as a developer. *Id.* In its response, Access Living relies on a ream of cases which it argues makes the FHA's design and construction subsection applicable to the City. There is a simple reason why these cases do not apply: all of these cases relate to claims against *private* parties (architects, builders, engineers, and owners), whereas the FHA expressly exempts the City in its role here. *See* Access Living Opp., at 30-34; *United States v. Tanski*, No. 1:04-CV-714, 2007 WL 1017020, *1 (N.D.N.Y. Mar. 30, 2007); *United States v. Taigen & Sons, Inc.*, 303 F.Supp.2d 1129, 1132 (D. Idaho 2003); *Monta Fair Hous., Inc. v. Am. Cap. Dev., Inc.*, 81 F.Supp.2d 1057, 1059 (D. Mont. 1999); *Baltimore Neighborhoods, Inc. v. Rommel Builders, Inc.*, 3 F.Supp.2d 661, 662 (D. Md. 1998); *Doering v. Pontarelli Builders, Inc.*, No. 01 C 2924, 2001 WL 1464897, *1 (N.D. Ill. Nov. 16, 2001); *United States v. Hartz Construction Co.*, No. 97 C 8175, 1998 WL 42265, *1 (N.D. Ill. Jan. 28, 1998). Simply put, the City's ordinary task to issue building permits (as cities across the country do all the time) does not make the City a development partner. The City is not a general contractor or developer. It does not construct or hire any contractors to construct the housing and does not design any of the housing or hire any architects to do so. City SOF, ¶¶ 40-42.

Though failing to cite a single case involving a §3604(f)(3)(C) claim against a governmental entity, Access Living disagrees with the City's citation to a case that actually involves a governmental entity, *Independent Living*, because that case was decided on a motion to dismiss and involved more narrow allegations. Access Living Opp., at 33. Access Living misreads *Independent Living*. The court in *Independent Living* dismissed the FHA claim against the governmental entities in the face of allegations that the defendants acquired, financed, operated,

built, and altered housing units—allegations of far more involvement than what the evidence shows of the City's involvement here. *Indep. Living Ctr. of S. California v. City of Los Angeles*, No. CV1200551SJOPJWX, 2012 WL 13036779, at *1 (C.D. Cal. Nov. 29, 2012).

## V.      Statute of Limitations

Access Living agrees that its claims are subject to a two-year statute of limitations. Access Living Opp. at 34. But it relies on the continuing violations doctrine in an effort to save its case which purports to stretch back three decades. Access Living relies on factually irrelevant cases and cases contrary to the Seventh Circuit's articulation of the continuing violation doctrine for its argument. The statute of limitations applies here.

First, Access Living's request that the Court ignore everything at summary judgment and essentially reaffirm Judge Dow's Opinion on the Motion to Dismiss should be rejected. Access Living Opp., at 34. Judge Dow's Opinion was driven by the principle that a statute of limitations argument is generally inappropriate for resolution at the pleading stage. *See* Dkt. No. 35. This is not the current posture of the case.

Second, Access Living's reliance on *Nat'l Fair Hous. All. v. A.G. Spanos Const., Inc.*, 542 F.Supp.2d 1054, 1062 (N.D. Cal. 2008) and *Nat'l Fair Hous. All., Inc. v. HHHunt Corp.*, 919 F.Supp.2d 712, 717 (W.D. Va. 2013) does not supplant Seventh Circuit law and the principle that separate torts have their own period of limitations. *Deibel v. Hoeg*, 998 F.3d 768, 771 (7th Cir. 2021). Further, an alleged failure to fix something that occurred in the past (such as inaccessible construction for which the City is allegedly responsible) is not a proper basis to evade the statute of limitations. The Seventh Circuit has staked out a position in the law different from the cases relied upon by Access Living. *See United States v. Midwest Generation, LLC*, 720 F.3d 644, 648 (7th Cir. 2013) ("enduring consequences of acts that precede the statute of limitations are not independently wrongful"); *see also Bridewell v. Eberle*, 730 F.3d 672, 678 (7th Cir. 2013) ("The

idea that failing to reverse the ongoing effects of a tort restarts the period of limitations has no support in Illinois law—or in federal law either.").  Access Living's reliance on *Woody v. City of Granite City, Illinois*, No. 17-CV-534-SMY-RJD, 2019 WL 1326884, at *5 (S.D. Ill. Mar. 25, 2019) and its reference to a "fresh violation" (Access Living Opp., at 37), is unpersuasive because "the refusal to undo a violation is not a 'fresh act' of discrimination."  *Pitts v. City of Kankakee, Ill.*, 267 F.3d 592, 597 (7th Cir. 2001).

