UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ACCESS LIVING OF METROPOLITAN CHICAGO, INC., | ) ) ) | |
| Plaintiff, | ) ) | No. 1:18-CV-03399 |
| v. | ) ) ) | Judge Edmond E. Chang |
| CITY OF CHICAGO, | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Access Living of Metropolitan Chicago sued the City of Chicago for alleged violations of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* (often called the ADA), Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*[1] *See* R. 1, Compl.[2] The lawsuit invokes these federal accessibility laws to challenge the City's affordable housing program as discriminating against would-be tenants on the basis of disability. The City moves for summary judgment, arguing that its affordable-housing activities do not qualify as a program or activity under the laws, so the City cannot be held liable for any of the residential buildings' shortcomings. *See* R. 307, Def.'s Mot. For the reasons explained below, summary judgment is denied.

---

[1]This Court has subject matter jurisdiction over Access Living's federal claims under 28 U.S.C. § 1331.

[2]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

## I. Background

In deciding the City's motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party, Access Living. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Since 1988, the City of Chicago has administered policies encouraging and facilitating (or at least trying to do so) the availability of affordable housing within the city limits. R. 309, DSOF ¶ 4; R. 309-1, DSOF Exh. 1. To date, the City has supported the construction and rehabilitation of over 500 residential developments, creating more than 50,000 affordable housing units. R. 313, Pl.'s Resp. to DSOF ¶ 6; R. 313-1, Pl.'s Resp. to DSOF Exh. 1, Feidt Dep. at 121, 173–74.

Each year, the City receives on average of $100 million from the United States Department of Housing and Urban Development to put towards the City's goal. R. 314-10, PSOF Exh. 37 at 19, 20. Chicago uses these funds, among other financing sources, to provide grants and loans to private developers and nonprofit organizations for building, rehabilitating, and preserving the available rental housing in the City. DSOF ¶¶ 2, 4, 6, 7; R. 27, Answer ¶¶ 2, 41–43; DSOF Exh. 1. In exchange for funding, the developers agree to provide some apartments at below market rate to tenants who meet certain income requirements. R. 309-8, DSOF Exh. 8 at 32 (PDF page number); R. 309-33, DSOF Exh. 33 at 2, 5. The Chicago Department of Housing is tasked with administering these funds. PSOF ¶ 3; R. 314-3, PSOF Exh. 30.

A developer or non-profit organization seeking Chicago Department of Housing funds for an affordable housing project must complete a Multi-Family Housing

Financial Assistance Application. PSOF ¶ 6; R. 314-4, PSOF Exh. 31. If the applicant passes this initial stage, then the loan proposal goes to the City Council for review and approval. DSOF ¶ 33; R. 309-4, Horan Dep. at 134:4–136:2. If the City Council approves the application, then the City will enter into standardized written loan and regulatory agreements with the developers, memorializing the transaction. DSOF ¶¶ 8–19, 39; R. 309-8–38, DSOF Exhs. 8–38.

The contracts obligate the City to provide the developer with funds or tax credits and, in turn, obligate the developer to comply with federal and state laws, including Section 504 and Title II of the ADA. *See* 24 C.F.R. § 92.504(a). The contracting parties (that is, the City and the respective developer) agree that the developers must document compliance with accessibility requirements, and set out remedies for non-compliance. *See* DSOF Exhs. 8–38; *see also* 24 C.F.R. § 92.504(c)(2)(iv). At the building's completion, the Chicago Housing Department must inform the federal HUD and the public that the building was inspected "and during the period of affordability … meets the … § 922.251 Property Standards," which incorporate federal accessibility requirements by reference. PSOF ¶ 18; R. 314-2, Horan Dep. at 53:1–12, 58:14–59:21.

Developers must also apply for a building permit, issued by the City's Department of Buildings. DSOF ¶ 35; R. 309-5, Ullrich Dep. at 21:7–22:6. During the permit process, the City's Mayor's Office for People with Disabilities reviews the building plan for compliance with federal, state, and local accessibility laws and standards. DSOF ¶¶ 36–37; Ullrich Dep. at 13:18–14:14, 16:1–16:19, 38:16–39:24, 85:24–87:17.