Third, Access Living's reliance on *Am. Council of Blind of Metro. Chicago v. City of Chicago*, No. 19 C 6322, 2023 WL 2744596, at *1 (N.D. Ill. Mar. 31, 2023) ("*ACBMC*") is both improper and emblematic of Access Living's mistaken view.  *See Access Living Opp.*, at 36-38. *ACBMC* involved claims that Chicago's pedestrian signalized intersections were inaccessible.  *Id.* at *1-3.  In *ACBMC* there was no dispute that Chicago owned, maintained, and controlled its signalized intersections.  *Id.* at *6 (arguing that Chicago failed to make its pedestrian signals accessible by installing accessible pedestrian signals).  *ACMBC* was a clear case of a city having control or involvement over the thing alleged to be inaccessible.  The *ACMBC* court's analysis does not support application of the continuing violation theory in this case, and highlights a broader problem with Access Living's view: *i.e.*, Access Living incorrectly presumes that the City holds the keys to 517 housing developments, and so it is the job of the City to fix them.  *See* City Memo., at 23-24 (citing cases rejecting the continuing violation doctrine where defendant was not involved following construction).  The 517 housing developments, which are owned, managed, and operated by multiple third parties are distinctly not like the sidewalks at issue in *ACBMC*.

Finally, while apparently focusing on its injunctive relief, Access Living does not address the statute of limitations as it applies to its damage claim.  Access Living seeks damages going back to 2008.  City SOF ¶ 62; Access Living Resp. to City SOF, ¶ 62.  The two-year statute of

limitations applies to bar Access Living from seeking damages prior to May 13, 2016.  *See ACBMC*, 2023 WL 2744596, at 11 (holding United States' claim for compensatory damages was limited by the statute of limitations).[15]

## VI.    Conclusion

For the foregoing reasons, the City respectfully requests that the Court grant the City's Motion for Summary Judgment and enter judgment in favor of the City and against Plaintiff Access Living of Metropolitan Chicago, Inc.  To the extent the Court does not grant summary judgment in its entirety, the City respectfully requests the Court to grant summary judgment, in part, as the Court deems appropriate, consistent with the City's Motion, Memorandum, and this Reply.

---

[15] The City also moved for summary judgment to the extent Access Living seeks to enforce various regulatory requirements.  *See* Dkt. No. 307, ¶ 5; City Memo., at 26-29.  Access Living concedes these grounds.  Access Living Opp. at 39.  In addition, Access Living's comments on violations as "evidence" can be ignored because none of the alleged regulatory violations mentioned by the City (City Memo., at 26-29) has bearing on the City's other grounds summary judgment.

Dated: December 15, 2023
Respectfully submitted,

*/s/ John C. Hansberry*

John C. Hansberry
(admitted *pro hac vice*)
Fox Rothschild LLP
500 Grant Street, Suite 2500
Pittsburg, PA 15219
Tel: 412-394-5539
JHansberry@Foxrothschild.com

Matthew S. Payne
Fox Rothschild LLP
321 North Clark Street, Suite 1600
Chicago, IL 60654
Tel: 312-517-9232
MPayne@Foxrothschild.com

Monica H. Khetarpal
Jason A. Selvey
Jackson Lewis P.C.
150 N. Michigan Avenue
Suite 2500
Chicago, IL 60601
Tel: 312-803-2529
Monica.Khetarpal@jacksonlewis.com
Jason.Selvey@jacksonlewis.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Defendant City of Chicago's Reply In Support of Motion for Summary Judgment was served via the Court's electronic filing system to all parties indicated on the electronic filing receipt this 15th day of December, 2023.

*/s/ John C. Hansberry*
John C. Hansberry