Access Living, an organization devoted to promoting independent living for Chicagoans with disabilities, alleges that, despite the City's effort to develop and maintain affordable housing units, most of these units fail to comply with federal accessibility laws (as pertinent here, the ADA, the Rehabilitation Act, and the Fair Housing Act). Compl. ¶¶ 1, 3; R. 312, Pl.'s Resp. at 7–9. In effect, the City lacks a sufficient supply of accessible, affordable housing units, leaving Chicagoans with certain disabilities unable to find affordable housing. Pl.'s Resp. at 7–9. Access Living attributes this failure in part to the City neglecting to consistently review building permits for compliance with accessibility standards. *Id.*

In 2018, Access Living sued the City of Chicago under Title II of the ADA, Section 504 of the Rehabilitation Act, and the Fair Housing Act, alleging that Chicago's failure to enforce federal accessibility requirements harms the organization by undermining the effectiveness of its services, making it more challenging and expensive for it to connect its clients with affordable, accessible housing. *See* Compl. Access Living also alleges that the City's failure to ensure that housing developments in the affordable housing scheme comply with federal accessibility requirements effectively excludes people with disabilities—Access Living's clients— from an equal opportunity to obtain affordable housing. *Id.* ¶¶ 12, 80.

Access Living seeks damages to compensate it for the injuries caused by the City's allegedly discriminatory practices. *Id.* ¶ 164. Access Living also seeks several kinds of injunctive relief. *Id.* ¶¶ 162–63. It seeks an injunction enjoining the City from providing funds or assistance for housing units that fail to comply with the federal

4

accessibility laws, from failing to bring buildings and units into compliance with the federal accessibility laws, and from failing to provide meaningful access to affordable housing for people with mobility, visual, and hearing disabilities. *Id.* And the organization seeks an injunction requiring the City to survey all affordable housing units that receive Chicago Housing Department funds to assess their compliance with the federal accessibility laws, to bring noncompliant units into compliance, to adopt policies and procedures to ensure that newly built or renovated units comply with the federal accessibility laws, and to adopt policies and procedures to ensure that owners of the City-funded affordable housing units comply with the Federal Accessibility Laws. *Id.*

Earlier in the case, Chicago moved to dismiss Access Living's complaint for lack of subject matter jurisdiction and for failure to state a claim because the complaint was untimely. R. 24, Def.'s Mot. to Dismiss. The previously assigned judge denied the motion to dismiss, finding that the complaint sufficiently alleged that the organization suffered an injury stemming from the City's actions and that it was too soon to tell whether the statute of limitations had run. R. 35, Order 03/29/2015. The City now seeks summary judgment, arguing that it does not build, own, or exercise operational control over the affordable rental housing, so it cannot be held liable under the federal accessibility laws. Def.'s Mot.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

5

matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Standing

Although the City does not re-raise its Article III standing contention on summary judgment, this Court has an independent obligation to ensure that it has subject matter jurisdiction over the cases before it. *See* R. 308, Def.'s Br.; *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). In the decision on the City's earlier motion to dismiss, the previously assigned judge found that Access Living adequately

6

alleged a concrete injury that was traceable to the actions of the City: the City's practices hindered Access Living's day-to-day operations by making it much more difficult for the organization to help place clients in accessible affordable housing. *See* Order 03/29/2015 at 7–8. Even more, the City's alleged failure to ensure compliance with the federal accessibility laws reduces the total amount of services that Access Living can provide, and that the effectiveness of those services is in turn reduced. *Id.* Nothing in the discovery record undermines this prior finding, so the Court agrees that Access Living has Article III standing. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373–79 (1982); *Common Cause Indiana v. Lawson*, 937 F.3d 944, 949 (7th Cir. 2019) (explaining the requirements an organization must satisfy to have standing to sue on behalf of its members).

**B. ADA and Section 504**

Access Living argues that the City's failure to ensure that affordable housing developments comply with the ADA and Section 504 of the Rehabilitation Act in effect excludes Chicagoans with disabilities from the affordable housing program, thus amounting to disability discrimination. Generally speaking, when it comes to disability discrimination in housing, "decades of deliberation and investigation" by Congress uncovered that "individuals with disabilities continually encounter various forms of discrimination, including … the discriminatory effects of architectural … barriers," even in housing. 42 U.S.C. § 12101 (a)(5). Congress thus enacted the Americans with Disabilities Act to address the need for a "comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Id.* § 12101(b)(1).

7

Title II of the ADA applies to public entities—like the City of Chicago—and provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* § 12132; *see also id.* § 12131(1)(b); 28 C.F.R. § 35.104.

Section 504 of the Rehabilitation Act is similarly directed at guaranteeing that "[n]o otherwise qualified individual with a disability … solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistances." 29 U.S.C. § 794(a). Section 504 requires that individuals with disabilities "be provided with meaningful access to the benefit that the grantee offers," one benefit being the "elimination of architectural barriers." *Alexander v. Choate*, 469 U.S. 287, 297, 301 (1985). The City is a recipient of federal funds under Section 504: Chicago received federal funding from HUD for the purpose of providing affordable housing for Chicagoans. *See* 24 C.F.R. §§ 8.2, 8.3. A "program or activity" under Section 504 is defined broadly, including "all of the operations of … a local government; or the entity of such … local government that distributes such assistance …." 29 U.S.C. § 794(b)(1); 24 C.F.R. § 8.3.

The focus of this dispute is whether the affordable housing scheme funded by Chicago is a "program or activity of" the City under the ADA and Section 504's requirements. The ADA and Section 504 use nearly identical language to describe the prohibited discriminatory acts, so the Seventh Circuit construes and applies them in

8

a consistent manner. *See Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). This Opinion will discuss the two standards together and rely interchangeably on cases arising under either statute. Under either statute, then, a violation occurs when (1) a qualified individual with a disability (2) was denied the benefits of the services, programs, or activities of a public entity (3) because, or on the basis of their disability. *Moore v. W. Illinois Corr. Ctr.*, 89 F.4th 582, 594 (7th Cir. 2023); 42 U.S.C. § 12132. For now, the parties only dispute the second element—whether Access Living's clients were denied the benefits of the services, programs, or activities of the City.[3]

Viewing the evidence in the light most favorable to Access Living, a reasonable jury could find that the affordable housing scheme is a "service, program, or activity" of the City. "Neither the statutory language nor the regulations" shine much light on what kinds of undertakings the statutes are meant to cover. *See Ashby v. Warrick Cnty. Sch. Corp.*, 908 F.3d 225, 231 (7th Cir. 2018). The regulations merely suggest that the scope of protection is broad, applying "to *all* services, programs, and activities provided or made available by public entities." 28 C.F.R. § 35.102(a) (emphasis added). The City explains that the affordable housing scheme cannot be a program of the City because the "presence of funds or tax credits does not impute statutory liability on the City" and, even more, the City does not operate the housing developments, both of which show (to the City's way of thinking) that the City had

---

[3]To be sure, the City says in passing that Access Living is not a "qualified" individual, but it does not develop its argument beyond stating this conclusion. *See* Def.'s Br. at 13. For this reason, the City's argument on the first element is waived. *See Gross v. Town of Cicero*, 619 F.3d 697, 705 (7th Cir. 2010).

9

intentionally *not* created an affordable housing program. Def.'s Br. at 8–12. Access Living, on the other hand, argues that the City's understanding of statutory liability is incorrect— "service, program, or activity" is meant to be interpreted broadly and cover exactly the kinds of operations like the affordable housing scheme. Pl.'s Resp. at 11–12.

The Seventh Circuit has identified two principles to help courts work out when an endeavor is a "service, program, or activity" of a government agency. First, the Seventh Circuit established that "a governmental entity cannot avoid its obligations under the statute by ceding its governmental functions to private entities." *Ashby*, 908 F.3d at 232. It follows that whether the affordable housing scheme is a "program" or "activity" will turn in part on whether the City itself is "doing, providing, or making available" the affordable housing, rather than the private developers. *Id.* Second, the Seventh Circuit recognized that the governing regulations contemplate that liability may attach to some relationships between public and private actors. *Id.* (citing 28 C.F.R. § 35.130(b)(1) (explaining that "a public entity may not discriminate on the basis of disability, directly or indirectly, such as 'through contractual, licensing, or other arrangements.'")).

The City's argument butts heads with these two observations. First, the City may not avoid liability by framing its role in the affordable housing scheme as merely providing funding and tax credits to developers in a way that blanketly absolves the City from its own duty of complying with the federal accessibility laws. The City attempts to frame its funding role as not directly "doing, providing, or making

10

available" the affordable housing to place liability directly on the developers who are more involved with the day-to-day operations of the individual developments. Def.'s Br. at 8–9. But this goes directly against the principle that the City may not "avoid its obligations under the statute by ceding its governmental functions to private entities." *See Ashby*, 908 F.3d at 232. This is *not* to say that any time a municipality provides some funding to private entities the government then becomes liable for any of the project's failures or legal violations. But here, the record evidence creates a genuine issue of fact on whether the City's funding and oversight role render it liable under the ADA and Section 504.

The City's closely related position that it cannot be held liable because it does not *directly* operate and manage the developments fares no better. To support this argument, the City explains that its contracts with the developers place property-management responsibilities on the developers. Def.'s Br. at 9–12. In this way, the City argues, the developers agree to assume compliance obligations. *See id.* The City also offers evidence that it is not involved with the oversight of the developments because it does not own any of the developments, it is not a landlord or manager of any of the developments, it is not a party to any lease agreements, nor does it receive rental payments from any of the developments' tenants *See* DSOF ¶¶ 45–56.

There are several problems with this position. First, the contracts themselves contemplate (or at the very least, a reasonable jury could so find) a general oversight or compliance obligation placed on the City by requiring that the developers comply with federal laws before receiving funding. The contracts set out, for example, that

11

the City agrees, pursuant to the Municipal Code of Chicago, to "supervise[] and coordinate[] the formulation and execution of projects and programs creating safe, decent, and affordable housing for residents of the City." *See* DSOF Exh. 33 at 2. Certain agreements even explicitly require the developers to comply with Section 504 and the ADA and permit the City to inspect the developments for compliance. *See, e.g.*, DSOF Exh. 8 § 2.27; R. 309-34, DSOF Exh. 34 § 6.01(a). The contractual relationship between the City and the developers, then, is evidence that the affordable housing scheme is a program or activity that is "made available," 28 C.F.R. § 35.102(a), by the City.

Despite the unambiguous terms of the contracts, the City insists that it makes all the difference under the federal accessibility laws that Chicago is not the owner, operator, or property manager of any of the individual developments. *See* Def.'s Br. at 9–12. The City is correct that it does not have these specified relationships with the developments and tenants. But the City cannot simply "ced[e] its governmental functions," *Ashby*, 908 F.3d at 232—ensuring compliance with the federal accessibility laws—to the developers.

Indeed, the City has a regulatory obligation to ensure that the private developers comply with the federal accessibility laws. For example, the receipt of certain federal funds requires recipients of federal funds (in this case, the City) to comply with program requirements and to monitor subcontractors for such compliance. *See* 24 C.F.R. §§ 92.219(b)(2)(iii), 92.504(a). This includes, among other things, an obligation that recipients inspect each project for compliance with the federal accessibility

laws and other property standards, both upon completion of the building and also periodically during the rental property's affordability period to ensure ongoing compliance. *See* 24 C.F.R. §§ 92.504(d), 92.251. Similarly, the ADA Title II regulation requires accessibility in facilities newly constructed or rehabilitated "by, on behalf of, or for the use of a public entity." 28 C.F.R. § 35.151(a)(1). If recipients of federal funds could evade liability by simply placing the burden on third-parties with which the recipient enters into a contract, then the statutes would lose much of their force.

What's more, if the jury finds that the affordable housing scheme is a program or activity of the City, then the program in its entirety must comply with the federal accessibility laws—even those developments that do not directly receive federal funds via the City. The analysis under the ADA is straightforward. The developments must comply with the ADA because a public entity—the City—is providing the service or program. 42 U.S.C. § 12131(2) (qualified individuals participate in the "programs or activities provided by a public entity").

Compliance with Section 504 warrants more discussion. Even though certain developments do not receive federal funds, the entire program must comply with Section 504 because the statute defines "program or activity" as "all of the operations" of the funding recipient. 29 U.S.C. § 794(b)(1); 24 C.F.R. § 8.3; *see Schroeder v. Chicago*, 927 F.2d 957, 962 (7th Cir. 1991) (explaining that "program or activity" is intentionally broad). So the City need not determine which individual buildings must comply with Section 504—because *all* of the buildings that are part of the City's "program" are swept up under Section 504's purview.

13

In sum, a jury must decide whether the City's affordable housing scheme is a qualifying "program" or "activity" of the City and, if so, the jury must determine whether Access Living was denied the benefits of the program or activity.

### C. Fair Housing Act

Access Living raises a similar claim for discrimination under the Fair Housing Act. The Fair Housing Act makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap …." 42 U.S.C. § 3604(f)(2). Discrimination under the Housing Act includes "a failure to design and construct those dwellings in such a manner that … [they] are readily accessible to and usable by handicapped persons … [and] contain [specified] features of adaptive design." 42 U.S.C. § 3604(f)(3)(C).

In this case, the parties dispute whether the City could be held liable under the Fair Housing Act. Access Living argues that the City is a central participant in the design and construction process, especially through the permit-review process, and is thus responsible for discrimination in the construction of the housing developments. *See* Pl.'s Resp. at 27–34. But the City maintains that the third-party developers are, in fact, the parties responsible for the design and development of the housing. *See* Def.'s Br. at 18–20.

Based on the evidence presented, and viewing the evidence in Access Living's favor for now, a reasonable jury can find that the City must comply with the Housing Act because of Chicago's role in the design and construction of the affordable housing

14

developments. Remember that the Housing Act's prohibitions are not directed at a specific actor. Instead, the prohibitions ban an outcome without requiring "who the actor is, or how such actors" discriminate against potential tenants. *See N.A.A.C.P. v. Am. Fam. Mut. Ins. Co.*, 978 F.2d 287, 298 (7th Cir. 1992) (emphasis omitted). And the Housing Act should be interpreted broadly. *See Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972). Under those principles, it is reasonable to hold that the City, in its role providing funding for the housing developments, approving the construction and rehabilitation of the developments, and its contractual obligation to ensure that the developments comply with federal law "discriminate[d] against [a] person in the … conditions … of sale or rental of a dwelling" by its "failure to design and construct those dwellings in such a manner that … [is] readily accessible to and usable by handicapped persons." 42 U.S.C. § 3604(f)(2), (f)(3)(C). At the very least, a reasonable jury could so find.

The City contends that "the responsibility of complying with the provisions of the FHA would fall solely on the person actually responsible for the property." Def.'s Br. at 20 (citing *Indep. Living Ctr. of S. California v. City of Los Angeles*, 2012 WL 13036779, at *9 (C.D. Cal. Nov. 29, 2012)). But the evidence presented here gives rise to a question of fact on whether the City is responsible for the property based on the City's extensive role in the affordable housing scheme. *Am. Fam. Mut. Ins. Co.*, 978 F.2d at 298; *see also Oconomowoc Res. Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 782, 787 (7th Cir. 2002) (finding a municipality liable for a discriminatory denial

15

of a zoning permit for a group home even though the municipality did not own, operate, or manage the housing). Summary judgment on this claim too is denied.

### D. Statute of Limitations

Next, the City argues that the statute of limitations extinguishes many developments from forming the basis of the claims. But a reasonable jury can find that the statute of limitations did not expire because the City has engaged in a pattern of discrimination in its affordable housing scheme, so much so that there is a continuing violation of the federal accessibility laws. The City argues that each of Access Living's claims are untimely because Section 504, the ADA, and the FHA are subject to a two-year statute of limitations. Def.'s Br. at 20–21; 42 U.S.C.§ 3613(a)(1)(A) (FHA); *see also Cheeney v. Highland Cmty. College*, 15 F.3d 79, 81 (7th Cir. 1994) (applying two-year statute of limitations to ADA and Section 504 from Illinois's personal injury statute); 735 ILCS 5/13-202. Access Living concedes that the statute of limitations under each statute is two years but argues that its claims are timely because it is experiencing continuous discrimination under the "continuing violations exception." Pl.'s Br. at 34–38.

The continuing-violations exception tolls the statute of limitations for certain claims if the plaintiff can prove that otherwise time barred actions are related to actions occurring within the limitation period. *See Havens Realty Corp.*, 455 U.S. at 380–81. The plaintiff instead has until two years after the "last asserted occurrence of [the discriminatory] practice." *County of Cook v. Bank of America, Corp.*, 181 F. Supp. 3d 513, 520 (N.D. Ill. 2015) (quoting *Havens Realty Corp.*, 455 U.S. at 380–81)).

16

The doctrine recognizes that certain claims are more like a "persistent process of illegal discrimination" rather than a discrete, completed discriminatory act. *See Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 265 (7th Cir. 1996).

The Seventh Circuit currently recognizes a continuing-violations exception for Housing Act discriminatory-practice claims but has yet to apply the exception to ADA or Section 504 claims. 42 U.S.C.§ 3613(a)(1)(A) (explaining that a Housing Act civil enforcement action must be filed "not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice"). Given the similarity of the statutes and the close relationship of the claims, and consistent with other district courts, this Court will apply the exception to the ADA and Section 504 claims. S*ee, e.g., Deck v. City of Toledo*, 56 F. Supp. 2d 886 (N.D. Ohio 1999) (ADA); *D.G. v. Somerset Hill Sch. Dist.*, 559 F. Supp. 2d 484 (D.N.J. 2008) (Rehabilitation Act).

Access Living has presented sufficient evidence to create a jury issue on whether the City has engaged in a "pattern" of discrimination. Access Living has declared that it is not challenging the continual ill-effects arising from a single (or multiple) *past* violation. *See Tyus*, 102 F.3d at 265–266. Instead, Access Living is challenging the City's *ongoing* failure to comply with and enforce the federal accessibility laws. *See* Compl. at ¶¶ 1–2, 6–12; R. 33, Pl.'s Resp. Mot. to Dismiss at 12; Pl.'s Resp. at 34. This distinction is important. If Access Living were to claim that it—or its clients—were suffering the ongoing *effects* of non-compliant housing, like a building having a defective elevator, much of the claim would likely not fit the continuing-*violations* exception. *See Bank of America*, 181 F. Supp. 3d at 520 (citing *Havens*

17

*Realty Corp.*, 455 U.S. at 380–81)). But alleging that there is an ongoing, systemic failure of the City to fulfill its contractual and statutory obligations is something altogether different. This kind of failure is ongoing and not a single isolated incident. *See id.* And each day brings with it a renewed violation of the laws because the City continues not to perform its statutory duties (or so the liability theory goes). The statute of limitations issue must be decided at trial as well.

### E. Private Right of Action

Access Living has a private right of action to sue the City under each of the federal accessibility laws. "[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). To determine whether a statute creates a private cause of action, "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.*

The City does not actually contest that each of the federal accessibility laws contains a private right of action. *See* Def.'s Br.; R. 318, Def.'s Reply. Instead, the City argues that Access Living sued under the laws to enforce the underlying regulations, and not to obtain the respective statutory remedies. Def.'s Br. at 26–29. The City misreads the Complaint. Access Living cites the regulations to provide the context and the definitions needed to apply the statutory provisions. Access Living does not, as the City believes, ask the Court to enforce the regulations that Access Living cites. *See, e.g.*, Compl. ¶ 27 (citing 28 C.F.R. § 35.149 to explain prohibited discrimination under Title II of the ADA, 42 U.S.C. § 12132).

18

Here, each statute supplies a cause of action and Access Living falls within the intended class of plaintiffs of each statute. *See Sandoval*, 532 U.S. at 286. For the reasons explained earlier in this Opinion, Access Living presents sufficient evidence that it is a "person alleging discrimination on the basis of disability" under Title II of the ADA. 42 U.S.C. § 12133; a "person aggrieved" within the meaning of Section 504, 29 U.S.C. § 794a(a)(2); and an "aggrieved person" authorized to file suit and seek relief against the City under the Fair Housing Act, 42 U.S.C. §§ 3602, 3612–13. PSOF ¶¶ 38, 40; R. 314-27 Feidt Dep. at 197:24–198:22, 292:2–13. Access Living thus has a cause of action under each statute to bring its claims. *See Sandoval*, 532 U.S. at 286.

## IV. Conclusion

The City's motion for summary judgment is denied. The remaining disputes for the jury are, at the least: (1) how the facts apply to the definitions of "program" or "activity" to trigger the application of the federal accessibility laws; (2) whether the City's involvement in design and construction triggers the obligations under the Fair Housing Act; and (3) whether the continuing-violations exception applies to set the proper statute of limitations. The Court also orders the parties to engage in settlement negotiations. If negotiations stall or falter, then the Court will set a trial schedule. During pretrial litigation, the Court will ask the parties to address whether the Court is bound for purposes of injunctive relief by any jury decision on liability; and what the damages presentation at trial would entail. For now, though, the parties shall engage in good-faith settlement negotiations. It would seem that both sides would want to minimize the risks and delay of further litigation, and indeed the City

19

naturally should want to fashion an affordable housing "program" (whether in statutory or non-statutory terms) that promotes compliance with the federal accessibility laws. The parties shall file a status report, on or before November 4, 2024, on the status of negotiations and the proposed next step of the litigation.

ENTERED:

      s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 30, 2024